IN THE FIRST JUDICIAL DISTRICT COURT, COUNTY OF SANTA FE
STATE OF NEW MEXICO

FILED
1st JUDICIAL DISTRICT COURT
Santa Fe County
5/29/2019 11:40 AM
STEPHEN T. PACHECO
CLERK OF THE COURT
Tamara Snee

| | |
|---|---|
| THE STATE OF NEW MEXICO, ex rel. HECTOR BALDERAS, ATTORNEY GENERAL, | §<br>§<br>§<br>§ |
| Plaintiff, | §<br>§ |
| v. | §<br>§ |
| MONSANTO CO., SOLUTIA, INC., and PHARMACIA LLC, | §<br>§<br>§<br>§ |
| Defendants. | §<br>§ |

No.: D-101-CV-2019-01445

Case assigned to Biedscheid, Bryan

**COMPLAINT WITH JURY
DEMAND**

Exhibit 1

# TABLE OF CONTENTS

I.    INTRODUCTION .................................................................................. 1

II.   JURISDICTION AND VENUE ........................................................... 7

III.  PARTIES ............................................................................................. 8

      A.    PLAINTIFF .................................................................................. 8

      B.    DEFENDANTS .......................................................................... 10

IV.   FACTUAL ALLEGATIONS ............................................................ 14

      A.    PCBs ARE DANGEROUS CHEMICALS THAT THREATEN HUMAN
            AND ENVIRONMENTAL HEALTH AND SAFETY ..................... 14

            1.    PHYSICAL AND CHEMICAL PROPERTIES OF PCBS ..... 14

            2.    HEALTH EFFECTS OF EXPOSURE TO PCBS ................... 17

            3.    PCBS ARE GLOBAL CONTAMINANTS ............................ 22

      B.    DEFENDANTS KNEW PCBs WERE DANGEROUS CONTAMINANTS
            AT THE TIME OF MANUFACTURE, MARKETING, SALE, AND
            DISTRIBUTION .......................................................................... 24

      C.    DEFENDANTS FAILED TO WARN THE PUBLIC AND THEIR
            CUSTOMERS ABOUT PCB HAZARDS, AND PROVIDED IMPROPER
            DISPOSAL INSTRUCTIONS TO CUSTOMERS ............................ 40

      D.    DEFENDANTS CONCEALED PCBs' TOXICITY FROM PUBLIC
            ENTITIES .................................................................................... 42

      E.    NEW MEXICO NATURAL RESOURCES HAVE BEEN DAMAGED BY
            DEFENDANTS' PCBs .................................................................. 47

V.    CAUSES OF ACTION ...................................................................... 54

JURY DEMAND ......................................................................................... 73

PRAYER FOR RELIEF ............................................................................. 73

Exhibit 1

## I.   INTRODUCTION

1.      The State of New Mexico, by its Attorney General Hector Balderas ("Plaintiff" or "New Mexico" or the "State"), brings this action against Defendants Monsanto Company ("Monsanto"), Solutia, Inc. ("Solutia"), and Pharmacia LLC ("Pharmacia") (collectively, "Defendants"), for all damages to New Mexico recoverable at law or in equity, and for declaratory and injunctive relief, including civil penalties, to remedy Defendants' violations of law.

2.      Polychlorinated biphenyls ("PCBs") are synthetic organic chemical compounds that were manufactured, marketed, sold, and distributed by Defendants in the United States from approximately 1929 to 1977.   During that period, Defendants were responsible for the manufacture of 99% or more of all PCBs used within the United States.   There are no known natural sources of PCBs in the environment.

3.      Production and, with limited exceptions, use of PCBs was prohibited in the United States in 1979, when the U.S. Environmental Protection Agency ("EPA") promulgated final regulations banning PCBs under the Toxic Substances Control Act ("TSCA"), enacted by the U.S. Congress in 1976.

Exhibit 1

4.     PCB production was banned under international law in 2004, when the Stockholm Convention on Persistent Organic Pollutants came into force.

5.     Numerous governmental and intergovernmental agencies recognize PCBs as probable or confirmed human carcinogens.  In particular, the U.S. EPA recognizes PCBs as probable human carcinogens, and the U.S. Department of Health and Human Services' National Toxicology Program ("NTP") considers PCBs to be "reasonably anticipated" carcinogens.  The International Agency for Research on Cancer ("IARC") classifies PCBs as known human carcinogens.

6.     Human exposure to PCBs is associated with cancer as well as adverse health effects on the endocrinal, nervous, immune, reproductive, neuropsychological, and other biological systems, even at very low levels of exposure.  Fish, birds, and mammals that consume PCBs or PCB-contaminated water or food also suffer adverse health effects.  PCBs have been detected in high concentrations in New Mexico waters and soils, among other natural resources.

7.     New Mexico waters are "impaired" by PCBs if the concentration of PCBs in such waters exceeds the Water Quality Standards for PCBs established by the New Mexico Environment Department ("NMED").  High PCB concentrations are the cause of impairment of over 50 significant New Mexico waterbodies.  In

2

Exhibit 1

addition, many other New Mexico waterbodies and waterways suffer PCB contamination at detectable levels below the threshold for impairment. According to the NMED's most recent Integrated Report on water quality (for 2018-2020), PCBs are one of the "three most common causes of water quality impairments in lakes and reservoirs" in New Mexico, resulting in the impairment of hundreds of miles of New Mexico rivers and streams as well as over 20,000 acres of lakes, reservoirs, and ponds, making New Mexico's PCB contamination problem among the most concerning in the country.

8.      As a result of Defendants' misconduct, as alleged in more detail below, New Mexico residents and New Mexico natural resources are presently exposed to dangerous levels of PCBs manufactured, marketed, distributed, and introduced into commerce by Defendants.

9.      At the time they manufactured, marketed, distributed, and sold PCBs—often under the trade name "Aroclor"—Defendants knew PCBs were highly toxic, harmful to human and animal health, and environmentally harmful. For example, an internal Monsanto memorandum from 1937 acknowledges that PCBs produce

3

Exhibit 1

"**systemic toxic effects**" resulting from prolonged exposure.[1]   In the 1950s, Monsanto's Medical Office specifically advised workers not to eat lunch in the PCB department.  In that connection, Monsanto's medical director openly declared that, "**[w]e know Aroclors are toxic.**"[2]

10.   Although they knew that their PCBs were contaminating natural resources and living organisms on a scale their personnel admitted was "**global**,"[3] and that PCBs were "**toxic**"[4] and indeed "**about the same as DDT in mammals**,"[5] Defendants embarked on a decades-long campaign of misinformation and deception in order to prolong the manufacture, sale, and use of PCBs in New Mexico and elsewhere.

11.   Indeed, internal talking-points memos designed to assist Monsanto employees fielding questions and concerns from customers about PCB toxicity

---

[1] *See* Exhibit 1 (MONS 061332).  All in-text style modifications (bold and italics) are added unless otherwise noted.

[2] *See* Exhibit 2 (MONS 095196).

[3] *See* Exhibit 3 (MONS 030483).

[4] *See* Exhibit 2 (MONS 095196).

[5] *See* Exhibit 4 (MONS 098480).

Exhibit 1

remind those employees that Monsanto **"can't afford to lose one dollar of business."**[6]

12.     The U.S. EPA finally banned PCBs in 1979, when the final rules implementing the TSCA came into force.  For many years prior to the TSCA's enactment and the U.S. EPA's implementing regulations, Defendants vigorously denied in public statements that PCBs are harmful to human and environmental health, despite accumulating a wealth of knowledge contradicting such statements.

13.     Defendants sold PCBs for a variety of commercial and industrial purposes.  PCBs were sold for use in paints, caulks, inks, dyes, lubricants, sealants, plasticizers, coolants, hydraulic fluids, fireproofing, and industrial electrical equipment such as capacitors and transformers, among other applications.  Defendants also manufactured and sold various products incorporating their PCBs.

14.     As Defendants knew, PCBs regularly volatilize and leach, leak, off-gas, and escape their intended applications, contaminating runoff during naturally occurring storm and rain events and entering groundwater, waterways, waterbodies,

---

[6] *See* Exhibit 5 (MONS 100123) at -24.

5

Exhibit 1

and other waters, sediment, soils, and plants, as well as fish and other wildlife throughout New Mexico.

15.   Furthermore, as Defendants knew, PCBs disposed of in landfills and other types of waste facilities regularly leach, leak, off-gas, and escape their disposal sites, entering New Mexico waters, soils, and wildlife.

16.   As Defendants also knew, PCBs substantially persist in the natural environment rather than breaking down over time.  The environmental persistence of PCBs and their resistance to breaking down is highly correlated with their chlorine content: the higher the chlorine content in a given PCB formulation, the more persistent it is.

17.   Compounding this hazard, as Defendants knew, PCBs bioaccumulate and biomagnify in animal tissue, including in fish tissue and human tissue.  As a result, as time passes, PCB contamination poses an increasingly hazardous threat to New Mexico residents' health.

18.   PCB contamination is responsible for an indeterminate number of adverse health consequences in New Mexico residents.

19.   Defendants' PCBs are present and have impaired or contaminated the natural resources of New Mexico, including without limitation New Mexico waters

6

Exhibit 1

described above and in further paragraphs below, as well as other parts and natural resources of the State, including without limitation sediment, land and soil, submerged lands, groundwater, surface water, bedlands, tidelands, wildlife, fish, shellfish, aquifers, biota, and air.

20.    Defendants' PCBs have caused and will continue to cause direct damage to New Mexico's natural resources.

21.    New Mexico has incurred and will continue to incur significant costs to identify and reduce sources of Defendants' PCBs entering and contaminating natural resources within the State.   New Mexico also has incurred significant costs in monitoring, investigating, analyzing, and remediating Defendants' PCBs in the environment.   New Mexico and its residents have borne costs of treating and managing PCB-contaminated waters and soils.

## II.    JURISDICTION AND VENUE

22.    The natural resources that are the subject of this suit all rest within the State of New Mexico.   No federal subject-matter jurisdiction exists or is invoked herein.

23.    Venue is proper in Santa Fe County pursuant to NMSA 1978 Section 38-3-1 because a plaintiff resides here and the defendants are foreign corporations.

7

Exhibit 1

24.     This Court has subject matter jurisdiction over this case pursuant to N.M. Const. Art. VI, Sec. 13.

25.     This Court has personal jurisdiction over Defendants pursuant to both NMSA 1978 Section 38-1-16(A) and New Mexico's "sufficient minimum contacts" test.   *Sproul v. Rob & Charlie's, Inc.*, 2013-NMCA-072, ¶ 13, 304 P.3d 18. Defendants marketed, sold, and distributed commercial PCB formulations and/or products and materials containing PCBs to customers within New Mexico.   In addition, Monsanto maintains at least one facility in New Mexico (Berino, NM).

## III.   PARTIES

### A.   PLAINTIFF

26.     The State of New Mexico, by the Honorable Hector H. Balderas, Attorney General of the State of New Mexico, brings this suit pursuant to its inherent *parens patriae* authority to remedy an injury to its "quasi-sovereign interest" in the physical and economic health and well-being of a substantial segment of its population.

27.     The Attorney General is authorized to act on behalf of the State in all actions when the interests of the State require action in his judgment, and is further empowered to prosecute all actions and proceedings brought by any State officer or

8

Exhibit 1

head of a State department, board, or commission, or any employee of the State in his official capacity. NMSA 1978 Section 8-5-2(B)-(C).

28.     New Mexico enjoys *parens patriae* standing in this suit because its residents are adversely affected by the presence of PCBs in the State's natural resources, stormwater systems and other water systems, and/or suffer loss through monetary assessments or expenditures that contribute in part to the assessment, monitoring, analysis, remediation, and cleanup of PCBs.

29.     Defendants' PCB contamination constitutes injury to New Mexico's natural resources, stormwater and other water systems, and other property of the State, for which New Mexico seeks damages and injunctive relief, including on behalf of itself and on behalf of its residents in its *parens patriae* capacity.

30.     New Mexico has a quasi-sovereign interest in its natural resources, including air, soils, and lands, aquatic and submerged lands, waters, aquifers, wildlife, fish, shellfish, biota, and other natural resources, as well as stormwater and other water systems within the State.

31.     New Mexico has a proprietary interest in protecting all property owned by the State and has an interest in remediating the contamination of its property and in preventing future contamination.

9

Exhibit 1

32.    New Mexico has spent and will continue to spend substantial sums to remediate Defendants' PCBs.

33.    Injury to natural resources and water systems caused by Defendants' PCBs has resulted in loss of public use and enjoyment of those resources. The economic value of these natural resources and water systems, as well as the cost of restoring them, is substantial.

34.    Further, the Attorney General has the statutory authority to enforce the New Mexico Unfair Practices Act (hereafter, "UPA") (*see* NMSA 1978 Sections 57-12-1 to -26 (1967, as amended through 2009)) and the New Mexico False Advertising Act (hereafter, "FAA") (*see* NMSA 1978 Sections 57-15-1 to -10 (1965, as amended through 1967)) to ensure the protection of New Mexico residents and consumers.

**B.    DEFENDANTS**

35.    Defendant Monsanto Company is a Delaware corporation with its principal place of business in St. Louis, Missouri. Following a merger transaction that closed in 2018, Monsanto is a wholly-owned subsidiary of Bayer AG.

Exhibit 1

36.     Defendant Solutia, Inc. is a Delaware corporation with its principal place of business in St. Louis, Missouri. Solutia is a wholly-owned subsidiary of Eastman Chemical Company.

37.     Defendant Pharmacia LLC, formerly known as Pharmacia Corporation, is the successor to the original Monsanto Company ("Old Monsanto"). Pharmacia LLC is a Delaware company with its principal place of business in Peapack, New Jersey. Pharmacia is a wholly-owned subsidiary of Pfizer, Inc.

38.     Old Monsanto operated an agricultural products business, a pharmaceutical and nutrition business, and a chemical products business. Old Monsanto began manufacturing PCBs in 1935 after acquiring Swann Chemical Company, which manufactured PCBs from 1929 to 1935. Old Monsanto continued to manufacture commercial PCBs until the late 1970s.

39.     Through a series of transactions beginning in approximately 1997, Old Monsanto's businesses were spun off to form three separate corporations.

40.     The corporation now known as Monsanto Company operates Old Monsanto's agricultural products business.

41.     Old Monsanto's chemical products business is now operated by Solutia.

11

Exhibit 1

42.    Old Monsanto's pharmaceuticals business is now operated by Pharmacia.

43.    Solutia was organized by Old Monsanto to own and operate its chemical manufacturing business.   Solutia assumed the operations, assets, and liabilities of Old Monsanto's chemical business.

44.    Although Solutia assumed and agreed to indemnify Pharmacia (then known as Monsanto Company) for certain liabilities related to the chemicals business, Defendants have also entered into agreements to share or apportion liabilities, and/or to indemnify one or more entities, for claims arising from Old Monsanto's chemical business, including the manufacture and sale of PCBs.

45.    In 2003, Solutia filed a voluntary petition for reorganization under Chapter 11 of the U.S. Bankruptcy Code.   Solutia's reorganization was completed in 2008.  In connection with Solutia's Plan of Reorganization, Solutia, Pharmacia, and Monsanto entered into several agreements under which Monsanto continues to manage and assume financial responsibility for certain tort litigation and environmental remediation related to the chemicals business.

46.    Eastman Chemical Co. reported in its 2017 Form 10-K that it has "been named as a defendant in several [legacy tort] proceedings, and has submitted the

Exhibit 1

matters to Monsanto as Legacy Tort Claims [as defined in a settlement agreement with Monsanto arising out of Solutia, Inc.'s bankruptcy proceedings]. To the extent these matters are not within the meaning of Legacy Tort Claims, Solutia could potentially be liable thereunder. In connection with the completion of its acquisition of Solutia, Eastman guaranteed the obligations of Solutia and Eastman was added as an indemnified party under the Monsanto Settlement Agreement."

47.     In its Form 10-K for 2017, filed with the U.S. Securities and Exchange Commission, Monsanto represented: "Monsanto is involved in environmental remediation and legal proceedings to which Monsanto is a party in its own name and proceedings to which its former parent, Pharmacia LLC or its former subsidiary, Solutia, Inc. is a party but that Monsanto manages and for which Monsanto is responsible pursuant to certain indemnification agreements. In addition, Monsanto has liabilities established for various product claims. -With respect to certain of these proceedings, Monsanto has established a reserve for the estimated liabilities." The filing specifies that the company holds $277 million in that reserve as of August 31, 2017.

Exhibit 1

## IV.   FACTUAL ALLEGATIONS

### A.   PCBS ARE DANGEROUS CHEMICALS THAT THREATEN HUMAN AND ENVIRONMENTAL HEALTH AND SAFETY

#### 1.   Physical and Chemical Properties of PCBs

48.   PCBs are a class of synthetic organic chemical compounds in which a minimum of 2 and a maximum of 10 chlorine atoms are attached to the biphenyl molecule. The general chemical structure of chlorinated biphenyls is shown below (*source*: "Chemical and Physical Information," *in* U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES, TOXICOLOGICAL PROFILE FOR POLYCHLORINATED BIPHENYLS (PCBs) (December 2000), available at https://www.atsdr.cdc.gov/toxprofiles/tp17-c4.pdf).



49.   There are no known natural sources of PCBs in the environment.

Exhibit 1

50.     PCBs are either oily liquids or solids, and are colorless to light yellow. They have no known smell or taste.

51.     Due to their chemical structure, a number of chlorinated compounds are possible.  Defendants manufactured PCB compounds primarily under the "Aroclor" trade name.  Aroclors are differentiated principally by the composition of chlorine by weight, so, for example, "Aroclor 1254" means the mixture contains approximately 54% chlorine by weight.

52.     PCBs do not burn easily, are hydrophobic (i.e., they do not dissolve in water but rather cluster together), and bioaccumulate and biomagnify in living tissue.

53.     PCBs entered the air, water, and soil during their ordinary use by Defendants and Defendants' commercial customers from 1929 to 1977. Applications containing PCBs, such as road paint and caulking, gradually release PCBs into the natural environment due to the chemical compound's tendency to volatilize.  Moreover, PCBs and PCB-contaminated wastes generated during manufacturing processes were routinely disposed in landfills by Monsanto and its commercial customers.  PCBs also entered the environment from spills or leaks during the transport of the chemicals, and from leaks or fires in transformers,

15

Exhibit 1

capacitors, or other products containing PCBs, and from the burning of wastes in some municipal or industrial incinerators.

54.     Once in the environment, PCBs do not break down readily and may remain for decades absent remediation, cycling easily between air, water, and soil and traveling to distant locations as a result.  In general, the more chlorine atoms the PCBs contain, the slower they break down.

55.     PCBs are present as solid particles or vapor in the atmosphere.  They eventually return to land and water by settling as dust or in rain and snow.

56.     In water, PCBs travel along currents and attach to bottom sediment or particles in the water, and evaporate into air or settle into sediment.  Sediments contaminated with PCBs also release PCBs into surrounding water.

57.     PCBs stick strongly to soil and will not usually be carried deep into the soil with rainwater, but it is possible for PCBs to contaminate groundwater flows.

58.     As a gas, PCBs can accumulate in the leaves and above-ground parts of plants and food crops.

59.     PCBs are taken up into the bodies of small organisms and fish in water. They are also taken up by other animals that eat these aquatic animals as food. PCBs especially accumulate in fish and marine animals reaching levels that may be many

16

Exhibit 1

thousands of times higher than in water because PCBs bioaccumulate and biomagnify over time in living tissue. Indeed, PCB levels are highest in animals higher up in the food chain.

60.     PCBs are inert in that they resist both acids and alkalis, and have thermal stability. These properties facilitated the use of PCBs as heat-resistant fluids in a variety of applications, including dielectric fluids in transformers and capacitors, heat-transfer fluids, and lubricants.

61.     PCBs are soluble in lipids, including body fat.

### 2.     Health effects of exposure to PCBs

62.     Humans are exposed to PCBs primarily from eating contaminated food, breathing contaminated air, or drinking or swimming in contaminated water. The major dietary sources of PCBs are fish (especially sportfish caught in contaminated waterbodies), meat, and dairy products. PCBs also collect in milk fat and can enter the bodies of infants through breast-feeding.

63.     Fetuses in the womb are also exposed to PCBs through their mothers. Studies show that babies born to mothers exposed to high concentrations of PCBs in the workplace or from eating PCB-contaminated fish suffer from lower birth weight than other babies. Babies born to women exposed to PCBs before and during

17

Exhibit 1

pregnancy showed abnormal responses to infant behavioral tests, including motor skills, and experienced short-term memory deficiencies.

64.     Many studies have examined how PCBs affect human health. Human health effects associated with PCB exposure include without limitation liver, thyroid, dermal, and ocular changes, immunological alterations, neurodevelopmental and neurobehavioral changes, reduced birth weight, reproductive toxicity, and cancer.

65.     Liver changes associated with PCB exposure include liver enlargement, microsomal enzyme induction (altered metabolism), increased levels of enzymes indicative of hepatocellular damage and serum and tissue biochemical changes indicative of liver dysfunction, and histopathological changes concerning fat deposition, as well as fibrosis and necrosis.

66.     Thyroid changes associated with PCB exposure include goiter and increased thyroid gland volume, histological changes in the thyroid gland indicative of stimulation of the gland and disruption of the processing of follicular colloid needed for normal production and secretion of thyroid hormone, depressed thyroid hormone levels, and modified (increased or decreased) activity in producing and transferring enzymes necessary for thyroid hormone production. Due to the

18

Exhibit 1

importance of the thyroid to brain development, PCBs' effects on the thyroid produce neurodevelopmental effects.

67.     Dermal changes associated with PCB exposure include skin irritation, chloracne (a dermatological condition starting with formation of keratin plugs and inflammatory folliculitis), and nail and skin pigmentation changes.

68.     Ocular changes associated with PCB exposure include hypersecretion of Meibomian glands, abnormal pigmentation of the conjunctiva, and swollen eyelids.

69.     Immunological alterations associated with PCB exposure include decreased antibody levels, changes in T cell subsets, and increased susceptibility to respiratory tract infections, infectious illnesses, and middle ear infections.

70.     Neurological changes associated with PCB exposure include abnormal reflexes and deficits in memory, learning, impulse control, and IQ.  Such changes impact infants and children more severely than adults.

71.     Reproductive changes associated with PCB exposure include menstrual disturbances in women and effects on sperm morphology and production in men, all of which can result in difficulty conceiving.

19

Exhibit 1

72.     PCBs are associated with a number of cancers, including cancer of the liver, biliary tract, intestines, and skin (melanoma).

73.     Studies of workers routinely exposed to PCBs show that PCB exposure is associated with irritation of the nose and lungs, gastrointestinal discomfort, changes in the blood and liver, and depression and fatigue, as well as cancer of the liver and biliary tract.

74.     The U.S. EPA has determined that PCBs are probable human carcinogens. In 1996, EPA reassessed PCB carcinogenicity based on data related to Aroclors 1016, 1242, 1254, and 1260. EPA's cancer reassessment was peer-reviewed by 15 experts on PCBs, including scientists from government, academia, and industry. All experts agreed that PCBs are probable human carcinogens.

75.     The U.S. Department of Health and Human Services' National Toxicology Program considers PCBs to be "reasonably anticipated" carcinogens.

76.     The International Agency for Research on Cancer, an intergovernmental agency forming part of the World Health Organization of the United Nations, concluded in March 2013, based on the assessments of 26 experts from 12 countries, that PCBs are known human carcinogens.

77.     The IARC announced in March 2013:

20

Exhibit 1

"On the basis of sufficient evidence of carcinogenicity in humans and experimental animals, the Working Group classified PCBs as carcinogenic to humans. The classification is based on consistent association between PCB exposure and increased risk of melanoma in humans. There is also limited evidence from some studies suggesting that exposure is linked to increased risks of non-Hodgkin lymphoma and breast cancer."

78.    In its formal 2015 report, the IARC stated unequivocally, "There is sufficient evidence in humans for the carcinogenicity of [PCBs]. PCBs cause malignant melanoma. Positive associations have been observed for non-Hodgkin lymphoma and cancer of the breast. … PCBs are carcinogenic to humans. . . ."

79.    In animal studies, PCBs were shown to be strongly associated with liver damage and death in rats; anemia, acne-like skin conditions, and liver, stomach, and thyroid gland injuries in rats, mice, and monkeys; and liver, kidney, and skin damage in rabbits and mice. Other effects of PCB exposure in animals include reduction in immune system function, behavioral alterations, and impaired reproduction.

80.    Studies of rats exposed to PCBs showed that PCBs are associated with liver cancer.

81.    Animal studies also show that exposure to PCBs causes an increased incidence of prenatal death and changes in the immune system, thyroid, and

21

Exhibit 1

reproductive organs.  Studies in monkeys showed that young animals developed skin effects from nursing after their mothers were exposed to PCBs.

### 3.    PCBs are global contaminants

82.    PCBs have been released to the environment solely by human activity. PCBs are globally circulated and are present in all environmental media.

83.    PCBs are predominantly redistributed from one environmental compartment to another—soil to water, water to air, air to water, sediment to water—so the majority of PCBs in the air, for example, results from volatilization of PCBs from soil and water.

84.    The ordinary and intended application of PCBs (in, for instance, paints, caulks, lubricants, hydraulic and heat-transfer fluids, transistor and capacitor fluids, and so on) has resulted in the release of PCBs into New Mexico air, waters, and soils, due principally to the chemical compound's well-known tendency to volatilize or redistribute itself across different environmental compartments.

85.    Moreover, PCBs may be released to the atmosphere from landfills and hazardous waste sites, incineration of PCB wastes, leakage and runoff from older electrical equipment in use or improperly disposed.

Exhibit 1

86.    PCBs may also be released to water from spillage of PCB-containing hydraulic fluids, improper disposal, combined sewer overflows or storm water runoff, and from runoff and leachate from PCB-contaminated sewage sludge applied to farmland.

87.    PCBs may further be released to soil from leaks and spills, releases from contaminated soils in landfills and hazardous waste sites, deposition of vehicular emissions near roadway soil, and land application of sewage sludges containing PCBs.

88.    Due to their uncontrollable environmental circulation, which was known to Defendants, Defendants internally acknowledged that PCBs are "**global contaminants**"—even as they continued to **increase** their production of PCBs and to conceal or deny any association of adverse human health and ecological effects with PCBs.[7]

---

[7] *See* Exhibit 3 (MONS 030483).

23

Exhibit 1

**B.** **DEFENDANTS KNEW PCBs WERE DANGEROUS CONTAMINANTS AT THE TIME OF MANUFACTURE, MARKETING, SALE, AND DISTRIBUTION**

89.     Defendants developed an early, sophisticated understanding of PCB toxicity. For instance, in an October 1937 memorandum prepared by Old Monsanto personnel, Defendants already internally acknowledged that PCBs produce **"systemic toxic effects"** as a result of prolonged exposure to PCB vapors or oral ingestion, and that bodily contact with PCBs produces "an acne-form skin eruption."[8]

90.     A year earlier, in 1936, many workers at a New York facility using PCBs and operated by Halowax Corporation were afflicted with severe chloracne. Three workers died and autopsies revealed severe liver damage in two of them.

91.     Halowax Corporation asked Harvard University researcher Cecil K. Drinker to investigate the issue, and Dr. Drinker's analysis was presented at a 1937 meeting attended by personnel employed by Old Monsanto, General Electric, Halowax, the U.S. Public Health Service, and various state health officials.

---

[8] *See* Exhibit 1 (MONS 061332).

Exhibit 1

92.     Dr. Drinker's tests demonstrated that rats exposed to PCBs suffered severe liver damage.  The results were published in a September 1937 issue of the *Journal of Industrial Hygiene and Toxicology.*

93.     Old Monsanto retained Dr. Drinker to conduct further animal studies. In one report, dated September 15, 1938, a study confirms liver damage in rats exposed to various formulations of PCB compounds.[9]

94.     As a further illustration of Defendants' knowledge of PCB toxicity, Old Monsanto Medical Director Dr. R. Emmet Kelly bluntly admitted in a September 1955 memorandum that, **"We know Aroclors are toxic**[.]"[10]

95.     Dr. Kelly candidly observes in the same document that, "It does not make too much difference [that Monsanto has not yet identified the precise limit of exposure beyond which adverse effects develop in humans], it seems to me, because our main worry is what will happen if an individual develop[s] any type of liver disease and gives a history of Aroclor exposure.  I am sure the juries would not pay a great deal of attention to [maximum allowable concentrate levels]."[11]

---

[9] *See* Exhibit 6 (MONS 048123) at -27-30.

[10] *See* Exhibit 2 (MONS 095196).

[11] *See* Exhibit 2 (MONS 095196).

25

Exhibit 1

96.    Before penning that damning 1955 admission that Defendants "know Aroclors are toxic" and are associated with "liver disease," Dr. Kelly acknowledged in February 1950 that when workers fell ill at an Indiana factory that used PCBs in the manufacturing process, he immediately "suspected the possibility that the Aroclor fumes may have caused liver damage."[12]

97.    Indeed, an Aroclor manual prepared by Defendants plainly acknowledges that in the "early days of development," workers at a plant in Anniston, Alabama processing PCBs had developed chloracne and liver problems.

98.    Old Monsanto's Medical Department prohibited workers from eating lunch in the Aroclor department in November 1955. The Department memorandum explains that "Aroclor vapors and other process vapors could contaminate the lunches unless they were properly protected," and that "[w]hen working with this material, the chance of contaminating hands and subsequently contaminating the food is a definite possibility." The memo also states, "It has long been the opinion of the Medical Department that eating in process departments is a potentially hazardous procedure that could lead to serious difficulties. While the Aroclors are

---

[12] *See* Exhibit 7 (M11678).

Exhibit 1

not particularly hazardous from our own experience, this is a difficult problem to define because early literature work claimed that chlorinated biphenyls were quite toxic materials by ingestion or inhalation."[13]

99.    Defendants attempted, but failed, to convince the U.S. Navy to use their PCB products in submarines.  In January 1957, Dr. Kelly reported that, "No matter how we discussed the situation, it was impossible to change their thinking that Pydraul 150 [a PCB congener marketed by Old Monsanto] is just too toxic for use in a submarine."[14]

100.    The first public warning that PCBs were becoming ubiquitous in the natural environment came when Søren Jensen, a Swedish chemist at Stockholm University's Institution of Analytical Chemistry, who was analyzing DDT accumulations in nature, accidentally found enormous quantities of unknown substances later identified as PCB compounds in wildlife.

---

[13] *See* Exhibit 8 (Unlabeled memo from Jack T. Garrett to H.B. Patrick, Nov. 14, 1955).

[14] *See* Exhibit 9 (MONS 095640).

Exhibit 1

101.  In 1966, *New Scientist* published a short article ("Report of a New Chemical Hazard"), estimating that PCBs may be spreading through environments in high volumes due to their use by manufacturing interests.

102.  Dr. Jensen studied the compounds for years before positively identifying them as PCBs.  His formal results, which were published in a 1969 issue of *Nature*, showed very high PCB concentrations in Baltic Sea fauna such as white-tailed sea eagles.  As a recent commentator observed, summarizing the implications of Dr. Jensen's results, "PCBs had entered the environment in large quantities for more than 37 years and were bioaccumulating along the food chain."

103.  Dr. Jensen presented his research to the scientific community in 1966, and Old Monsanto's Medical Director, Dr. Kelly, obtained a copy or transcript of Dr. Jensen's remarks in that time frame.  Among other things, Dr. Jensen's presentation states that PCBs "appear[] to be the most injurious chlorinated compounds of all tested," and cites a 1939 study associating PCBs with the deaths of three young workers and concluding that "pregnant women and persons who have at any time had any liver disease are particularly susceptible."  Dr. Jensen reports that the "main characteristic[s]" of PCBs include their "very high stability," lack of "metaboliz[ation] in living organism[s]," and their non-flammability.  Kelly does

28

Exhibit 1

not dispute any of Jensen's remarks, noting only that "it is true that chloracne and liver trouble can result from large doses."

104.   In December 1968, *Nature* published an article by Dr. Richard Risebrough of the University of California entitled, "Polychlorinated Biphenyls in the Global Ecosystem." The article assesses PCB presence in marine wildlife and reports high concentrations of PCBs detected in peregrine falcons and 34 other bird species, drawing an immediate connection between PCBs and the catastrophic decline of peregrine falcon populations in the United States.

105.   Defendants' personnel took note of Dr. Risebrough's article, recognizing the public-relations disaster it portended.   W.R. Richard, an Old Monsanto employee, wrote in early 1969 that the article shows not only that PCBs are "toxic substance[s]" but also that, since they are easily and broadly distributed in air and water, they are "an uncontrollable pollutant ... causing [the] extinction of [the] peregrine falcon ... [and] endangering man himself."[15]

106.   Later that year, in September 1969, W.R. Richard wrote a memorandum titled, "Defense of Aroclor." Richard's memo notes that critics of

---

[15] *See* Exhibit 10 (MONS 096509).

Exhibit 1

PCBs have raised a multitude of different issues with the compounds, so "[w]e can't defend vs. everything.  Some animals or fish or insects will be harmed.  Aroclor degradation will be slow.  Tough to defend against.  Higher chlorination compounds will be worse [than] lower chlorine compounds.  Therefore we will have to restrict uses and clean-up as much as we can, starting immediately."  Richard also observes that, when agencies or others test for PCBs in the Great Lakes region, "Aroclor 1254 will be found!"  In the same document, Richard admits that PCBs will leak from virtually all applications, including such "closed" applications as air compressor, heat transfer, and capacitor fluids.[16]

107.   An "Aroclor Ad Hoc Committee" was formed in that same month to strategize about saving Defendants' PCB business in light of the growing public outcry, and growing evidence of PCBs' toxicity and environmental harms.  The meeting minutes observe that PCBs have been found in fish, oysters, shrimp, and birds, along the coasts of industrialized areas including Great Britain, Sweden, the Rhine River, Lake Michigan, Pensacola Bay, and in wildlife throughout the Western

---

[16] *See* Exhibit 11 (DSW 014256) at -56-59.

Exhibit 1

hemisphere. The minutes acknowledge that PCBs may be considered "**a global contaminant**."[17]

108. The Committee acknowledged that normal and intended uses of PCB-containing products were the cause of the global contamination: "In one application alone (highway paints), one million lbs/year are used. **Through abrasion and leaching we can assume that nearly all of this Aroclor winds up in the environment**."[18]

109. The Committee attempted to formulate a response to growing concerns over PCBs, including those reflected by the U.S. Department of the Interior's Fish and Wildlife Service (which found PCBs in dead eagles and marine birds), the Bureau of Commercial Fisheries (which found PCBs in the river below Monsanto's Pensacola plant), and the U.S. Food and Drug Administration (which found PCBs in milk supplies). The Committee quickly abandoned any notion that Defendants could alleviate or discredit the public health and environmental concerns raised by

---

[17] *See* Exhibit 3 (MONS 030483).

[18] *See* Exhibit 3 (MONS 030483) at -85.

Exhibit 1

the recent studies and governmental reports. Instead, the Committee focused on keeping the PCB business afloat *in spite of* these concerns.[19]

110. Indeed, the Committee's constitutive agenda is to: "1. Protect continued sales and profits of Aroclors; 2. Permit continued development of new uses and sales; and 3. Protect the image of the Organic Division and the Corporation as members of the business community recognizing their responsibilities to prevent and/or control contamination of the global ecosystem."[20]

111. As the minutes reflect, "There is little probability that any action that can be taken will prevent the **growing incrimination** of specific polychlorinated biphenyls ... as nearly **global environmental contaminants** leading to **contamination of human food** (particularly fish), the **killing of some marine species** (shrimp), and the possible **extinction of several species of fish eating birds**." However, while "there is no practical course of action that can so effectively police the uses of these products as to prevent environmental contamination ... **[t]here are ... a number of actions which must be undertaken to prolong the**

---

[19] *See* Exhibit 12 (DSW 014612) at -20.
[20] *See* Exhibit 12 (DSW 014612).

Exhibit 1

**manufacture, sale and use of these particular Aroclors** as well as to **protect the continued use of other members of the Aroclor series.**"[21]

## PROBABILITY OF SUCCESS

The committee believes there is little probability ~~(could)~~ that any action that can be taken will prevent the growing incrimination of specific polychlorinated biphenyls (the higher chlorinated--e.g. Aroclors 1254 and 1260) as nearly global environmental contaminants leading to contamination of human food (particularly fish), the killing of some marine species (shrimp), and the possible extinction of several species of fish eating birds.

Secondly, the committee believes that there is no ~~possible~~ *practical* ~~this course of action~~ that can so effectively police the uses of these products as to prevent environmental con- tamination.    *in order*              *completely Some*

There are, however, a number of ~~possible~~ actions which must be undertaken/to prolong the manufacture, sale and use of these particular Aroclors as well as to protect the continued use of other members of the Aroclor series.
                                    *(Less than 5 chlorines)*
The ultimate that can be expected is the continued use of the lower chlorinated biphenyls and the chlorinated terphenyls in applications amenable to such control that there is, practically zero losses to the environment.  In the interim we would hope to establish by appropriate research efforts "tolerance" or safe levels for particu- lar Aroclors in the environment.

— The identification is ~~poss~~ possible.
— Toxicity towards certain species is high.
— Persistance is high. —
— Likely hood of natural origin or degradation is remote —

---

[21] *See* Exhibit 12 (DSW 014612) at -15.

Exhibit 1

112. Defendants not only continued producing Aroclors through 1969, but increased production that year and in 1970, which were the highest volume production years in the history of PCBs.

113. Elmer Wheeler, in Old Monsanto's Medical Department, circulated laboratory reports discussing results of animal studies in January 1970, in which Dr. Wheeler noted that, **"PCBs are about the same as DDT in mammals**."[22] Notably, Monsanto was also manufacturing DDT at the same time it was manufacturing PCBs, and had already compiled an extensive toxicological profile of DDT showing that it is extremely toxic to human and environmental health. Indeed, by the late 1940s, scientific researchers had established that DDT and other chlorinated hydrocarbons (a class of chemicals to which PCBs also belong) are absorbed and stored in fatty tissue of living organisms exposed to them, and pass these contaminants on to their offspring. For instance, the *American Journal of Public Health* published a 1950 report warning that "chlorinated hydrocarbons, such as DDT and chlordane, are soluble in fats and are stored in the fatty tissues of the body. These compounds possess a high order of toxicity, and their uncontrolled or unwise

---

[22] *See* Exhibit 4 (MONS 098480).

34

Exhibit 1

use is not desirable." Extensive scientific research establishing the toxicity and bioaccumulative and biopersistent nature of DDT and other chlorinated hydrocarbons was published from the 1940s to the 1960s.

114.    At the same time that it was internally acknowledging that PCBs are "about the same" as DDT, in January 1970, the journal *Environment* published a note authored by Old Monsanto: "Monsanto Statement on PCB." The company note acknowledges that recent studies, including Dr. Jensen's studies, indicate PCBs' widespread presence in the natural environment, and expresses the company's "concern[] over the situation."

115.    However, the note defends PCBs by deploying a variety of flawed arguments and false statements that Old Monsanto used on multiple occasions in the late 1960s and early 1970s.

116.    In particular, in the course of its regular business and in connection with the sale of its products Old Monsanto defends its PCB business by arguing, among other things, that (a) a "principal market" for PCBs is in closed electrical applications, where PCBs are "completely sealed in metal containers" and (the note implies) incapable of escape; (b) PCBs are also used in polymers meant for applications as adhesives, elastomers, and surface coatings, and so again are (the

35

Exhibit 1

note implies) incapable of escape; (c) PCBs are not "to our knowledge" used in "household products"; and (d) it is simply "not true" that PCBs are "highly toxic," but that Old Monsanto is conducting various research programs into PCB toxicity in fish and mammals and PCB presence in waters and soils, and "[v]ery early results of chronic toxicity studies confirm that PCBs are not highly toxic."

117.   Defendants knew each of those statements was false or misleading at the time they were made.

118.   Statements (a) and (b) are misleading because Defendants knew PCBs would leach, leak, off-gas, and escape their ordinary and intended applications, and/or would leach, leak, off-gas, and escape their disposal sites, regardless of the nature of the application.  For example, as the Aroclor Ad Hoc Committee minutes prepared in September 1969 declare, "Through abrasion and leaching we can assume that nearly all of this Aroclor [used in surface applications] winds up in the environment."[23]

119.   Statement (c) is false because Defendants themselves aggressively promoted the use of PCBs in "household products."  For example, in a 1960

---

[23] *See* Exhibit 3 (MONS 030483) at -85.

Exhibit 1

brochure, Defendants promoted the use of Aroclors not only in a variety of industrial or commercial applications (including transformers, capacitors, utility transmission lines, electric motors, fluorescent light ballasts, wire and cable coatings, impregnants for insulation, dielectric sealants, chemical processing vessels, drying ovens, furnaces, vacuum diffusion pumps, plasticizers, resins, aircraft parts, and wood and metal maritime equipment), but also in products with which ordinary consumers come into regular contact, such as home appliances, food cookers, potato chip fryers, thermostats, automotive transmission oil, insecticides, waxes used in dental casting, jewelry, lubricants, adhesives, moisture-proof coatings, printing inks, papers, sealants and caulking compounds, tack coatings, asphalt, paints, varnishes, lacquers, masonry coatings for swimming pools, stucco homes, and highway paints, and protective or decorative coatings for a number of other finishes.[24]

120.   Moreover, a 1961 brochure published by Old Monsanto explains that Aroclors are presently being used in "lacquers for women's shoes," as a "wax for the flame proofing of Christmas trees," as "floor wax," as an adhesive for

---

[24] *See* Exhibit 13 (LEXOLDMON004615).

37

Exhibit 1

bookbinding, leather, and shoes, and as invisible marking ink used to make chenille rugs and spreads.[25]

121.   The messaging reflected in statement (c) in Old Monsanto's 1970 note published in *Environment* is of a piece with the company's broader defense of PCBs. In July of 1970, Old Monsanto issued a press release claiming that, "What should be emphasized … is that PCB was developed over 40 years ago primarily for use as a coolant in electrical transformers and capacitors.   It is also used in commercial heating and cooling systems.   **It is not a 'household' item**."[26]   This messaging stands in stark contrast to the marketing and promotional statements Defendants issued for decades.

122.   Statement (d) is false because Defendants knew PCBs were highly toxic well before January 1970, when the note was published, and that a number of studies, both internal and external, had already shown human and animal toxicity as well as prevalent contamination of waters and soils.

123.   Moreover, as Old Monsanto's Elmer Wheeler wrote in the very month the "Monsanto Statement on PCB" was published in *Environment*, Defendants knew

---

[25] *See* Exhibit 14 (0627503).

[26] *See* Exhibit 15 (Monsanto Press Release, July 16, 1970).

Exhibit 1

that **"PCB's are about the same as DDT in mammals,"**[27] i.e., toxic, harmful, and potentially lethal.

124.   Indeed, in February 1970, Defendants' personnel circulated a talking-points memorandum to be used in engaging with customers raising concerns over PCB toxicity.   Old Monsanto had reformulated certain high-chlorine congeners (Aroclor 1254 and 1260) but resisted any product returns, explaining that Defendants **"can't afford to lose one dollar of business."**[28]   Accordingly, the memo instructs employees to advise customers to use up their existing Aroclor 1254 and 1260 stock before topping up with new fluids: **"We don't want to take fluid back."**[29]

125.   Old Monsanto's sales force promoted its commercial PCB formulations by making sales calls directly to customer locations, as well as via telephone calls and written correspondence.   Its salespeople used marketing resources, such as talking-point memoranda, technical product bulletins, and product brochures, in conveying the company's promotional messaging, which included unfair and deceptive representations about the safety of the products.   Old Monsanto directed

---

[27] *See* Exhibit 4 (MONS 098480).

[28] *See* Exhibit 5 (MONS 100123) at -24.

[29] *See* Exhibit 5 (MONS 100123).

Exhibit 1

the use of such representations with customers, as documents attached hereto demonstrate, and also published its own inaccurate, deceptive marketing statements in press releases and notes, such as the company note published in *Environment*. In addition, Old Monsanto published advertisements in trade publications—such as *Chemical & Engineering News*, *Adhesives Age*, and *American Paint Journal*, among others—since at least 1950, promising that its PCB formulations resist the effects of weather and refuse to volatilize, evaporate, or otherwise escape their applications, when, in fact, PCBs regularly and unavoidably escaped from applications of its PCB formulations even when used as intended.

## C.   DEFENDANTS FAILED TO WARN THE PUBLIC AND THEIR CUSTOMERS ABOUT PCB HAZARDS, AND PROVIDED IMPROPER DISPOSAL INSTRUCTIONS TO CUSTOMERS

126.   Despite knowing that PCBs are toxic to human and environmental health, and that PCBs would leach, leak, off-gas, and escape their ordinary and intended applications and leach, leak, off-gas, and escape their disposal sites—regardless of the nature of the application—to contaminate waters, soils, and air, Defendants issued no public warning or instruction about PCBs or the health and environmental safety hazards they present. Indeed, as alleged above, in public statements, Defendants expressly denied the harmfulness and environmental toxicity

40

Exhibit 1

of PCBs.  Although Defendants eventually (in the early 1970s) disclosed to at least some of their direct commercial customers certain hazards associated with long-term or high volume exposure to PCBs in the workplace, Defendants made no such public disclosure and instructed their customers to dispose of PCB materials and wastes in local landfills.

127.   Despite the breadth of its knowledge of PCB contamination, even Old Monsanto itself failed to take adequate precautions in disposing of PCBs and PCB-contaminated waste that it generated.  Its staff routinely disposed of PCB wastes in an unsafe manner.   For example, sanitation staff handling on-site spills would routinely sweep PCB materials into the drainage system rather than collect it for proper disposal.  Moreover, Old Monsanto operated an open outdoor dump site in which it would routinely dispose of PCB wastes, among other things.

128.   Indeed, Old Monsanto executive William Papageorge wrote in a letter dated March 6, 1970 that, "All waste containing PCB's [sic] is at present hauled to the dumps the plants have been using for other plant waste.  **We recognize this is not the ultimate, since PCB's [sic] could eventually enter the environment, but we will continue this practice until better methods of disposal are available**."

Exhibit 1

129.   As Mr. Papageorge explained in testimony provided in 1975 to the Wisconsin Department of Natural Resources, Old Monsanto instructed its customers to dispose of PCB-contaminated wastes in landfills: "we have to reluctantly suggest, because we don't have a better answer, that they [i.e., Monsanto's commercial customers] find a well operated, properly operated landfill and dispose of the material in that fashion."

### D.   DEFENDANTS CONCEALED PCBS' TOXICITY FROM PUBLIC ENTITIES

130.   As alleged above, Old Monsanto adopted a defensive posture in the late 1960s and early 1970s in response to growing public concern over the toxicity of PCBs.   Even as governmental investigations and formal inquiries were launched, Old Monsanto doubled down on its campaign of misinformation and denial.

131.   An internal memorandum prepared by Dr. Emmet Kelly and dated February 10, 1967, addressing the problem of "Aroclor in the air and in various fish and other living reservoirs," indicates that: "We are very worried about what is liable to happen in the [United States] when the various technical and lay news media pick up the subject.   This is especially critical at this time because air pollution is getting a tremendous amount of publicity in the United States."   The memo continues: "We have been receiving quite a few communications from our customers, but the most

42

Exhibit 1

critical one is NCR, who are very much involved with their carbonless carbon paper.

… The consensus in St. Louis is that while Monsanto would like to keep in the background in this problem, we don't see how we will be able to in the United States. We feel our customers, especially NCR, may ask us for some sort of data concerning the safety of these residues in humans. This obviously might be opening the door to an extensive and quite expensive toxicological/pharmacological investigation."[30]

132.   Old Monsanto's Aroclor Ad Hoc Committee, its mendacious company note in the *Environment* journal, its misrepresentations to public entities and customers, and other tactics alleged throughout this complaint were all designed to conceal the toxicity and hazardousness of PCBs to humans and the natural environment from the public.

133.   In an internal presentation to the Corporate Development Committee, Old Monsanto personnel explained that Aroclors represent "one of Monsanto's most profitable franchises," generating $22 million in annual revenues and gross annual profits of $10 million. The presentation advises against exiting the Aroclor market, stating, "there is too much customer/market need and **selfishly too much Monsanto**

---

[30] *See* Exhibit 16 (MONS 031358) at -58-59.

43

Exhibit 1

**profit to go out**."[31]  As another internal Monsanto memorandum remarks, "There can not be too much emphasis given to the threat of curtailment or outright discontinuance of the manufacture and sales of this **very profitable** series of compounds."[32]

134.   Adjusted for inflation, according to the methodology adopted by the U.S. Bureau of Labor Statistics' CPI Inflation Calculator, Old Monsanto's annual PCB revenues (circa 1969) are equivalent to roughly $157 million in late 2018, and its annual PCB profits (circa 1969) are equivalent to roughly $71 million in late 2018.   Old Monsanto was plainly unwilling to abandon its hand-over-fist profiteering, even as its products endangered the natural environment and the lives of millions and, indeed, generations.

135.   Defendants aggressively denied PCBs' toxicity in terms of both human and environmental safety in communications with regulators and public entities.  For example, Howard S. Bergen, who worked in Old Monsanto's Functional Fluids division, sent a letter dated March 27, 1969, to the Regional Water Quality Control Board of the San Francisco Bay Region, in which he claimed that PCBs are

---

[31] *See* Exhibit 17 (MONS 058730) at -33, -37.

[32] *See* Exhibit 12 (DSW 014612) at -24.

44

Exhibit 1

associated with "no special health problems," and that due to PCBs' chemical inertness, "we would anticipate no problems associated with the environment from refuse dumps."[33] Both of those statements were false.

136. Old Monsanto's Elmer Wheeler wrote in an internal memorandum dated May 26, 1969 to W.R. Richard, another Old Monsanto executive that he had spoken with a representative of the National Air Pollution Control Administration, who promised to relay to Congress the message that Old Monsanto "cannot conceive how the PCBs can be getting into the environment in a widespread fashion."

137. Old Monsanto delivered the same message to a number of other public entities, regulators, and authorities, including the New Jersey Department of Conservation in July 1969. Old Monsanto there claimed that, "Based on the available data, manufacturing and use experience, we do not believe PCBs to be seriously toxic," adding that, "[W]e are unable at this time to conceive of how the PCBs can become wide spread in the environment. It is certain that no applications to our knowledge have been made where the PCB's would be broadcast in the same

---

[33] *See* Exhibit 18 (NEV 031051).

45

Exhibit 1

fashion as the chlorinated hydrocarbon pesticides have been."[34] Those statements were false.

138.    Dr. Emmet Kelly, in correspondence dated March 30, 1970, wrote to William Papageorge, another Old Monsanto employee, about his communications with the Ohio State Board of Health. Dr. Kelly observes that a Dr. Hill of the Ohio State Board of Health

> has found PCB, particularly Aroclor 1254, in samples of milk from at least three herds in Ohio. He has traced this contamination back to silage from three different silos. Dr. Hill reported concentrations of 0.2 ppm of PCB in the silage in the center of the silo and up to 20 ppm in the material next to the walls. He also stated that concentrations in the milk were between 0.1 ppm and 0.6 ppm and that some of the milk had been destroyed.
>
> The silos are concrete silos whose interior surfaces were painted in 1967 using a formulation that contained [Aroclor] 1254. I don't know if there was any other Aroclor in the formulation nor do we know the coating manufacturer; although, this could be found out if important. The presence of PCB in the silage came from flaking off of the material and possibly from leaching out during the silage storage. At present they will have to destroy about 150 tons of silage which is valued at about $30 per ton. As a rough guess, they consider there may be 50 other silos involved in Ohio that were painted with the same formulation. They are also looking into the fat contamination of the cows themselves.

---

[34] *See* Exhibit 19 (NCR-FOX-0575899).

Exhibit 1

> All in all, this could be quite a serious problem, having legal and
> publicity overtones.
>
> This brings us to a very serious point.  When are we going to tell
> our customers not to use any Aroclor in any paint formulation
> that contacts food, feed, or water for animals or humans?  I think
> it is very important that this be done.[35]

139.   Old Monsanto had a complete and comprehensive record of all PCB-
related scientific research and general reportage during the relevant time period.
Indeed, in an August 6, 1971 internal memorandum, Elmer Wheeler admits that, "we
have probably the world's best reference file on the PCB situation.  This includes
reprints from the literature beginning in 1936 to reports issued last week."[36]

### E.   NEW MEXICO NATURAL RESOURCES HAVE BEEN DAMAGED BY DEFENDANTS' PCBs

140.   The 2018-2020 Integrated Report, prepared by the NMED, states that
PCBs represent one of the "three most common causes of water quality impairments
in lakes and reservoirs" in New Mexico.  Indeed, over 20,000 acres of New Mexico

> water quality impairment in New Mexico. The three most common causes of water quality impairments in
> lakes and reservoirs continue to be mercury in fish tissue, PCBs in fish tissue, and temperature.

---

[35] *See* Exhibit 20 (Unlabeled correspondence – Kelly to Papageorge).
[36] *See* Exhibit 21 (MONS 029656).

Exhibit 1

lakes, reservoirs, and ponds are impaired by PCBs, as are over 250 miles of New Mexico rivers and streams.

141.    The quality of New Mexico's water resources directly affects the quality of life of New Mexico citizens.

142.    The historical patterns of environmental impact in New Mexico are related to the geographical distribution of basic industries and land use as well as New Mexico's geology, land form, and other natural features, as these determine the basic characteristics and ecological potential of streams and rivers.

143.    Between 1929 and 1977, Defendants sold a large volume of PCBs and PCB-containing products to various customers, including retail and secondary manufacturers, within New Mexico.

144.    Defendants never advised their New Mexico customers that their PCBs are toxic to human and environmental health (beyond certain inadequate disclosures concerning workplace exposure to PCBs), and that PCBs would leach, leak, off-gas, and escape their ordinary and intended applications and leach, leak, off-gas, and escape their disposal sites, regardless of the nature of the application, to contaminate New Mexico waters, soils, and air.  Defendants issued no public warning or instruction about PCBs or the health and environmental safety hazards they present

48

Exhibit 1

and indeed denied that such hazards exist. Nor did Defendants warn or instruct their commercial customers not to dispose of PCB materials and wastes in landfills, or to otherwise dispose of such materials in a manner calculated to avoid environmental discharge, leakage, leaching, off-gassing, or other form of contamination of New Mexico waters, soils, and air.

145. Instead, when Defendants provided any information concerning the use and disposal of PCBs, Defendants denied their toxicity and adverse human and environmental health effects, and advised customers that PCBs and PCB wastes should be deposited in landfills, despite knowing this would result in environmental contamination and human and ecological hazards, as alleged above.

146. As a result, New Mexico waters, soils, and air have become contaminated with Defendants' PCBs.

147. The NMED reports that the following waters are currently impaired by excessive levels of PCBs:

        a. Conchas Reservoir;

        b. Ute Reservoir;

        c. Acid Canyon (Pueblo to headwaters);

        d. Arroyo del Palacio (Rio Grande to headwaters);

Exhibit 1

e.  Canada Agua (Arroyo La Mina to headwaters);

f.  DP Canyon (Grade control to upper Los Alamos National Laboratory ("LANL") boundary);

g.  DP Canyon (Los Alamos Canyon to grade control);

h.  Graduation Canyon (Pueblo Canyon to headwaters);

i.  Los Alamos Canyon (DP Canyon to upper LANL boundary);

j.  Los Alamos Canyon (NM-4 to DP Canyon);

k.  Pojoaque River (San Ildefonso boundary to Pojoaque boundary);

l.  Pueblo Canyon (Acid Canyon to headwaters);

m. Pueblo Canyon (Los Alamos Canyon to Los Alamos wastewater treatment plant ("WWTP"));

n.  Pueblo Canyon (Los Alamos WWTP to Acid Canyon);

o.  Rio Grande (Ohkay Owingeh boundary to Embudo Creek);

p.  Rio Grande (Santa Clara Pueblo boundary to Ohkay Owingeh boundary);

q.  South Fork Acid Canyon (Acid Canyon to headwaters);

r.  Walnut Canyon (Pueblo Canyon to headwaters);

s.  Abiquiu Reservoir;

50

Exhibit 1

t.  Arroyo del Toro (Rio Chama to headwaters);

u.  Canada de Horno (Rio Chama to headwaters);

v.  Rio del Oso (Perennial Portion Rio Chama to headwaters);

w.  Ancho Canyon (North Fork to headwaters);

x.  Ancho Canyon (Rio Grande to North Fork Ancho);

y.  Arroyo de la Delfe (Pajarito Canyon to headwaters);

z.  Canada del Buey (within LANL);

aa. Canon de Valle (LANL gage E256 to Burning Ground Spring);

bb. Canon de Valle (upper LANL boundary to headwaters);

cc. Chaquehui Canyon (within LANL);

dd. Mortandad Canyon (within LANL);

ee. North Fork Ancho Canyon (Ancho Canyon to headwaters);

ff. Pajarito Canyon (Lower LANL boundary to Two Mile Canyon);

gg. Pajarito Canyon (Two Mile Canyon to Arroyo de la Delfe);

hh. Pajarito Canyon (upper LANL boundary to headwaters);

ii. Rio Grande (Cochiti Reservoir to San Ildefonso boundary);

jj. Rio Grande (non-pueblo Angostura Diversion to Cochiti Reservoir);

51

Exhibit 1

kk. Sandia Canyon (Sigma Canyon to NPDES outfall 001);

ll.  Sandia Canyon (within LANL below Signa Canyon);

mm.     Santa Fe River (Guadalupe St to Nichols Reservoir);

nn. Ten Site Canyon (Mortandad Canyon to headwaters);

oo. Two Mile Canyon (Pajarito to headwaters);

pp. Water Canyon (within LANL below Area-A Cyn);

qq. Rio Grande (Isleta Pueblo boundary to Tijeras Arroyo);

rr.  Rio Grande (Tijeras Arroyo to Alameda Bridge);

ss.  Rio Grande (non-pueblo Alameda Bridge to HWY 550 Bridge);

tt.  Elephant Butte Reservoir;

uu. Pecos River (Eagle Creek to Rio Felix);

vv. Pecos River (Rio Felix to Rio Hondo);

ww.     Pecos River (Rio Hondo to Salt Creek);

xx. Pecos River (Rio Penasco to Eagle Creek);

yy. Lower Tansil Lake/Lake Carlsbad (Carlsbad Municipal Lake);

zz.  Pecos River (Black River to Six Mile Dam Lake);

aaa.     Pecos River (Brantley Reservoir to Rio Penasco);

bbb.     Pecos River (Six Mile Dam Lake to Lower Tansil Lake):

Exhibit 1

ccc.     Pecos River (Texas border to Black River);

ddd.     Lake Farmington (Beeline Reservoir);

eee.     Bill Evans Lake.

148.   In this case, New Mexico does not seek damages or other relief concerning PCB contamination of any federal or tribal lands, waters, or other resources, including areas, sites, or resources within LANL, and areas, sites, or resources within the scope of an ongoing assessment by the LANL Trustee Council pursuant to federal regulations. The relief sought concerns only PCB contamination of New Mexico resources and water systems, pursuant to New Mexico law.

149.   Further, PCBs currently contaminate an indeterminate number of other New Mexico waterbodies and waterways at levels that do not rise to the State's impairment threshold, as well as waters for which adequate PCB measurements are not currently available, such as aquifers.

150.   Like New Mexico waters, New Mexico soils and air also suffer PCB contamination.

151.   Comprehensive data showing aggregate PCB concentrations in New Mexico soils and air are not yet available.

Exhibit 1

152.   PCB-contaminated sediments and soils have been the subject of numerous remediation actions taken or overseen by NMED and/or EPA.

153.   For example, 5,100 cubic yards of PCB contaminated soil and debris were identified at the Pagano Salvage EPA site (ID# NMD980749980) in Valencia County and remediated.

154.   New Mexico has invested significant sums in a variety of general and site-specific efforts to assess, investigate, strategize, and implement remediation plans designed to remove PCBs from New Mexico waters, soils, and air.

155.   New Mexico and its residents have suffered loss of use of New Mexico natural resources, including without limitation catching, selling, and/or consuming fish within impaired or contaminated New Mexico waters.

## V.   CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### PUBLIC NUISANCE

156.   New Mexico realleges and incorporates the allegations set forth in paragraphs 1 through 155 as if fully stated herein.

157.   New Mexico asserts this cause of action based on its inherent *parens patriae* authority, and does not here assert or usurp claims on behalf of any individual or non-State entity harmed in his or her person or property by Defendants' conduct.

54

Exhibit 1

158.   Defendants manufactured, distributed, marketed, promoted, and sold PCBs and PCB-containing products in a manner that created or participated in the creation of a public nuisance that is harmful to human and environmental health and obstructs the free use of New Mexico natural resources and water systems.

159.   Defendants intentionally manufactured, distributed, marketed, promoted, and sold PCBs and PCB-containing products with the knowledge that they were causing and would continue to cause environmental contamination of New Mexico natural resources and water systems, including waterways, waterbodies, aquifers, groundwater, lands and submerged lands, soils, sediments, fish and animal tissue, above-ground plants and food crops, biota, air, and stormwater systems.

160.   Defendants knew that their PCBs would end up in New Mexico natural resources and water systems, including waterways, waterbodies, aquifers, groundwater, lands and submerged lands, soils, sediments, fish and animal tissue, above-ground plants and food crops, biota, air, and stormwater systems.

161.   Defendants' conduct and the presence of PCBs annoy, injure, and endanger the comfort, repose, health, and safety of others.

162.   Defendants' conduct and the presence of PCBs interfere with and obstruct the public's free use and comfortable enjoyment of New Mexico natural

55

Exhibit 1

resources for commerce, navigation, fishing, recreation, consumption, and aesthetic enjoyment.

163.   The presence of PCBs also interferes with the free use of New Mexico natural resources for a healthy environment.

164.   Defendants' conduct and the presence of PCBs in New Mexico natural resources and water systems are injurious to human, animal, and environmental health.

165.   An ordinary person would be reasonably annoyed or disturbed by the presence of toxic PCBs that endanger the health of fish, animals, and humans, and degrade water quality and marine habitats as well as soils and sediments, above-ground plants and food crops, and air within New Mexico.

166.   The seriousness of the environmental and human health risk far outweighs any social utility of Defendants' conduct in manufacturing, distributing, marketing, promoting, and selling PCBs and concealing the dangers posed to human and environmental health.

167.   The rights, interests, and inconvenience to New Mexico and the general public far outweighs the rights, interests, and inconvenience to Defendants, who

Exhibit 1

profited heavily from the manufacture, distribution, marketing, promotion, and sale of PCBs, and which can no longer produce PCBs by law.

168.   Defendants' conduct caused and continues to cause harm to the State and its citizens.

169.   New Mexico suffered and continues to suffer damage from Defendants' PCBs, including costs to remove PCBs that have invaded New Mexico natural resources and water systems, to prevent PCBs from injuring additional New Mexico natural resources and water systems, and to restore those natural resources whose use has been lost. The injury to New Mexico natural resources and water systems is specially injurious to the State in its proprietary and public capacities.

170.   The State is incurring and will continue to incur costs to investigate, monitor, analyze, and remediate PCB contamination in New Mexico natural resources and water systems.

171.   Defendants knew, or in the exercise of reasonable care should have known, that the manufacture, distribution, marketing, promotion, and sale of PCBs was causing and would cause the type of contamination now found in New Mexico natural resources and water systems.

Exhibit 1

172.  Defendants knew that PCBs would contaminate water supplies and waterbodies, degrade marine habitats and endanger fish, birds, and animals, and contaminate soils, sediments, above-ground plants and food crops, air, and stormwater and other water systems within New Mexico.

173.  In addition, Defendants knew or should have known that PCBs are associated with serious illnesses, including liver, thyroid, dermal, and ocular changes, immunological alterations, neurodevelopmental and neurobehavioral changes, reduced birth weight, reproductive toxicity, and cancer, and that humans may be exposed to PCBs through ingestion of contaminated fish or water, breathing contaminated air, and/or dermal contact.

174.  As a result, it was foreseeable to Defendants that humans may be exposed to PCBs through, e.g., swimming in contaminated waters, using contaminated beaches, or eating fish and shellfish from contaminated areas. Defendants thus knew or should have known that PCB contamination would seriously and unreasonably interfere with the ordinary comfort, use, and enjoyment of contaminated waters, soils, plants, food crops, air, and water systems.

Exhibit 1

175. Accordingly, Defendants had a duty to cease manufacturing, distributing, marketing, promoting, and selling PCBs but failed to do so, as alleged elsewhere herein.

176. Defendants also had a duty to warn about the dangers of PCBs but failed to do so, as alleged elsewhere herein.

177. Defendants are under a continuing duty to act to correct and remediate the injuries their conduct has introduced and to warn the State, their customers, and the public about the human and environmental risks posed by its PCBs, and each day on which it fails to do so constitutes a new injury to the State.

178. As a direct and proximate result of Defendants' creation of a public nuisance, New Mexico has suffered and continues to suffer monetary losses, including loss of value and loss of use of New Mexico natural resources and water systems, in amounts to be proven at trial.

179. As a further direct and proximate result of Defendants' creation of a public nuisance, New Mexico has suffered and will suffer monetary losses in the form of past, current, and forthcoming expenditures in assessing, monitoring, analyzing, remediating, and/or restoring New Mexico natural resources and water

Exhibit 1

systems injured by Defendants' misconduct, which is a further special injury to the State.

180.   As a result of the foregoing, the State seeks monetary damages and injunctive relief.

## SECOND CAUSE OF ACTION
### DESIGN DEFECT

181.   New Mexico realleges and incorporates the allegations set forth in paragraphs 1 through 155 as if fully stated herein.

182.   New Mexico asserts this cause of action based on its inherent *parens patriae* authority, and does not here assert or usurp claims on behalf of any individual or non-State entity harmed in his or her person or property by Defendants' conduct.

183.   Defendants' PCBs and PCB-containing products were not reasonably safe as designed at the time they left Defendants' control.

184.   Defendants' PCBs' toxicity, bioaccumulativity, inability to be contained, and environmental persistence rendered them unreasonably dangerous at all times.

185.   Defendants' PCBs were unsafe as designed, as demonstrated by numerous studies alleged hereinabove as well as the U.S. Congress' and U.S. EPA's prohibition on the production and sale of PCBs pursuant to the TSCA in 1979.

Exhibit 1

186.   Due to their toxicity, bioaccumulativity, inability to be contained, and persistence, Defendants knew their PCBs were not safe at the time of manufacture because it was certain that the product would contaminate natural resources and water systems within the United States, including New Mexico, and cause toxic contamination of New Mexico natural resources and water systems.

187.   Defendants knew their PCBs were unsafe to an extent beyond that which would be contemplated by an ordinary person because of the information and evidence available to them associating PCB exposure with adverse human and animal health effects as well as the overwhelming seriousness of creating global contamination.

188.   Defendants manufactured, distributed, marketed, promoted, and sold PCBs despite such knowledge in order to maximize their profits despite the foreseeable and known harms.

189.   Practical and feasible alternative designs capable of reducing the State's injuries were available.  Such alternatives include mineral oils and nonfluid insulating chemicals, as evidenced by the rapid replacement of PCBs by such alternatives upon the prohibition of PCBs, as well as alternative chemical formulations and/or additional chemical processing measures Defendants could

Exhibit 1

have taken to enhance the safety of PCBs. Alternative chemical formulations that would have reduced the State's injuries include a reduction of chlorine content in all PCB products, which would have materially decreased the environmental persistence and toxicity of PCBs without eliminating their typical applications or utilities.

190. Defendants' conduct and the presence of PCBs in New Mexico caused and continue to cause injury to the physical and economic health and well-being of New Mexico citizens.

191. New Mexico has suffered and will continue to suffer injuries to its natural resources and water systems, and damages to its public treasury as a result of Defendants' conduct and the presence of PCBs within the State.

192. Defendants are under a continuing duty to act to correct and remediate the injuries their conduct has introduced and to warn the State, their customers, and the public about the human and environmental risks posed by its PCBs, and each day on which it fails to do so constitutes a new injury to the State.

193. Defendants are strictly liable for all damages arising out of their defective designs.

Exhibit 1

194.   As a result of the foregoing, the State seeks monetary damages in amounts to be proven at trial.

## THIRD CAUSE OF ACTION
## FAILURE TO WARN AND INSTRUCT

195.   New Mexico realleges and incorporates the allegations set forth in paragraphs 1 through 155 as if fully stated herein.

196.   New Mexico asserts this cause of action based on its inherent *parens patriae* authority, and does not here assert or usurp claims on behalf of any individual or non-State entity harmed in his or her person or property by Defendants' conduct.

197.   Defendants' PCBs and PCB-containing products were not reasonably safe at the time they left Defendants' control because they lacked adequate warnings.

198.   At the time Defendants manufactured, distributed, marketed, promoted, and sold PCBs, they knew their PCBs were not safe because it was certain that the product would contaminate natural resources and water systems within the United States, including New Mexico, and cause toxic contamination of New Mexico natural resources and water systems.

199.   Despite Defendants' knowledge, Defendants failed to provide adequate warnings that their PCBs would contaminate New Mexico natural resources and water systems.

63

Exhibit 1

200.   Defendants could have warned of this certainty but intentionally concealed this information in order to maximize profits.

201.   In addition, Defendants advised their commercial customers to dispose of PCBs and PCB wastes in landfills when Defendants knew that this method of disposal would lead to contamination of New Mexico natural resources and water systems.

202.   Defendants continued to conceal the dangers of PCBs after they manufactured, distributed, marketed, promoted, and sold PCBs.

203.   Without adequate warnings or instructions, Defendants' PCBs were unsafe to an extent beyond that which would be contemplated by an ordinary person.

204.   Defendants knowingly failed to issue warnings or instructions concerning the dangers of PCBs, their volatilization risks, and proper disposal techniques, in the manner that a reasonably prudent manufacturer would act in the same or similar circumstances.

205.   Defendants' conduct and the presence of PCBs in New Mexico caused and continue to cause injury to the physical and economic health and well-being of New Mexico citizens.

64

Exhibit 1

206.   New Mexico has suffered and will continue to suffer injuries to its natural resources and water systems, and damages to its public treasury as a result of Defendants' conduct and the presence of PCBs within the State.

207.   Defendants are under a continuing duty to act to correct and remediate the injuries their conduct has introduced and to warn the State, their customers, and the public about the human and environmental risks posed by its PCBs, and each day on which it fails to do so constitutes a new injury to the State.

208.   Defendants are strictly liable for all damages arising out of their failure to provide adequate warnings and instructions as alleged above.

209.   As a result of the foregoing, the State seeks monetary damages in amounts to be proven at trial.

### FOURTH CAUSE OF ACTION
### NEGLIGENCE

210.   New Mexico realleges and incorporates the allegations set forth in paragraphs 1 through 155 as if fully stated herein.

211.   New Mexico asserts this cause of action based on its inherent *parens patriae* authority, and does not here assert or usurp claims on behalf of any individual or non-State entity harmed in his or her person or property by Defendants' conduct.

65

Exhibit 1

212.   Defendants failed to exercise ordinary care because a reasonably careful company that learned of its product's toxicity, carcinogenicity, harmfulness to humans, and harmfulness to the natural environment would not manufacture or distribute that product, or would warn of its toxic and environmentally hazardous properties, or would take steps to enhance the safety and/or reduce the toxicity and environmental persistence of the product.

213.   Defendants failed to exercise ordinary care because a reasonably careful company that learned that its product could not be contained during normal production and use would not continue to manufacture or distribute that product or would warn of its dangers.

214.   Defendants failed to exercise ordinary care because a reasonably careful company would not continue to manufacture or distribute PCBs in mass quantities and to the extent that Defendants manufactured and distributed them.

215.   Defendants were grossly negligent because they failed to exercise even slight care, placing revenue and profit generation above human and environmental health and safety.

216.   Defendants owed the State and its citizens a duty of care in the manufacture, distribution, marketing, promotion, and sale of PCBs because it was

Exhibit 1

foreseeable to Defendants that their PCBs would end up in New Mexico's natural resources, including waterways, waterbodies, aquifers, soils, lands and submerged lands, sediments, fish and animal tissue, above-ground plants and food crops, biota, air, and stormwater and other water systems.

217.   Defendants' negligent conduct and the presence of PCBs in New Mexico caused and continue to cause injury to the physical and economic health and well-being of New Mexico citizens.

218.   New Mexico has suffered and will continue to suffer injuries to its natural resources and water systems, and damages to its public treasury as a result of Defendants' negligent conduct and the presence of PCBs within the State.

219.   Defendants are under a continuing duty to act to correct and remediate the injuries their conduct has introduced and to warn the State, their customers, and the public about the human and environmental risks posed by its PCBs, and each day on which it fails to do so constitutes a new injury to the State.

220.   As a result of the foregoing, the State seeks monetary damages in amounts to be proven at trial.

## FIFTH CAUSE OF ACTION
### UNJUST ENRICHMENT

67

Exhibit 1

221. New Mexico realleges and incorporates the allegations set forth in paragraphs 1 through 155 as if fully stated herein.

222. New Mexico asserts this cause of action on its own behalf.

223. New Mexico has incurred and will continue to incur expenses in connection with PCB contamination within the State, including investigative, assessment, analysis, monitoring, and remediation or restoration costs.

224. Defendants are responsible for the PCB contamination that New Mexico has addressed and will address, and in fairness, Defendants should have paid these costs. It would be unjust for Defendants to retain the benefit of New Mexico's expenditures in connection with PCB contamination within the State.

225. New Mexico requests an injunction ordering Defendants to return all monies by which Defendants were unjustly enriched as a result of New Mexico's expenditures in connection with PCB contamination within the State.

## SIXTH CAUSE OF ACTION
### VIOLATIONS OF UNFAIR PRACTICES ACT
### NMSA 1978 Sections 57-12-1, *et seq.*

226. New Mexico realleges and incorporates the allegations set forth in paragraphs 1 through 155 as if fully stated herein.

Exhibit 1

227.    The Attorney General of the State of New Mexico asserts this cause
of action based on his statutory enforcement authority under the Unfair Practices Act
("UPA," as defined above), NMSA 1978 Section 57-12-15.

228.    The State of New Mexico is the real party in interest in this action,
and no statute of limitations applies. *See State v. Roy*, 1937-NMCA-026, 41 N.M.
308.

229.    The UPA was signed into law on April 4, 1967 (1967 N.M. Laws, ch.
268, codified as 1953 Comp., Section 49-15-1, *et seq.*).

230.    The UPA, NMSA 1978 Sections 57-12-1, *et seq.*, prohibits "[u]nfair
or deceptive trade practices and unconscionable trade practices in the conduct of any
trade or commerce[.]"

231.    Defendants are "persons" as defined in the UPA.  Section 49-15-2(A)
NMSA 1953; NMSA 1978 Section 57-12-2(A).

232.    Defendants' conduct alleged herein occurred in "trade" and
"commerce" as defined in the UPA.  Section 49-15-2(B) NMSA 1953; NMSA 1978
Section 57-12-2(C).

233.    The UPA's original prohibition on unfair or deceptive trade practices
was broad, and included twelve enumerated classifications of conduct as well as a

69

Exhibit 1

thirteenth "catch-all" provision prohibiting companies from "engaging in any other conduct which similarly creates a likelihood of confusion or misunderstanding." Section 49-15-2(C)(13) NMSA 1953.

234.    In 1971, the UPA's definition of "unfair or deceptive trade practice" was broadened substantially to include "any false or misleading oral or written statement, visual description or other representation of any kind knowingly made in connection with the sale ... of goods or services ... by any person in the regular course of his trade or commerce, which may, tends to or does deceive or mislead any person, and includes" an expanded list of enumerated offenses. *See* N.M. Laws 1971 Ch. 240.

235.    The UPA's current prohibition on unfair or deceptive trade practices is broader still, and includes both "act[s] specifically declared unlawful pursuant to the [UPA]" and any "false or misleading oral or written statement, visual description or other representation of any kind knowingly made in connection with the sale ... of goods ... by a person in the regular course of his trade or commerce, which may, tends to or does deceive or mislead any person[.]" NMSA 1978 Section 57-12-2(D).

236.    In addition to generally prohibiting any unfair or deceptive trade practices, and any false or misleading statement or other representation of any kind,

70

Exhibit 1

the UPA specifically prohibits, *inter alia*, "representing that goods ... have ... characteristics, ... uses, [or] benefits ... that they do not have" (Section 49-15-2(C)(5) NMSA 1953 (1967); NMSA 1978 Section 57-12-2(D)(5) (1995)); "representing that goods ... are of a particular standard, quality or grade ... if they are of another" (Section 49-15-2(C)(7) NMSA 1953 (1967); NMSA 1978 Section 57-12-2(D)(7) (1995)); and "using exaggeration, innuendo or ambiguity as to a material fact or failing to state a material fact if doing so deceives or tends to deceive" (Section 49-15-2(C)(14) NMSA 1953 (1971); NMSA 1978 Section 57-12-2(D)(14)).

237.    The Attorney General finds that Defendants' conduct as alleged herein demonstrates that Defendants have used methods, acts, and practices that are unlawful pursuant to the UPA.

238.    Among other things, Defendants marketed, promoted, sold, and distributed PCBs and PCB-containing products within New Mexico on the basis of unfair, deceptive, false, and misleading representations and omissions. As alleged in more detail above, Defendants carried out a decades-long campaign of deception in publicly denying and casting doubt on the toxicity of, and environmental hazards associated with, their PCB products—including failing to disclose that PCBs are

71

Exhibit 1

toxic to human and animal life, bioaccumulative in living tissue, extremely persistent in nature and resistant to degradation, and tend to escape their ordinary and intended applications to contaminate the natural environment and water systems.

239.   Such statements and omissions were made by Defendants to the public in numerous public statements (such as press releases, advertisements, and the 1970 company note published in the journal *Environment*), to public authorities and regulators across the country, and to customers directly (as evidenced by sales manuals, talking-points memos, technical bulletins, and other documents attached to this complaint), among other audiences in New Mexico and elsewhere.

240.   Actionable statements (in addition to omissions or failures to disclose) include, but are not limited to:

> a. Advertisements published in trade publications, such as *Chemical & Engineering News*, *Adhesives Age*, and *American Paint Journal*, among others, since at least 1950 until an unknown end date, promising that its PCB products resist the effects of weather and refuse to volatilize, evaporate, or otherwise escape their applications;

72

Exhibit 1

b. The four false and misleading statements included in the company note appearing in the *Environment* journal in 1970;

c. The July 1970 company press release downplaying safety and environmental concerns by claiming that its PCB products are "not a household item."

241.    Pursuant to NMSA 1978 Section 57-12-8(B), New Mexico seeks injunctive relief sufficient to remedy Defendants' violations of law, including an award of restitution and disgorgement of all moneys obtained by Defendants as a result of Defendants' violations of the UPA.

242.    Pursuant to 1953 Comp., Section 49-15-9 (1967, as amended through 1970), and NMSA 1978 Section 57-12-11, New Mexico also seeks "a civil penalty of not exceeding five thousand dollars ($5,000) per violation."

## JURY DEMAND

New Mexico respectfully requests trial by jury on all claims so triable.

## PRAYER FOR RELIEF

New Mexico prays for judgment against Defendants, jointly and severally, as follows:

A.    Damages according to proof;

73

Exhibit 1

B.      Award of past, present, and future costs to abate the ongoing public nuisance and/or to investigate, assess, analyze, monitor, and remediate the contamination;

C.      Award of restitution and disgorgement of all moneys obtained as a result of Defendants' violations of the Unfair Practices Act;

D.      Any other damages or losses as permitted by law;

E.      An injunction ordering Defendants to return all monies by which Defendants were unjustly enriched as a result of the State's expenditures in connection with PCB contamination within the State;

F.      Civil penalties in an amount equal to $5,000 per violation of the Unfair Practices Act, pursuant to 1953 Comp., Section 49-15-9 (1967, as amended through 1970), and NMSA 1978 Section 57-12-11;

G.      Litigation costs and attorneys' fees as permitted by law;

H.      Pre-judgment and post-judgment interest on all monies awarded, as permitted by law;

I.      Such other and further relief as the Court deems just and proper.

DATED: May __, 2019

Exhibit 1

HECTOR H. BALDERAS
ATTORNEY GENERAL OF NEW
MEXICO

*/s/ P. Cholla Khoury*
P. Cholla Khoury
Anne Minard
Assistant Attorneys General
P.O. Drawer 1508
Santa Fe, New Mexico  87504-1508
ckhoury@nmag.gov
Tel: 505.490.4052
aminard@nmag.gov
Tel: 505.490.4045
Fax: 505.318.1050

75

Exhibit 1

# EXHIBIT 1

Exhibit 1

October 11, 1937.

Experimental work in animals shows that prolonged exposure to Arochlor vapors evolved at high temperatures or by repeated oral ingestion will lead to systemic toxic effects.

Repeated bodily contact with the liquid Arochlors may lead to an acne-form skin eruption.

Suitable draft ventilation to control the vapors evolved at elevated temperatures, as well as protection by suitable garments from extensive bodily contact with the liquid Arochlors, should prevent any untoward effect.

In talking with Dr. Kelly before these three paragraphs were written, we agreed that they might as well be phrased so that they could be used not only in the Arochlor booklet, but quoted in correspondence as that may be necessary.

L.A. Watt



PLAINTIFF'S
EXHIBIT
ALL-STATE LEGAL
4A004

MONS 061332

Attachment 3-2

3.2

CV96-J-0440-E
DATE 04/02/01

PLFF EXHIBIT NO. 877

Exhibit 1

# EXHIBIT 2

Exhibit 1

<u>COPY</u>          Dr. D.V.N. Hardy
                   Dr. H.R. Newman.

<u>Monsanto Chemical Company</u>

St. Louis, Missouri

                   September 20, 1955

Dr. J.W. Barrett          Your memo September 8 to Mr. Nason

London                    AROCLOR TOXICITY


Howard Nason has given me your memo of September 8.   I
will be happy to discuss this with Dr. Newman during his
visit here.   I think, however, there are several points
that I can answer you now.

You comment upon the difference in toxicity between Aroclor
1254 and 1242.   This is not particularly surprising because
in the earlier work it was found that toxicity increased
with chlorination.   Of course, from the standpoint of vol-
atility in the case of inhalation or absorption from the
gut from the point of view of ingestion are important.
Frankly, there was not too great a difference between the
two compounds, however.   As you know, the maximum allowable
concentrate is 0.1 ml/cubic meter in the case of 1254, and
as high as 10.0 mgm in the case of 1268.   I think the former
is too low and the latter is too high.   In this country they
don't use the MACs very routinely, but certainly in England
I think it would be alright to consider 0.2 mgm/cubic meter
as perfectly safe.

I don't know how you would get any particular advantage in
doing more work.   What is it that you want to prove?   I
believe your work should be directed towards finding out
what the concentrations are of Aroclor during different
operations whether it is industrial or painting.   The re-
ports you have seen from Kettering Laboratory are the re-
sult of approximately $15,000 to $20,000 expenditure by
MCC.

MCC's position can be summarized in this fashion.   We know
Aroclors are toxic but the actual limit has not been pre-
cisely defined.   It does not make too much difference, it
seems to me, because our main worry is what will happen if
an individual developes any type of liver disease and gives
a history of Aroclor exposure.   I am sure the juries would
not pay a great deal of attention to MACs.



PLAINTIFF'S
EXHIBIT

4A02

Exhibit 1

<u>COPY</u>

Page 2    September 20, 1955    AROCLOR TOXICITY


We, therefore, review every new Aroclor use from this point of view.   If it is an industrial application where we can get air concentrations and have some reasonable expectation that the air concentrations will stay the same, we are much more liberal in the use of Aroclor.   If, however, it is distributed to householders where it can be used in almost any shape and form and we are never able to know how much of the concentration they are exposed to, we are much more strict.   No amount of toxicity testing will obviate this last dilemma and therefore I do not believe any more testing would be justified.

Let's see what our discussions with Dr. Newman and yourself bring out.


R. Emmet Kelly, M.D.

REK:k

MONS  095197

Exhibit 1

# EXHIBIT 3

Exhibit 1

# CONFIDENTIAL

## MINUTES OF AROCLOR "AD HOC" COMMITTEE

### First Meeting

**Date:** September 5, 1969

**Present:** M. W. Farrar
P. B. Hodges, Secretary
E. V. John
W. R. Richard
E. P. Wheeler, Chairman

**Objectives:** (Agreed to by the Committee)

Submit recommendations for action which will:

1. Permit continued sales and profits of Aroclors and Terphenyls.

2. Permit continued development of uses and sales.

3. Protect image of Organic Division and of the Corporation.

**Background Discussion of Problem:**

1. Agreed that we should concentrate on Aroclor 1254 and 1260. Aroclor 1242 has not yet been incriminated for these possible reasons:

   a. Nature of uses of 1242 minimizes environmental contamination.

   b. It may degrade biologically.

   c. Unless analytical techniques are performed carefully, 1242 can be destroyed by oxidation during the analyses.

2. PCB has been found in:

   a. Fish, oysters, shrimp, birds.

   b. Along coastlines of industrialized areas such as Great Britain, Sweden, Rhine River, low countries, Lake Michigan, Pensacola Bay, in Western wild life (eagles). It may be a global contaminant.

3. PCB has been tied to DDT in effects on disappearance of wild birds which have fish diets. Ratio of PCB to DDT has been about 40-50:1 generally. Dr. Reisboro reported almost 1:1 ratio. PCB may be contributing to or exaggerating the effects of other chlorinated aromatics.

MONS  030483



PLAINTIFF'S EXHIBIT

Exhibit 1

-2-

4. Sample acceptance from the numerous researchers was
   discussed. This has been done on a limited basis.
   Our corroboration of testing of their samples adds
   to our knowledge and demonstrates a willingness by Mon-
   santo to help define the problem, but it is expensive
   and also tightens any possible legal cases against us--
   it rules out possibilities that Aroclors are not
   involved.

5. Toxicity levels:

   Aroclors have been shown to be safe for man in rea-
   sonable exposure concentrations. We are testing 100
   ppm in diet of rats and dogs on a rule-of-thumb
   basis that 1/100 of toxicity level is safe and 1
   ppm is probably the upper limit in total diet.

   "Allowable levels" are probably lower than DDT. The
   worst example to date is the test at Pensacola where
   5 ppb was found to be toxic to shrimp in 18 days
   exposure.

   One problem we are facing is to keep the "safe level" (?)
   for shrimp from being applied to e.g. Lake Michigan
   where more tolerant fish species probably exist. We
   need to show the safe level in shrimp, clams, oysters
   and several species of fish.

   Many toxicity studies on PCB are underway and it was
   agreed to be desirable to keep contact with all lab-
   oratories which have requested Aroclor samples. One-
   half to two-thirds of the sample requests have come
   from state labs (who would let us know what they are
   doing) and about 1/3 have come from universities (who
   may give us the "brush-off"). Question of who should
   call on the laboratories was not resolved.

6. Escambia River Problem:

   For a clearer understanding of the general problem,
   the situation at Pensacola was reviewed. From a rela-
   tively negligible discharge of 1-3 gal/day into a large
   river, 1/4 mile downstream levels of 42 ppb in water
   and 476 ppm in mud were found. Although use of Aroclor
   was halted immediately, we can expect the water contam-
   ination to continue for a lengthy period by leaching
   from the contaminated mud. No downstream samples have
   yet been taken to measure the decrease in contamination
   (as of 9/5/69).

MONS  030484

Exhibit 1

-3-

7. Problem in Producing Plants:

P. Hodges reviewed what was being done to stop gross losses at Anniston and at WGK. Basically, the work to date consists of stopping or trapping any sewering of free Aroclor with return to process or land fill disposal of the trapped Aroclor. This will reduce levels in plant effluents to below solubility ranges, particularly as we move to install traps (or sumps) back into the waste source points where flows are small and as yet undiluted by Aroclor-free waste streams. The question of exactly how far to reduce (how much money to spend) is not yet clear and expenditures to date have been comparatively small. It was agreed that, until the problems of gross environmental contamination by our customers have been alleviated, there is little object in going to expensive extremes in limiting discharges from the plants.

One problem that has been interfering with logical development of our plant Aroclor waste reduction programs has been delays in obtaining analytical results from in-plant and ex-plant sampling. It was agreed that additional help was necessary in Dr. Tucker's lab but no specific actions were proposed. In addition to in-plant work, the plants are sampling the receiving streams.

Air pollution reduction has not been considered by the plants to date except as incidental prevention of product contamination during tank car and drum loading operations. Long range (1-2 year) improvements at Anniston are planned to reduce product contamination (and air emissions) in car loading operations. It was agreed that a comprehensive air sampling and testing program would be very expensive and is probably not justified at this stage of the problem.

8. Environmental Contamination by Customers:

Our in-plant problems are very small vs. problems of dealing with environmental contamination by customers. In one application alone (highway paints), one million lbs/year are used. Through abrasion and leaching we can assume that nearly all of this Aroclor winds up in the environment.

Because the rate of natural (bio-degradation) is very low, other degradation must destroy PCB equal to the rate of environmental exposure in order to avoid build-up of contamination.

A general discussion was held on philosophy of controlling sales or working with customers to prevent pollution by PCB.

MONS 030485

Exhibit 1

-4-

Action Planned:

Each member of the group will submit to the other members
for consideration possible ideas and programs to help
accomplish the overall objectives set by the Committee.
Following review of the suggestions, the Committee will
meet again at an early date to be arranged by the Chairman.

P. B. Hodges
Secretary

:ju

MONS   030486

Exhibit 1

# EXHIBIT 4

Exhibit 1

Elmer P. Wheeler, Medical Department

January 29, 1970

Status of Aroclor Toxico-
logical Studies

J. S. Barrett, ~~London~~
~~R. Of Sorgen, ~~
W. B. Papageorge, ~~~~

D. S. Cameron
Brussels

Enclosed is a copy of the reports from our consulting
laboratory indicating the status of the animal toxicity
studies. I have summarized the pertinent findings
separately and as indicated in the table.

We have given copies of these data to one U. S. custo-
mer, the U. S. FDA and one or two other state agen-
cies. I don't see why this information cannot be
released with discretion in Britain or Europe.

Our interpretation is that the PCB's are exhibiting
a greater degree of toxicity in this chronic study
than we had anticipated. Secondly, although there
are variations depending on species of animals, the
PCB's are about the same as DDT in mammals.

We have additional interim data which will perhaps
be more discouraging. We are repeating some of the
experiments to confirm or deny the earlier findings and
are not distributing the early results at this time.

Elmer P. Wheeler

EPW:ju

Enclosure

MONS 098480



PLAINTIFF'S
EXHIBIT
4 A 9

Exhibit 1

# EXHIBIT 5

Exhibit 1

**Monsanto**

FROM (NAME & LOCATION)    N. T. Johnson   St. Louis

DATE              February 16, 1970                    cc:    P. J. A. Marsh - Brussels
SUBJECT                                                       R. Enrhardt - New York
                                                              T. W. Oneson - Montreal
REFERENCE         POLLUTION LETTER                            J. N. Haggart - Brussels
                                                              V. Morse - St. Louis
TO                                                            J. Brydon - Montreal
                  P. Craska - Wilmington                      R. Graham - New York
                  C. Clay - St. Louis                         P. G. Benignus
                  J. H. Davidson - Los Angeles                J. G. Bryant
                  R. A. Damiani - Chicago                     D. E. Roush
                  G. F. Fague - Detroit               —       J. R. Fallon
                  R. A. Garcia - Akron                        D. A. Hall
                  R. Garnsworthy - Melbourne                  D. R. Pogue
                  J. A. Heilala - Akron                       D. F. Smith
                  R. Irwin - Houston                          D. A. Olson
                  J. S. Pullman - New York
                  J. J. Roder - Chicago
                  R. Giles - Melbourne

Attached is a list of questions and answers which may be asked of
you by customers receiving our Aroclor-PCB letter.  You can give
verbal answers; no answers should be given in writing.  If the
customer asks a question you can't answer or if he wants an
answer in writing, then send his questions to me and we will
answer from here.

We want to avoid any situation where a customer wants to return
fluid.  The new reformulated products will be available within a
month.  We would prefer that the customer use up his current
inventory and purchase Pydraul 625A, Pydraul ACA, Pydraul ACA
Winter Grade and Pydraul 540A when available.  He will then top
off with the new fluid and eventually all Aroclor 1254 and Aroclor 1260
will be out of his system.  We don't want to take fluid back. Sell
him the replacement.

We must be very positive in our approach with each customer
relative to our decision to eliminate the use of Aroclor 1254 and
Aroclor 1260 in our Pydraul products.  We (your customer and
Monsanto) are not interested in using a product which may present
a problem to our environment.  We certainly have no reason to
be defensive or apologetic about making this change.  The decision
to change makes good sense and our customers should commend us,
not criticize  our actions.  No one has forced us to make this



PLAINTIFFS
EXHIBIT
ZD02

Exhibit 1

2

change. We have done it to keep our customers out of possible
trouble. They should appreciate our effort, and stay with us as
a customer on the reformulated Pydrauls. To make this change
has cost us research monies and time. Fortunately, we possess
the technical skills to make a change in our formulations without
affecting the performance of products. Be positive, Take the
offense. Don't let a customer or competitor intimidate you. I
doubt if our competitors know whether their product could present
a problem to our environment. You might ask your customer,
if he has ever asked Houghton or Stauffer, Carbine, etc. about the
effects of their products.

We should also recognize (point this out to your customer) we
must clean-up. The Chemical Week article gives him an idea
of laws in effect in his state. Read this yourself. Be familiar
with the data on each state in which your customers are located.
Use this in your discussions.

We have no replacement products for Aroclor 1254 and Aroclor 1260.
We will continue to make these products; however, customers
will have to use their own judgement on continued use.

We can't afford to lose one dollar of business. Our attitude in
discussing this subject with our customer will be the deciding
factor in our success or failure in retaining all our present
business. Good luck.

(We have also attached a copy of the letter sent to transformer
customers.)

N. T. Johnson

1b

MONS 100124

Exhibit 1

# EXHIBIT 6

Exhibit 1

*Toxicity*

REPORT TO THE MONSANTO CHEMICAL COMPANY

by

Cecil K. Drinker, M.D.
Dean and Professor of Physiology
Harvard School of Public Health, Boston, Mass.

September 15, 1938

MONS  048123

EXHIBIT 10

Exhibit 1

Page

I.  Experiments to determine the possible toxicity of the following
    substances:  . . . . . . . . . . . . . . . . . . . . . . . . . . .   2

        1.  Chlorcosane  . . . . . . . . . . . . . . . . . . . . . .   2

        2.  Diphenyl phthalate . . . . . . . . . . . . . . . . . . .   3

        3.  Chlorinated diphenyl #1268 . . . . . . . . . . . . . . .   4

        4.  Mixture of chlorinated diphenyl and chlorinated
            diphenyl benzene #5460 . . . . . . . . . . . . . . . . .   7

II.  Some general considerations: . . . . . . . . . . . . . . . . . .   9

        1.  Evidence for the destruction of a mixture of penta
            and hexachlornaphthalenes (#1006) in the body  . . . . .   9

        2.  The effect of increasing the sodium chloride in the
            diet upon animals receiving toxic doses of #1006 . . . .  10

        3.  The effect of high and low calcium intake on animals
            inhaling high concentrations of #1006  . . . . . . . . .  10

        4.  The effect of injections of xanthine on animals
            inhaling high concentrations of #1006 . . . . . . . . . .  11

MONS  048124

Exhibit 1

-2-

# I. EXPERIMENTS TO DETERMINE THE POSSIBLE TOXICITY OF THE FOLLOWING SUBSTANCES

## 1. CHLORCOSANE

On July 14, 1937, we were informed by F. D. Smith that each 6 ounce bottle of a soft drink might contain 60 to 70 mgm. of chlorcosane. There was no pharmacological reason to believe the compound would be irritating or toxic in any way, and therefore it was decided to dose rats with it very heavily, the argument being that if they survived heavy dosage without any evidence of damage a verdict of no toxicity might be given and much time saved. If, on the other hand, the large doses proved poisonous it would be necessary to reduce dosage until a non-toxic level was reached. The first of these alternatives proved correct.

Experiments. -- August 10, 1937. 20 adult white rats ranging in weight from 162 to 210 gm. were each fed 70 mgm. of chlorcosane in 1 cc. of olive oil daily by stomach tube. These animals showed no evidence of damage in any way attributable to chlorcosane. They were examined microscopically from the 35th to the 92nd day. The only constant change observed was a possible slight increase in the granularity of the cells of the liver cords, but the pathologist in charge felt this to be within normal limits. This finding is doubly reassuring since many of the animals developed a chronic suppurative lung condition very prevalent in Boston stock rats at the time. But even with this added handicap there was no evidence of damage and we thus conclude that chlorcosane even in enormous dosage is an inert material in the body and in all probability passes through the intestine unchanged.

MONS 048123

Exhibit 1

## 2.  DIPHENYL PHTHALATE

On August 23, 1937, we were informed by Dr. R. E. Kelly that diphenyl phthalate might be absorbed through the skin or might be inhaled and swallowed during spraying operations.  After consultation it was decided to feed heavily, and if there were indications of toxicity to project other experiments.

Experiments. -- September 20, 1937.  20 adult white rats ranging in weight from 242 to 301 gm. were each fed 0.5 mgm. of diphenyl phthalate suspended in 1 cc. of water by stomach tube daily.  The animals were from new stock and with one exception remained clear of the lung condition which existed in the chlorocesane group.  During the period of experiment, which lasted 92 days, practically all the animals gained weight.  Examination of 8 animals killed at intervals during this period of test resulted as follows:

The organs were normal grossly, and on microscopic examination the liver alone was of possible interest.  The changes in the liver varied from those in which the cells of the liver cords were almost normal, having only a slight swelling and granularity of their cytoplasm, to those in which these changes were pronounced.  In the latter there was a moderate degree of vacuolization and a rare hyaline body.  These alterations it must be understood were the result of very certain dosage, since the compound was given by stomach tube and the animals had no possible way of avoiding it.  Neither the pathologist nor myself was able to consider them of enough moment to cause us to make further experiments.

I am confident that with the ordinary precautions accompanying spray lacquering no possible harm could be done, even if the concentration of diphenyl phthalate in the lacquer was far above the 5 per cent figure given us by R. E. Kelly.

MONS  048126

Exhibit 1

5. CHLORINATED DIPHENYL -- COMPOUND #1268

This material was furnished by the Monsanto Chemical Company. It was said to have a chlorine content of 68 per cent, the highest chlorine figure of any compound tested by us during the past three years. It had been our impression that toxicity and chlorine content followed one another closely, but this has not turned out to be the case for #1268. ~~maximumsmmaniimxwith chlorxxxxxxxxxx~~ Further discussion of this point will follow the description of the experimental observations and their results.

Experiments. -- August 2, 1937. The compound #1260 was administered by inhalation, the technique being that described in the paper entitled The Problem of Possible Systemic Effects from Certain Chlorinated Hydrocarbons, Journal of Industrial Hygiene, 1937, 19, 283. For the first observations 80 adult white rats were used. They were exposed as follows:

Group 1. -- 80 animals. Temperature to which the compound was heated to introduce fume into air line 140-190° C. Average concentration in air breathed by rats 0.53 mgm. per cubic meter. Average daily exposure 16 hours. The experiment was continued for 119 days, animals being sacrificed at intervals for pathological examination and for the carbon tetrachloride and alcohol test (see paper previously cited).

The conditions described above caused swelling and increase of granularity of the liver cells. Hyaline inclusions were rare. These changes were quite uniform in all animals examined after the 51st day, but were not certainly progressive. The rats were very healthy throughout the period and there was an almost uniform gain in weight. The carbon tetrachloride-alcohol test was positive after 52 days, which indicates that though liver damage was apparently slight some degree of harm had been done the organ. There was no evidence of

MONS  048127

Exhibit 1

damage in any part of the body except the liver.

At the end of 93 days 10 rats, apparently in excellent condition, were removed from the experiment and set aside for observations upon liver recovery. These recovery animals showed no clinical changes of any sort. When sacrificed 72 and 141 days after removal from exposure it was observed that the swelling of the liver cells had disappeared, but the granular and hyaline material remained in the liver cells and had apparently become permanent. There was absolutely no progression of damage after removal from exposure.

These changes may be compared with those produced in rats by inhalation of chlorinated diphenyl #4465, administered in a similar manner in concentrations of 0.57 to 0.93 mgm. per cubic meter over similar periods of time. In the case of this compound the conspicuous difference was the far greater incidence of hyalinization of the liver cells, which in our opinion was the characteristic lesion caused by #4465 and mixtures containing it. One can therefore conclude that #1268 in low concentrations is definitely less toxic than #4465.

Group 2. — After 119 days, the low concentration of #1268 having proved but slightly poisonous, it was decided to increase the concentration in the air breathed by the 54 rats then remaining. Temperature and other conditions were maintained as during the first 119 days, but by the use of 4 vaporizers instead of 1 the average concentration of #1268 in the air was brought to 6.93 mgm. per cubic meter of air. Exposure to this very high concentration was continued for 87 days.

Under these extreme conditions the animals again remained in perfect health. The carbon tetrachloride and alcohol test was positive but there was absolutely no other indication of liver damage and no evidence of disturbance to other organs.

                                            MONS  048128

-6-

When examined at autopsy at the end of 87 days — the animals had experienced a total exposure of 206 days — there were no gross evidences of abnormality in any part. On microscopic examination no organ showed changes except the liver. The number of cells containing hyaline and the amount of hyaline in the cells involved increased during this period of exposure to the higher concentration of #1258. The hyaline was most abundant in the portal zone of the lobule with very little in the central area. After 42 days of exposure 10 rats were set aside and were sacrificed 73 days later. They were in excellent condition when removed and did not change. Grossly, at autopsy, they showed nothing abnormal, and on microscopic examination the liver cells had lost their swelling but retained increased granularity and hyaline inclusions.

The experiments on inhalations of high concentrations of #1258 reenforced the conclusion that this compound is of low toxicity as compared with #4465 or with chlorinated naphthalenes above tri-ichloronaphthalene. The question as to why #1258, the most highly chlorinated compound tested, proved but slightly harmful cannot be answered with any definiteness. It has been suggested that the toxicity of all these chlorinated compounds, even though of varied composition, may depend on the ability of the animal to decompose them after lodgment in the tissues, and that this decomposition might be shown by an increase in the chlorine in the urine in suitably conducted feeding experiments. In experiments upon this point we have shown a definite increase in the urinary chlorides when dogs and rats were fed a mixture of penta and hexachloronaphthalenes (#1000), a compound highly injurious to the liver and containing 62.6 per cent of chlorine, but similar observations have not been made with any of the chlorinated diphenyls or allied compounds. It may, however, be that when about 65 per cent chlorination is reached the substances formed are quite stable in the body and no cause a minimum of damage.

MONS  048129

Exhibit 1

-7-

In conclusion, #1268, if handled with ordinary precautions as to ventilation should be entirely harmless to workmen. While it cannot be given an absolutely clean bill as to health, it is preferable to #4465 and #5460.

### 4. MIXTURE OF CHLORINATED DIPHENYL AND CHLORINATED DIPHENYL BENZENE -- COMPOUND #5460

This substance was furnished by the Monsanto Chemical Company and was said to have a chlorine content of 60 per cent, being in this respect below #4465 and far below #1268.

Experiments. -- The inhalation technique was used as in the case of #1268 and #4465.

August 2, 1937. 80 adult white rats were the subjects. Temperature to which the compound was heated to introduce fume into the air was 140-165° C. Average concentration in air breathed by rats 0.005 mgm. per cubic meter. Average daily exposure 16 hours. The experiment lasted 119 days. A certain number of animals were sacrificed for pathological examination, others were used for the carbon tetrachloride and alcohol test, and still others set aside for observations as to recovery from possible damage.

In spite of the fact that the concentration in the air breathed by the rats averaged about 1/6 that obtained at comparable temperatures from #1268, a number of these animals became sick and lost weight towards the end of the second month of exposure. When killed, such individuals showed gross mottling of the liver but no changes in other organs. On microscopic examination swelling of the liver cells, increased granularity and hyaline inclusions were noted in rats killed as early as the 16th day of exposure. These changes obviously occurred rapidly. Hyaline deposits were never as numerous as with #1268. Animals

MONS  048130

Exhibit 1

-9-

removed for recovery after 51 and 119 days of exposure did not gain markedly
in weight, and one died for no obvious cause.  When examined at autopsy the
swelling of the liver cells had subsided, but abnormal granularity and
hyalinization remained.

Needless to say the carbon tetrachloride and alcohol test was positive
whenever used.

In view of the fact that #5460 in such low concentration proved so
definitely toxic, no higher concentrations were tested.  It seems imperative
that whenever this compound is used in industry, great care be taken to keep
concentrations in the air at an extremely low level.  No liberties can be
taken with it, as with #1200.

MONS  048131

Exhibit 1

-7-

## II.   SOME GENERAL CONSIDERATIONS

In addition to these tests of compounds, certain experiments were done which are of interest to those manufacturing or using chlorinated hydrocarbons. Details as to these experiments are of course available but are not included in this report since they are not of direct industrial interest.

### 1.   EVIDENCE FOR THE DESTRUCTION OF A MIXTURE OF PENTA AND HEXACHLORNAPHTHALENES (#1006) IN THE BODY

It has always been a question as to whether the chlorinated hydrocarbons which have been examined by ourselves and by others do harm _per se_ or whether toxicity depends on their breakdown in the body with the liberation of something harmful to the liver. A partial answer has been obtained by feeding #1006 to rats and dogs which were on a low chloride diet with uniform excretion of chlorides in the urine. When these animals received the chlorinated hydrocarbon (#1006) the urinary chlorides rose. This indicates that the body certainly has power to detach chlorine from this compound, and it is probable that the same condition is true for allied toxic compounds. It would be most interesting to see whether ingestion of #1260 results in similar findings or whether in the case of this relatively non-toxic compound there is practically no splitting off of chlorine. Neither time nor our financial resources permitted such tests.

MONS  048132

Exhibit 1

-10-

2.   THE EFFECT OF INCREASING THE SODIUM CHLORIDE IN THE DIET
UPON ANIMALS RECEIVING TOXIC DOSES OF #1006

On the ground that chlorides might be fundamentally associated with
toxicity, a group of 15 rats was fed a low toxic dose of #1006 and compared
with a similar group on the same dosage of #1006 plus a marked increase in
chloride intake secured by giving 5 cc. per kilogram of body weight of 4 per
cent NaCl solution daily.

No differences were found between the two groups, and it may be concluded
that chlorine increase secured through the diet does not enhance toxicity.
This experiment was done in order to find out whether increase in chloride
intake during hot weather might be harmful.

A particular phase of the problem, the possible enhancement of typical
skin lesions by increasing chloride intake, cannot be decided by experiments
on fur-bearing animals with no sebaceous glands.  All that can be said at
the moment is that increased chloride intake does not increase systemic
toxicity.

3.   THE EFFECT OF HIGH AND LOW CALCIUM INTAKE ON ANIMALS
RECEIVING HIGH CONCENTRATIONS OF #1006

It is well known that a diet rich in calcium is markedly effective in
preventing the acute yellow atrophy of the liver produced by carbon tetra-
chloride (The Prevention and Treatment of Carbon Tetrachloride Intoxication.
By P. D. Larson, M.D., A. S. Minot, Ph.D., and D. B. Robbins, M.S., Journal
of the American Medical Association, 1928, volume 90, page 345).

To discover whether calcium in the diet would protect against liver damage

MONS   048133

Exhibit 1

-11-

from a toxic chlorinated hydrocarbon, 30 adult white rats were placed upon a
diet of lean horsemeat, starch and lard, a combination adequate for maintenance
but very low in calcium. Another group was given a diet consisting of dog
chow, milk, lettuce and eggs, with added calcium lactate -- a ration very high
in calcium.

Both groups were exposed simultaneously to inhalation of high concentra-
tions of #1006, an average of 11.21 mgm. per cubic meter for 16 hours a day.

After 18 days, 12 high calcium diet rats were alive and 7 of the low
calcium group. At intervals animals were killed for examination. In both
groups the liver was abnormal grossly and microscopically, and in both groups
animals died from liver damage. It was impossible to consider that the high
calcium diet was in the least degree protective. It may, therefore, be
concluded that adding calcium to the diet of workers either in the form of
extra milk or of calcium lactate will not prevent liver damage.


4.    THE EFFECT OF INJECTIONS OF XANTHINE ON ANIMALS

INHALING HIGH CONCENTRATIONS OF #1006

In 1937, R. C. Neale published a brief paper (The Protective Action of
Certain Purines against Liver Necrosis Produced by Carbon Tetrachloride and
Chloroform, Science, 1937, volume 86, page 63). He claimed that rats
injected with sodium xanthine became markedly resistant to carbon tetrachloride.
This suggested that xanthine might have similar protective power over liver
damage from the chlorinated hydrocarbons on examination in this laboratory.

Accordingly 58 adult white rats were caused to inhale #1006 in concentra-
tions averaging 15 mgm. per cubic meter for 16 hours daily. One group of
20 rats was given 20 mgm. of xanthine subcutaneously every other day and 40 rat-

MONS  048134

Exhibit 1

of xanthine by stomach tube on the alternate days.  The second group of 18 rats
had the same exposure to #1006 without xanthine treatment.  No differences were
noted and one cannot expect any efficacy from xanthine either in the prevention
or treatment of liver disease due to this chlorinated hydrocarbon, and in all
probability the same negative result would be encountered in connection with
allied toxic compounds.

MONS  048135

Exhibit 1

# EXHIBIT 7

Exhibit 1

February 14, 1950

Dr. Louis W. Spolyar, Director
Division of Industrial Hygiene
Indiana State Board of Health
1098 West Michigan Street
Indianapolis 7, Indiana

Dear Dr. Spolyar:

I enclose an application bulletin on our Aroclors. On page 19, there
is a summary of almost all our toxicology information on this compound.

If the case you refer to is in Brazil, Indiana, our company has had
some contact with the problem. This particular installation used a
temporary heat transfer system, and thus did not make the installation
air tight. This is contrary to our expressed instructions when
Aroclor is to be used at elevated temperatures. Upon hearing of the
illness, one of our development engineers went to the plant and gave
his recommendations, and then I called the plant physician to try to
obtain some idea of what the illnesses were. As far as I could
determine, two men suffered from gastrointestinal upset. I suspected
the possibility that the Aroclor fumes might have caused liver damage,
but was unable to obtain this information over the phone. I was also
unable to contact the employee's physician.

The toxicology of Aroclors is somewhat confused. The experimental
work was done by Dr. Drinker at Harvard about 12 years ago, and was
done in connection with chlorinated naphthylene, chlorinated diphenyl,
and chlorinated diphenyl high boiler. Both of these last two are
Aroclors. In the particular work at Harvard, Dr. Drinker found that
Aroclor 1263, which means diphenyl chlorinated to 68%, was of low
toxicity. The confusion existed in his findings that Aroclor 1254,
which is the diphenyl chlorinated to only 54%, was considerably more
toxic on inhalation. We did not supply him with this material, and I
was never convinced that some error might not have been made in the
sample.

At any rate, we have advised protection against all Aroclor fumes when
an elevated temperature is used. I will appreciate it if you will let
me know the result of your investigation, if one is to be made.

Very truly yours

R. Emmet Kelly, M.D.
Medical Director

RFK:rg

B CC: Mr. Paul Benignus
      St. Louis

M11678

Exhibit 1

From **MONSANTO CHEMICAL COMPANY**

At St. Louis                                   – 4 SEP 1953

Date September 1, 1953

To Mr. E. Mather

At Ruabon

Reference Your memo to
ATB – 8/11/53

Subject AROCLORS: TOXICITY

cc Mr. T.K. Smith – 7
Mr. A.T. Beauregard – 7
Mr. P. O. Benignus – 7
Dr. J.W. Barrett – London
Dr. J.A. Gardner,– Fulmer
Mr. J.F. Stkickley – KXOK
Dr. N.B. Dyson – Newport

Mr. Beauregard has asked the Medical Department to comment on your letter referred to above.

As I am sure you know, Aroclors cannot be considered nontoxic. The interpretation of the toxic properties of a compound, however, determine whether or not there is any hazard associated with the specific use of a compound.  To my knowledge, there is no hazard involved in the use of transformers containing Aroclors as a substitute for other materials.  To my understanding, in the United States this application of Aroclors is widely accepted and has not resulted in any difficulty from a toxicological standpoint.

I cannot state whether or not a flash discharge might generate phosgene.  I believe, however, that any phosgene so generated would be in a very small proportion to the total smoke and fumes resulting from the discharges.  In instances where Aroclor as a heat exchange medium, has been subjected to fire and high temperature after a leak in equipment, the clouds of breakdown products have been highly irritating but probably no more so than one would expect from the burning of any type of industrial oil or chemical.

I'm sure that Mr. Benignus will answer your questions relative to the effect of Aroclor on insulating materials, when he returns from his vacation next week.

As you indicated, we are watching the use of the Aroclors as plasticizers in emulsion paints.  We do not recommend that they be used in paints which might be applied in confined or unventilated areas, particularly if the paints might be used on heated surfaces. As you stated, this is a case of worrying about the exposure of painters who might apply such materials day in and day out rather than the worrying about those who might occupy the room during or shortly after the paint has been applied.

Elmer P. Wheeler

EPW:SMB

RECEIVED – 4 SEP 1953 RUABON

MONS  095187

EXHIBIT 12

Exhibit 1

# EXHIBIT 8

Exhibit 1

From **MONSANTO CHEMICAL COMPANY**

At   St. Louis

cc Mr. J. Cresce -Krumm. Plt
Mr. E. W. Lieben -" "
Mr. R. M. Webber -" "

**CONFIDENTIAL**

Date   November 14, 1955

To   Mr. H. B. Patrick   Reference

At   Krummrich Plant   Subject   DEPARTMENT 246 (AROCLORS)

It is the opinion of the Medical Department that the eating
of lunches should not be allowed in this department for a
number of reasons.

(1) Aroclor vapors and other process vapors could con-
taminate the lunches unless they were properly pro-
tected.

(2) When working with this material, the chance of contami-
nating hands and subsequently contaminating the food
is a definite possiblity.

(3) It has long been the opinion of the Medical Department
that eating in process departments is a potentially
hazardous procedure that could lead to serious diffi-
culties.  While the Aroclors are not particularly
hazardous from our own experience, this is a diffi-
cult problem to define because early literature
work claimed that chlorinated biphenyls were quite
toxic materials by ingestion or inhalation.  In any
case where a workman claimed physical harm from any
contaminated food, it would be extremely difficult
on the basis of past literature reports to counter
such claims.

*Jack T. Garrett*

Jack T. Garrett

JTG:SMB

PLAINTIFF'S
EXHIBIT 6
4403
PENGAD-Bayonne,NJ

[_]IN 10

Exhibit 1

# EXHIBIT 9

Exhibit 1

St. Louis, Missouri

Messrs.:
G. R. Buchanan - Robts.
R. E. Hatton   - M.C.
F. H. Langenfeld-Robts.
E. B. Litzinger-Robts.
G. R. Sido-Washington,D.

January 21, 1957

Mr. H. I. Armstrong

Roberts Building                    HYDRAUL 150

Dr. Treon and I spent an afternoon with the Navy people to
discuss Pydraul 150.  Those present were Captain Shone,
Captain Alvis, Captain Sessions, Commander Siegel and
Mr. Mickey Albert.  They discussed their information con-
cerning Pydraul 150 which was obtained at the Naval Institute
of Medical Research.  While reports were not available, they
had the following general data:

Skin applications of Pydraul 150 caused death
in all of the rabbits tested.  (The amount
administered was not given.)  A like amount of
Cellulube 220 did not cause any deaths.

The inhalation of 10 milligrams of Pydraul 150 per
cubic meter or approximately 2 tenths of a part
of the Aroclor component per million for 24 hours
a day for 50 days caused, statistically, definite
liver damage.  No matter how we discussed the
situation, it was impossible to change their
thinking that Pydraul 150 is just too toxic for
use in a submarine.  It may be that such concen-
trations would never be reached in the submarine
but the Navy does not appear willing to even put
the material in a trial run to see if it will work.

It would appear, therefore, that we should discontinue to
sell Pydraul 150 for this particular application and try to
develop a hydraulic fluid without Aroclor as one of its
components.  In this connection, Cellulube 220 is not used
in a submarine but it was used in this test merely as a
yardstick.

The Navy said they did not have any competitive fluid far
enough along engineering-wise to even consider the toxicity
of it.

R. Emmet Kelly, M.D.

REK:EMM

MONS  095640


PLAINTIFF'S
EXHIBIT

ALL-STATE LEGAL

57

Exhibit 1

# EXHIBIT 10

Exhibit 1

W. H. Richard - Research Center

| | | |
|---|---|---|
| Date | March 6, 1969 | H. Bergen    HBERG |
| | | J. Springate JSPRI |
| Subject | AROCLOR WILDLIFE ACCUSATIONS | W. Schall   WSCHA |
| | | D. Olson    DOLSO |
| Reference | | R. Kelly    RKELL |
| | | J. Garrett  JGARR |
| TO : | E. Wheeler - EWHEE | P. Hodges   PHODG |
| | | P. Park     PPARK |
| | | R. Keller   JFQ |
| | | E. Tucker   JFQ |

Risebrough in a recent paper "Nature", Vol. 220, Dec. 14, 1958, has attacked chlorinated biphenyls in three ways:

(1) a pollutant – widely spread by air-water; therefore an uncontrollable pollutant.

(2) a toxic substance – with no permissible allowable levels causing extinction of peregrine falcon by induced hepatic enzymes which degrade steroids upsetting Ca metabolism leading to reproductive weakness, presumably through thinner egg shells.

(3) a toxic substance endangering man himself; implying that the peregrine falcon is a leading indicator of things to come.

As outlined in Science, Vol. 163, Pg. 548, Environmental Defense Fund (EDF) is attempting to write new legal precedents in conservation law by hearings and court action. In the Wisconsin case, water quality standards are at issue. "A substance shall be regarded as a pollutant if its use results in public health problems or in acute or chronic (injury) to animal, plant or aquatic life". Wisconsin is one of 7 states which now have federally approved water quality standards. According to Bern Wright, acting chief of the Federal Water Pollution Control Administration's Water Quality Standards Branch, DDT would fit the definition of a pollutant upon a showing that it is harmful to aquatic life.

These people in EDF are saying we must not put stress on any living thing through a change in air or water environment. Eagles, plant life, anything which lives or breathes. This group is pushing hard on the extension of the word harmful. They claim "enzyme inducer" activity is the real threat of DDT and PCB's and are using these arguments to prove that very small amounts of chlorinated hydrocarbons are "harmful".

Monsanto is preparing to challenge certain aspects of this problem but we are not prepared to defend against all of the accusations.

(a) Monsanto is preparing itself to identify trace ppb quantities of chlorinated biphenyls in water samples, in concentrated collected air samples, and in animal tissues. We will know whether we have been falsely identified and accused or not. We will eventually know where any pollution is taking place and the extent of the pollution.

MONS 096509

CV96-J-0440-E
DATE 04/02/0.

PLFF EXHIBIT NO. 163

Exhibit 1

E. Wheeler                    -2-                    March 6, 1969

(b) We are not prepared to defend ourselves against the accusations made of enzyme and hormone activity, the isolation of enzymes or metabolic products, the indirect accusation of cancer, or the splitting of genes, when this accusation is made. Whether we can defend this route or not needs further discussion.

(c) Through the Industrial Bio-Test program we are to establish the long term allowable limits of chlorinated biphenyls for certain birds-fish-animals by feeding experiments, pathological examination, and tissue analysis for chlorinated biphenyls. We may be able to answer reproductive ability in some animals.

DDT has been under attack for some years because of its chlorine content, its persistent ability to be identified, and the wildlife problems attributed to it. We will still be under the same attack by the mechanisms listed in (b) even though we might establish safe operating limits for humans and certain animals.

Where does this leave us?

Under identification and control of exposure - we will be able to identify and analyze residues as well or better than anyone in the world. We will probably find residues other than DDT and PCB's. We will probably wind up sharing the blame in the ppm to ppb concentration level.

We can take steps to minimize pollution from our own chlorinated biphenyl plants, we can work with our larger customers to minimize pollution, we can continue to set up disposal and reclaim operations. We can work for minimum exposure in manufacture and disposal of capacitors, transformers and heat transfer systems, and minimize losses for large hydraulic users.

But, we can't easily control hydraulic fluid losses in small plants. It will be still more difficult to control other end uses such as cutting oils, adhesives, plastics and NCR paper. In these applications exposure to consumers is greater and the disposal problem becomes complex. If chlorinated biphenyl is shown to have some long term enzyme or hormone activity in the ppm range, the applications with consumer exposure would cause difficulty.

Risebrough has taken known Aroclor samples and claims to have evidence of enzyme and hormone change. Here there is no question of identification. Either his position is attacked and discounted or we will eventually have to withdraw product from end uses which have exposure problems. Since Risebrough's paper in "Nature", Dec. 1968 has just been published, it is timely, perhaps imperative, that this paper and its implications be discussed with certain customers. This is a rough one because it could mean loss of business on empty and false claims by Risebrough.

Well prepared discussions with Ind. Bio-Test, Monsanto biochemists, the medical and legal departments must take place now. The

MONS   096510

Exhibit 1

E. Wheeler                        -3-                    March 6, 1969

position of DDT manufacturers should be determined as a guide.
We are being accused of the same things attributed to DDT.

I have written this memo to clarify some of the issues.  May I
please have comments.

Thanks,


                            W. R. Richard

me
Att.

MONS  096511

Exhibit 1

# EXHIBIT 11

Exhibit 1

Monsanto

FROM (NAME & LOCATION): W. R. Richard - Research Center

DATE: September 9, 1969

SUBJECT: DEFENSE OF AROCLOR - F. FLUIDS

REFERENCE:

CC: P. Hodges    PHCDG
    M. Farrar    Res. 1
    H. Bergen    HBERG

TO: E. Wheeler - EWHEE

## General Policy

Make the Govt., States and Universities prove their case, but avoid as much confrontation as possible. Comply and work with public officials to meet or exceed requirements ahead of time. Adverse publicity and competition are the real weapons.

Analytical     ⎰In Air  - Which Aroclors are present? Where?⎱  ⎰Govt.
for Aroclor    ⎨In Water- Which compounds                   ⎬  ⎱Agencie
               ⎱In Animals  interfere?                      ⎭

     Keep track of how much contamination - which sources.

Prove Bioharmful - Let Govt. prove its case, on case by case basis

          Monsanto Visit-Govt. Biolabs - in search of toxicological
                                         experiments and evidence
                                         vs. Aroclors to keep up with
                                         progress.

## Monsanto Prove Bioharmless - Limited work at Ind. Bio-test -

     "Safe" toxic  ⎰man                    Rats      Seek evidence of Biodegra
     level for     ⎨mammals  via           Chickens       dation
                   ⎱fish                   Fish      Question evidence against
                                                          us.
                                                     Question shrimp toxicology
                                                          especially other toxic
                                                          chemicals.
                                                     If Aroclor bad, others
                                                          must be worse.

## Probable Outcome

We can prove some things are OK at low concentration.
Give Monsanto some defense.

We can't defend vs. everything. Some animals or fish or insects will be harmed.

Aroclor degradation rate will be slow. Tough to defend against. Higher chlorination compounds will be worse than lower chlorine compounds.

Therefore we will have to restrict uses and clean-up as much as we can, starting immediately.

                                                            DSW  014256

Exhibit 1

-2-

Therefore we will have to work for alternate products in end use applications; for Aroclor production facilities.

Clean Up Aroclors and substitute products where necessary and when required, before threats of publicity and competitive activity over-whelm us.

## Water Pollution seems to be first issue

Aroclor product is refractive, will settle out on solids - sewerage sludge - river bottoms, and apparently has a long life.

Florida or Gulf Coast - Aroclor 1254 - Aroclor 1260 present issue.

40-200 ppb - causing problem at Pensacola (Monsanto) in plant effluent-causing " with shrimp.
- can't risk shut-down of plant.

Federal and State can extrapolate to other plants in Gulf area.

San Francisco - Aroclor 1254 and 1260

Reported Aroclor to be present in San Francisco Bay.

Reported to be thin egg shells in birds -

Lot of screaming -

Great Lakes     Warf studies on DDT
                Aroclor 1254 will be found!
                Aroclor 1242 will be found?

Air Pollution - Possible spread - but less of an issue right now.
Analytical work more difficult.

## Direct Contact with Product

Doesn't seem to be an issue - except for food heat transfer-

We don't believe Aroclor is being used as carrier for insecticide - sprayed around -

We are not positive but most uses are "closed" systems or products used in solid plastics, or adhesives, or sealants.

DSW  014257

Exhibit 1

-3-

| F. Fluids | Possible Pollution by Customers Plant Operation | Possible Pollution by Customers Pro |
|-----------|--------------------------------------------------|-------------------------------------|
| **Product** | | |
| Hydraulic Fluids | Yes, leakage external | Possible - See Johnson Motors Castings. |
| Air Compressor Fluids | Yes, leakage external | Leakage into produ |
| Heat Transfer | Yes, leakage external | Leakage into produ |
| Capacitor Fluids | Yes, leakage from plant - Scrap materials. | In product but closed for end use |
| Transformer Fluids | No, Should be clean. Yes, Reworked transformers. | In product but closed for end use |

* Capacitors can go to land fill dumps. Probably not burned, in Al containers.

** Need to take care of Aroclor in discarded transformers. Product could be drained and reworked.

### Probable Conclusions

| | |
|--|--|
| Hydraulic Leakage | - Product could be caught at machines but will take a lot of clean-up work with customers. - Will have to have replacement product - with less-sensitive components. Work from this base on clean-up to prevent more pollution problems. |
| Air Compressor Fluids | " |
| Hydraulic Fluids | Must expect "shrimp" experiments, West Florida State, to be "aired" sometime soon; next few months. |

This will lead to bad publicity and competitive action vs. all Pydrauls.

We will have to try to confine to Aroclor 1254 and Aroclor 1260.

DSW 014258

Exhibit 1