**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

THE STATE OF NEW MEXICO, ex rel.
HECTOR BALDERAS, ATTORNEY
GENERAL

        Plaintiff,

    v.

MONSANTO CO., SOLUTIA, INC.,
and PHARMACIA LLC,

       Defendants.

Case No.: 1:19-cv-01139

**MOTION TO REMAND**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................................................1

I.      FACTS .....................................................................................................2

II.     LEGAL STANDARDS ...........................................................................4

III.    ARGUMENT ...........................................................................................5

        A.     Monsanto Was Not a Federal Officer Because It Was a Mere Vendor, Not an Arm of the Federal Government. ...........................................................5

             1.     Monsanto Has Not Shown That It "Acted Under" a Federal Officer When It Manufactured the PCBs That Injured the State of New Mexico. ......................................................................................7

             2.     No Causal Nexus Exists Between Monsanto's Actions at Issue Here and the Directions of Any Federal Officer. ...................................16

             3.     Monsanto Has Not Shown It Has a Colorable Federal Defense....18

        B.     Monsanto Has Not Established "Federal Enclave" Jurisdiction...............19

             1.     Monsanto Failed to Meet its Burden of Proving that the State's Claims Arose on a Federal Enclave. .............................................19

             2.     In the Clean Water Act, the Federal Government Expressly Authorized States to Control Water Pollution on Federal Lands. .22

             3.     No "Federal Common Law" Jurisdiction Exists............................23

IV.    CONCLUSION.....................................................................................27

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re "Agent Orange" Prod. Liab. Litig.*,
    304 F. Supp. 2d 404 (E.D.N.Y. 2004) ...............................................................13, 16

*Akin v. Ashland Chem. Co.*,
    156 F.3d 1030 (10th Cir. 1998) ............................................................................22

*Akin v. Big Three Indus.*,
    851 F. Supp. 819 (E.D. Tex. 1994)...................................................................20, 21

*Allison v. Boeing Laser Tech Servs.*,
    689 F.3d 1234 (10th Cir. 2012) ............................................................................22

*Am. Elec. Power Co. v. Connecticut*,
    564 U.S. 410 (2011)..............................................................................................25

*Anderson v. Crown, Cork & Seal*,
    93 F. Supp. 2d 697 (E.D. Va. 2000) .....................................................................20

*Anderson v. Hackett*,
    646 F. Supp. 2d 1041 (S.D. Ill. 2009)........................................................... *passim*

*Bailey v. Monsanto Co.*,
    173 F. Supp. 3d 853 (E. D. Mo. 2016)....................................................................5

*Ballard v. Ameron Int'l Corp.*,
    No. 16-cv-06074-JSC, 2016 WL 6216194 (N. D. Cal. Oct. 25, 2016) ..................20

*Bd. of Cty. Commissioners of Boulder Cty. v. Suncor Energy (U.S.A.) Inc.*,
    No. 18-CV-01672-WJM-SKC, 2019 WL 4200398 (D. Colo. Sept. 5, 2019) .........19

*Brown v. Cerro Flow Prods., Inc.*,
    No. 09-582-GPM, 2010 WL 55905 (S.D. Ill. Jan. 4, 2010) .....................5, 8, 14, 16

*Cabalce v. Blanchard & Assoc.*,
    797 F.3d 720 (9th Cir. 2015) ...........................................................................18, 19

*Caterpillar Inc. v. Williams*,
    482 U.S. 386 (1987)..............................................................................................23

*City of Milwaukee v. Illinois & Michigan*,
    451 U.S. 304 (1981)..............................................................................................25

*Clayton v. Cerro Flow Prods., Inc.*,
    No. 09-550-GPM, 2010 WL 55675 (S.D. Ill. Jan. 4, 2010) ...........................................5, 8, 16

*Cooper v. S. California Edison Co.*,
    170 F. App'x. 496 (9th Cir. 2006) ...........................................................................................22

*Custer v. Cerro Flow Prods., Inc.*,
    No. 09-514-DRH, 2009 WL 5033931 (S.D. Ill. Dec. 15, 2009)...............................5, 8, 14, 16

*Devon Energy Prod. Co., L.P. v. Mosaic Potash Carlsbad, Inc.*,
    693 F.3d 1195 (10th Cir. 2012) .........................................................................................23, 24

*Durham v. Lockheed Martin Corp.*,
    445 F.3d 1247 (9th Cir. 2006) ....................................................................................................8

*Faulk v. Owens-Corning Fiberglas Corp.*,
    48 F. Supp. 2d 653 (E.D. Tex. 1999)........................................................................................17

*Felix v. Lucent Techs., Inc.*,
    387 F.3d 1146 (10th Cir. 2004) .........................................................................................23, 24

*Franchise Tax Bd. of Cal. v. Construction Laborers Vacation Tr. for S. Cal.*,
    463 U.S. 1 (1983).......................................................................................................................23

*Gilmore v. Weatherford*,
    694 F.3d 1160 (10th Cir. 2012) ................................................................................................24

*Grable & Sons Metal Prod., Inc. v. Darue Eng'g & Mfg.*,
    545 U.S. 308 (2005)...................................................................................................................24

*Illinois v. City of Milwaukee, Wis.*,
    406 U.S. 91 (1972).............................................................................................................25, 26

*Jefferson County v. Acker*,
    527 U.S. 423 (1999).........................................................................................................6, 16, 18

*Kelly v. Monsanto Co.*,
    No. 4:15CV1825, 2016 WL 3543050 (E.D. Mo. June 19, 2016).................................. *passim*

*Kokkonen v. Guardian Life Ins. Co.*,
    511 U.S. 375 (1994).....................................................................................................................4

*Laughlin v. Kmart Corp.*,
    50 F.3d 871 (10th Cir. 1995) ......................................................................................................4

*Leite v. Crane Co.*,
    749 F.3d 1117 (9th Cir. 2014) ....................................................................................................8

*Maryland v. Soper*,
  270 U.S. 9 (1926) ................................................................17

*Mater v. Holley*,
  200 F.2d 123 (5th Cir. 1952) ...............................................22

*Mesa v. California*,
  489 U.S. 121 (1989) .................................................6, 16, 18

*Meyers v. A. W. Chesterton*,
  No. 16-292, 2015 WL 2452346 (E.D. La. May 20, 2015) ..................17

*Mobley v. Cerro Flow Prods., Inc.*,
  No. 09-697-GPM, 2010 WL 55906 (S.D. Ill. Jan. 5, 2010) .......... *passim*

*Morgan v. Great Southern Dredging, Inc.*,
  No. 11-2461, 2012 WL 4564688 (E.D. La. Sept. 30, 20 ...................10

*N.G. v. Downey Regional Med. Ctr.*,
  140 F. Supp. 3d 1036 (C.D. Cal. 2015) ..................................11

*Olig v. Xanterra Parks & Resorts, Inc.*,
  No. CV 13-15, 2013 WL 3936904 (D. Mont. July 30, 2013) ................20

*Outboard Marine Corp. v. Illinois*,
  453 U.S. 917 (1981) ......................................................25

*Penteco Corp. Ltd. Partnership–1985A v. Union Gas Sys., Inc.*,
  929 F.2d 1519 (10th Cir. 1991) ...........................................21

*People of the State of California v. U.S.*,
  235 F.2d 647 (9th Cir. 1956) .............................................21

*People of State of Illinois v. Outboard Marine Corp.*,
  619 F.2d 623 (7th Cir. 1980) .............................................25

*Qwest Corp. v. City of Santa Fe*,
  380 F.3d 1258 (10th Cir. 2004) ...........................................24

*Ruppel v. CBS Corp.*,
  701 F.3d 1176 (7th Cir. 2012) .......................................6, 7, 13

*Ryan v. Dow Chem. Co.*,
  781 F. Supp. 934 (E.D.N.Y. 1992) .........................................11

*Schmeling v. NORDAM*,
  97 F.3d 1336 (10th Cir. 1996) ............................................23

iv

*Snowdon v. A. F. Chesterton, Co.*,
366 F. Supp. 2d 157 (D. Me. 2013) ...............................................................13

*State of Missouri v. State of Illinois*,
180 U.S. 208 (1901)......................................................................................26

*State of Ohio v. Sherwin-Williams Co.*,
No. 2:08-cv-00079, 2008 WL 4279579 (S.D. Ohio Sept. 17, 2008) ......................10

*State of Oregon v. Monsanto Co.*,
Case No. 18-cv-00238 (D. Or. July 19, 2018) .................................................5

*State of Washington v. Monsanto Co.*,
17-cv-00053-RSL (W.D. Wa.)........................................................................5

*State of Washington v. Monsanto Co.*,
274 F. Supp. 3d 1125 (W.D. Wa. 2017), *affirmed* 738 Fed. App'x 554 (9th
Cir. 2018) .......................................................................................5, 15, 16, 19

*State of Washington v. Monsanto Company*,
738 Fed. App'x 554 (9th Cir. 2018) ....................................................11, 12, 15

*Transwestern Pipeline Co. v. Monsanto Co.*,
46 Cal. App. 4th 502 (Cal. App. 1996).........................................................17

*United States v. Solvents Recovery Services of New England*,
496 F. Supp. 1127 (D. Conn. 1980).............................................................25

*Watson v. Philip Morris Cos.*,
551 U.S. 142 (2007).................................................................................7, 10

*Willingham v. Morgan*,
395 U.S. 402 (1969).........................................................................6, 16, 18

*Winters v. Diamond Shamrock Chem. Co.*,
149 F.3d 387 (5th Cir. 1998) .......................................................................13

**Statutes**

15 U.S.C. § 2605(3) ........................................................................................2

28 U.S.C. § 1331...........................................................................................4, 26

28 U.S.C. § 1441(a) .........................................................................................4

28 U.S.C. § 1442...................................................................................4, 6, 7, 11

33 U.S.C. § 1323 (a) .......................................................................................22

42 U.S.C. § 9613(b) ...........................................................................................................4

50 U.S.C. § 4511(a) .........................................................................................................15

**Other Authorities**

Erwin Chemerinsky, Federal Jurisdiction § 5.2.3 (6th ed. 2012) .................................23

# INTRODUCTION

The State of New Mexico, by its Attorney General Hector H. Balderas ("State"), respectfully requests that the Court remand this matter back to the First Judicial District Court, County of Santa Fe, because defendants Monsanto Company, Solutia, Inc., and Pharmacia LLC, collectively, "Monsanto," have failed to show any basis for federal officer, federal enclave, or federal question jurisdiction. The State asserts only state common law tort and state statutory claims that arise from the contamination of New Mexico's own waters and other natural resources with toxic PCBs that Monsanto had sold to private customers. As other courts evaluating nearly identical removal arguments have held, Monsanto is no "federal officer" and no federal question jurisdiction exists under the facts and controlling law here.

District courts in **nine** prior cases have rejected Monsanto's assertion of federal officer jurisdiction after evaluating Monsanto's relationship with the United States Government with respect to PCBs.  For good reason: Monsanto may not don the clothes of the Federal Government because it did not produce PCBs under any government contract or specification, did not act at the direction of the Federal Government in any way that is causally connected to the claims at bar, and lacks any colorable federal defense. Similarly, Monsanto's argument for federal enclave jurisdiction misconstrues the State's claims for damage to natural resources and fails to establish that the State's action implicates federal enclaves in any meaningful way. Lastly, Monsanto tries in vain to fabricate a federal question by characterizing the State's tort claims as arising under federal common law.  Because the State (as the master of its Complaint) has explicitly pled only state law claims concerning only State-owned, State-controlled, or State-managed natural resources, Monsanto's efforts to recast the allegations as federal in nature must fail.  New Mexico thus respectfully asks the Court to remand this action to state court where it belongs.

1

## I.     FACTS

The State sued Monsanto in the First Judicial District Court, County of Santa Fe to recover damages associated with contamination of New Mexico's natural resources with toxic polychlorinated biphenyls ("PCBs") manufactured, marketed, and sold by Monsanto. Dkt. #1-1.

Monsanto knew for decades that PCBs were toxic, bioaccumulative, and extremely persistent in the environment, could not be contained to their ordinary applications, and were widely contaminating natural resources and living organisms because of their ordinary and foreseeable use and disposal.  The company concealed these key facts and continued producing and promoting PCBs until shortly before Congress enacted the Toxic Substances Control Act ("TSCA"), which banned the manufacture and most uses of PCBs as of January 1, 1978. *Id*. at 16-49 (¶¶ 48-139); 15 U.S.C. § 2605(3). Further, Monsanto perpetuated and exacerbated the contamination of natural resources and living organisms by instructing customers to dispose of PCBs in landfills, knowing that landfills were not suitable for PCB contaminated waste. *Id*. at 43-44 (¶¶ 128-129). The State asserts claims under New Mexico law for public nuisance, defective design, failure to warn, negligence, unjust enrichment and violation of the Unfair Practices Act. *Id*. at 56-75 (¶¶ 156-242). Specifically, the State seeks compensation for harms Monsanto's commercial PCBs caused to State-owned, State-controlled, and State-managed natural resources, such as the beds of waterbodies and waterways, fish and wildlife, and ground and surface waters. *Id*. at 51 (¶¶ 146-155). In addition, the State seeks to hold Monsanto liable, through unjust enrichment, for certain costs to remediate contamination. *Id*. at 76 (Prayer).

Monsanto's PCBs have become virtually ubiquitous environmental contaminants, which have impaired or contaminated the natural resources of the State of New Mexico including its sediment, land and soil, submerged lands, groundwater, surface water, wildlife, fish, aquifers,

biota, and air.  *Id.* at 8-9 (¶ 10). Exposure to PCBs causes serious health effects in humans and animals, including cancer, and adversely affects the immune system, reproductive system, nervous system, and endocrine system. *Id.* at 19-24 (¶¶ 62-81). Published estimates show that between 1929 and 1977, Monsanto produced and sold a large volume of PCBs and PCB-containing products to various customers, including retail and secondary manufacturers in New Mexico. *Id.* at 50 (¶ 143).   These commercial compounds were used in a variety of industrial, commercial, and consumer products from which PCBs readily escape to contaminate the environment, including paint, caulking, transformers, capacitors, coolants, hydraulic fluids, plasticizers, sealants, inks and lubricants, as well as a variety of household products such as shoe lacquer, flame proofing for Christmas trees, floor wax, adhesive for certain goods, and invisible marking ink used to make chenille rugs and spreads. *See generally id.* at 39 (¶¶ 119-120).

 As a result of Monsanto's conduct, natural resources throughout the State of New Mexico are contaminated with Monsanto's PCBs. *Id.* at 8-9 (¶ 19). Much of this harm has occurred on property owned and managed by the State, which includes contamination of hundreds of miles of rivers and streams and over 20,000 acres of lakes, reservoirs and ponds. *Id.* at 5 (¶ 7). The Complaint identifies 57 rivers, lakes, reservoirs, and canyons confirmed to be contaminated with Monsanto's PCBs, as measured in fish tissue or sediment. *Id.* at 51-55(¶ 147).  As for resources located within the Los Alamos National Lab ("LANL"), the Complaint explicitly disclaimed any damages of relief for PCB contamination within federal lands, "including areas, sites or resources within LANL and areas, sites or resources within the scope of an ongoing assessment by the LANL Trustee Council pursuant to federal regulations."  *Id.* at 148 (¶ 148).

Monsanto filed a timely notice of removal that asserts three separate grounds for federal jurisdiction. First, Monsanto asserts "federal officer" jurisdiction based chiefly on assertions that

it sold its PCBs to federal contractors. Second, Monsanto claims the State's suit is subject to federal enclave jurisdiction because certain bodies of water described in the Complaint are allegedly on, adjacent to, or near certain federal enclaves. Finally, Monsanto contends the State's causes of action under New Mexico law are actually claims arising under "federal common law," subject to exclusive federal jurisdiction under 42 U.S.C. § 9613(b) and thus federal question jurisdiction under 28 U.S.C. § 1331. Monsanto is incorrect on all three grounds.

## II.    LEGAL STANDARDS

Monsanto faces a significant burden on removal: Courts presume that federal jurisdiction does not exit over a removed case unless the defendant can affirmatively show otherwise. "Federal courts are courts of limited jurisdiction. They possess only that power authorized by the Constitution and statute . . . which is not to be expanded by judicial decree." *Kokkonen v. Guardian Life Ins. Co.*, 511 U.S. 375, 377 (1994) (cit. omitted). "[I]t is to be presumed that a cause lies outside this limited jurisdiction and the burden of establishing the contrary rests upon the party asserting jurisdiction." *Id*.

Apparently in an attempt to take advantage of a less strict presumption against removal by a federal officer, Monsanto emphasizes 28 U.S.C. § 1442 as a basis for removal. But, Monsanto's federal enclave and federal common law jurisdiction theories are properly analyzed under the general removal provision, 28 U.S.C. § 1441(a), under which "there is a strong presumption against removal jurisdiction" and doubtful cases must be resolved in favor of remand. *Laughlin v. Kmart Corp.*, 50 F.3d 871, 873 (10th Cir. 1995).

## III.    ARGUMENT

### A.    Monsanto Was Not a Federal Officer Because It Was a Mere Vendor, Not an Arm of the Federal Government.

Monsanto made PCB products and sold them to commercial customers, industrial users, government contractors and, in rare cases, to the government itself. This does not make Monsanto a federal officer, but rather a vendor or subcontractor just like any other.

District courts in **nine** prior cases have rejected Monsanto's arguments for federal officer removal jurisdiction in litigation arising from Monsanto's manufacture and/or sale of PCBs. *See State of Washington v. Monsanto Co.,* 274 F. Supp. 3d 1125, 1128-1131 (W.D. Wa. 2017), *affirmed* 738 Fed. App'x 554 (9th Cir. 2018); *State of Oregon v. Monsanto Co.*, Case No. 18-cv-00238, Dkt. #57 at 56-62 (D. Or. July 19, 2018) (transcript ruling on motion to remand); *Bailey v. Monsanto Co.*, 173 F. Supp. 3d 853, 870 (E. D. Mo. 2016); *Kelly v. Monsanto Co.*, No. 4:15CV1825, 2016 WL 3543050, at *1 (E.D. Mo. June 19, 2016); *Mobley v. Cerro Flow Prods., Inc.*, No. 09-697-GPM, 2010 WL 55906, at *7 & n.4 (S.D. Ill. Jan. 5, 2010); *Brown v. Cerro Flow Prods., Inc.*, No. 09-582-GPM, 2010 WL 55905, at *7 & n.4 (S.D. Ill. Jan. 4, 2010); *Clayton v. Cerro Flow Prods., Inc.*, No. 09-550-GPM, 2010 WL 55675, at *7 & n.4 (S.D. Ill. Jan. 4, 2010); *Custer v. Cerro Flow Prods., Inc.*, No. 09-514-DRH, 2009 WL 5033931, at *8 (S.D. Ill. Dec. 15, 2009); *Anderson v. Hackett*, 646 F. Supp. 2d 1041, 1054-55 (S.D. Ill. 2009).

Monsanto has brought forth no new evidence for its notice of removal in this case.[1]  As in previous cases where it tried this jurisdictional gambit, Monsanto fails to meet its burden of establishing the existence of federal officer removal jurisdiction because it cannot demonstrate (1)

---

[1] Indeed, the factual allegations in Monsanto's current notice of removal are virtually identical to those alleged in its Notice of Removal in the *Washington* litigation.  *Compare* Dkt. #1 with *State of Washington v. Monsanto Co.,* 17-cv-00053-RSL, Dkt. #1 (W.D. Wa.)

that it acted under the direction of a federal officer, (2) that there was a causal connection between Monsanto's actions taken pursuant to a federal officer's directions and the conduct giving rise to the State's claims; or (3) that it has a colorable federal defense.

Section 1442(a)(1) permits removal of a state court action against "any person acting under [an officer]...of the United States or of any agency thereof, in an official or individual capacity, for or relating to any act under color of such office." 28 U.S.C. § 1442. A party seeking removal under section 1442 must demonstrate that (a) it is a "person" within the meaning of the statute; (b) there is a causal nexus between its actions, taken pursuant to a federal officer's directions, and plaintiff's claims; and (c) it can assert a "colorable federal defense." *Jefferson County v. Acker*, 527 U.S. 423, 431 (1999); *Mesa v. California*, 489 U.S. 121, 139 (1989); *Willingham v. Morgan*, 395 U.S. 402, 409 (1969). The removing party bears the burden of proving the grounds supporting federal officer removal. *Ruppel v. CBS Corp.*, 701 F.3d 1176, 1180 (7th Cir. 2012). A defendant seeking removal under section 1442(a) must provide "candid, specific and positive" facts in its notice of removal, showing that a plaintiff's claims are based on its conduct as a federal officer. *See Willingham*, 395 U.S. at 408.

Courts generally read the federal removal statute narrowly when the purported "federal officer" is actually just a private company, like Monsanto:

> Because federal officer removal is rooted in 'an anachronistic mistrust of state courts' ability to protect and enforce federal interests and immunities from suit,' although such jurisdiction is read 'expansively' in suits involving federal officials, it is read narrowly where, as in this instance, only the liability of a private company purportedly acting at the direction of a federal officer is at issue.

*Mobley, supra*, 2010 WL 55906 at *3, *quoting Freiberg v. Swinerton and Walberg Prop. Servs., Inc.* 245 F. Supp. 2d 1144, 1152 n.6 (D. Colo. 2002). The Supreme Court has confirmed that the

statute "is not limitless[,]" and that "a liberal construction nonetheless can find limits in a text's language, context, history, and purposes." *Watson v. Philip Morris Cos.*, 551 U.S. 142, 147 (2007).

This case, like prior state lawsuits seeking to hold Monsanto accountable for contamination of a sovereign's natural resources, does not implicate the purposes of section 1442. The "'basic' purpose is to protect the Federal Government from the interference with its 'operations' that would ensue were a State able, for example, to 'arres[t]' and bring 'to trial in a State cour[t] for an alleged offense against the law of the State,' 'officers and agents' of the Federal Government 'acting . . . within the scope of their authority.' " *Id*. at 150, *quoting Willingham, supra*, 395 U.S. at 406. The present case does not involve an actual federal officer being prosecuted under state law in a state court, simply for carrying out his or her official duties. Rather, it involves a private company attempting to strategically move state law tort litigation to a federal court (efforts that have repeatedly failed in similar cases), because it seeks to delay the progress of this case. Section 1442 thus simply does not apply here, and even if it did, Monsanto does not meet its strictures.

### 1. Monsanto Has Not Shown That It "Acted Under" a Federal Officer When It Manufactured the PCBs That Injured the State of New Mexico.

For purposes of section 1442, "acting under" a federal officer "must involve an effort to assist, or to help carry out, the federal superior's duties or tasks." *Watson*, 551 U.S. at 152. "Cases in which the Supreme Court has approved removal involve defendants working hand-in-hand with the federal government to achieve a task that furthers an end of the federal government." *Ruppel, supra*, 701 F.3d at 1181. Monsanto's notice of removal, however, fails to demonstrate that Monsanto ever manufactured PCBs (1) under a direct contract with the United States government, (2) under any particular government specification for PCBs, or (3) under "direction" from any

federal officer. Indeed, Monsanto sold virtually all of its products to private companies and does not contend that the government supervised or controlled the manufacturing process.[2]

In cases where federal officer removal is successful, defendants can generally clearly show that the plaintiff's claim relates to products sold by the defendant *to the government*--not merely supplied to others for use in manufacturing products for the government. *See Leite v. Crane Co.*, 749 F.3d 1117, 1123 (9th Cir. 2014) (no question that defendant had, in the first instance, sold the products at issue in the case to the government); *see also Durham v. Lockheed Martin Corp.*, 445 F.3d 1247, 1248 (9th Cir. 2006) (all products to which plaintiff claimed exposure were sold to the Air Force). By contrast, Monsanto's shaky argument for federal officer removal rests chiefly on its unsubstantiated opinion that sales of commercial PCB products to government agencies would account for some portion of contamination within New Mexico. *See generally* Dkt. #1 at 18 (¶¶ 54-55) (indicating that the sale of PCBs to federal agencies constitute acts under color of federal office and positing, without citation, that the presence of PCBs in New Mexico was the result of Federal Government operations). In support of this speculative inference, Monsanto offers various invoices evidencing sales of PCB-containing products[3] to federal sites in California, Georgia, Kentucky, Maine, and Pennsylvania. *See* Dkt. #1-9, 1-11. These sales account for an infinitesimal fraction (8/10,000th of a percent) of the total 1.4 billion pounds Monsanto produced in the United

---

[2] *Compare Mobley*, 2010 WL 55906, at *7 & n.4 (holding that even though plants where Monsanto made PCBs were operated under contracts with Chemical Warfare Service, operation "under general auspices of federal authorities" failed to establish federal officer jurisdiction); *Brown.*, 2010 WL 55905, at *7 & n.4 (same); *Clayton*, 2010 WL 55675, at *7 & n.4 (same); *Custer*, 2009 WL 5033931, at *8 (same); and *Anderson*, 646 F. Supp. 2d at 1055 (same).

[3] Many of these invoices identify sales of diphenyl, which is the same as biphenyl and polychlorinated biphenyls (PCBs).

States--and there is no evidence that any of the products Monsanto directly supplied to the Federal Government ever reached New Mexico.

Moreover, as explicitly demonstrated in the very supporting materials Monsanto offers with its Notice of Removal, Monsanto did not manufacture PCBs for the Federal Government under any government contracts. Consequently, Monsanto's own evidence contradicts its argument.  In its Request for a Certificate of Necessity on May 21, 1941, Monsanto represented that it did not have any government contracts to supply products from its Anniston, AL plant (where it manufactured PCBs) to the United States Government:

> 5. In support of the representation that the facilities [are] necessary in the interests of National Defense, give a brief statement as to each of the following matters. . . . (a). Supplies furnished or to be furnished, or services rendered or to be rendered to the Army and/or the Navy (identify principal present and anticipated supply contracts, and indicate volume or amounts involved).
> **Applicant has no contract with the United States government or its agencies for the supply of diphenyl.**

 Dkt. #1-13 at 2-3. (emphasis added).

During the World War II era, Monsanto was considered—at most—a subcontractor for certain companies that incorporated PCBs into products they then sold to the Federal Government. For example, Monsanto described an ongoing plant expansion as being wholly due to its relationship with General Electric Company and other product manufacturers who used PCBs in transformers and condensers. *Id.* at 3. The evidence offered by Monsanto in support of removal makes clear that it was nothing more than a subcontractor indirectly related to the federal government. *See, e.g.,* Dkt. #1-18 at 2 (award documentation for Monsanto's Anniston, Alabama plant noting that, as of January 20, 1942 "**Company is a subcontractor**." Dkt. #1-18 at 2 (emphasis added); *accord id.* at 5 (identifying Monsanto on July 7, 1944, as a "sub-contractor").

Based on Monsanto's admitted role as a subcontractor, to fall within the parameters of the federal officer removal statute, "[t]he assistance that private contractors provide federal officers [must go] beyond simple compliance with the law and help[] officers fulfill other basic governmental tasks." *Watson*, 551 U.S. at 153. "Government contractors fall within the terms of the federal officer removal statute, at least when the relationship between the contractor and the Government is an unusually close one involving detailed regulation, monitoring, or supervision." *Watson*, 551 U.S. at 153. Cases interpreting the Supreme Court's opinion in *Watson*, have unequivocally held that companies lacking a direct contract with the government **cannot remove on federal officer grounds**. *Morgan v. Great Southern Dredging, Inc.*, No. 11-2461, 2012 WL 4564688, at * 6 (E.D. La. Sept. 30, 2012) (holding company that "worked as a subcontractor" not entitled to remove case); *State of Ohio v. Sherwin-Williams Co.*, No. 2:08-cv-00079, 2008 WL 4279579, * at 4 (S.D. Ohio Sept. 17, 2008) ("[T]here is no authority for the proposition that a subcontractor is entitled to the government contractor defense."). As one federal court rejecting Monsanto's removal attempt recently held, "the evidence shows that, although the government required the use of PCBs in certain products and provided financial assistance to Old Monsanto to manufacture PCBs during World War II, Old Monsanto sold the PCBs mostly to government contractors and not to the government itself." *Kelly*, 2016 WL 3543050, at *9.

Monsanto further supports its federal officer claim by alleging that the Federal Government "approved and financed" Monsanto's plant expansions by issuing Certificates of Necessity so that Monsanto could increase production of PCBs. *See* Dkt. #1 at 7 (noting that Necessity Certificates were submitted and approved to finance expansions of Monsanto's facilities "so that it could expand production of PCB's for the military and defense contractors"). This is not accurate. By the time Monsanto sought a Necessity Certificate on May 21, 1941, Monsanto's facility expansion

had already been underway for two months.  Dkt. #1-13 at 2 (showing that construction began on

March 28, 1941). Further, the May 1941 Request for a Certificate of Necessity explicitly states

Monsanto was not seeking reimbursement for the cost of its PCB-production facilities: "Has

applicant entered into, or is applicant negotiating a contract with the United States providing

reimbursement for the cost of the facilities? [Response] No." *Id.* at 1.

In any event, even if Monsanto's allegations concerning the government's financial interest

in producing PCBs were true—which they are not—merely receiving money from the Federal

Government does not establish that a person acts under the direction of a federal officer.  *See State*

*of Washington v. Monsanto Company*, 738 Fed. App'x 554, 555 (9th Cir. 2018) ("These documents

show that Monsanto received tax incentives for producing PCBs, but again, do not show that the

government supervised or controlled Monsanto's manufacture of PCBs [in order to establish

federal officer jurisdiction].").[4]  Indeed, permitting federal officer removal simply because the

Federal Government has an interest in procuring a product would impermissibly expand federal

officer jurisdiction to a host of state tort claims that belong in state court:

> From the standpoint of federalism, the mere assertion of a nebulous federal
> procurement interest cannot, without further specification, be a basis for removal.
> Otherwise any state suit against a manufacturer whose product has at one time been
> diverted and adapted for military use—for example, a nuisance suit against a metal
> foundry—would potentially be subject to removal, seriously undercutting the
> power of the state courts to hear and decide basic tort law. Such a result is
> incompatible with the respect owed to state courts under our federal system.

*Ryan v. Dow Chem. Co.*, 781 F. Supp. 934, 951 (E.D.N.Y. 1992).

Monsanto also cannot show that it "acted under" a federal officer's specifications of the

sort that might support removal. Lacking a contractual relationship with the Federal Government,

---

[4] *See, e.g., N.G. v. Downey Regional Med. Ctr.*, 140 F. Supp. 3d 1036, 1040 (C.D. Cal. 2015)
(holding that receiving payments through Medicare and Medicaid did not establish that healthcare
provider acted under direction of federal officer for purposes of section 1442).

Monsanto relies on a 1961 government specification for heat-resistant paint to support its suggestion that it "acted under" the direction of a federal officer. *See* Dkt 1 at 7-8 (falsely claiming that military specifications "continued to call expressly" for PCB products). That specification, however, identifies a formulation containing Aroclor 1254 (one of Monsanto's commercial PCB formulations), merely as "**an example** of a formulation contemplated by this specification," and provides that "**in no way is the supplier restricted to this formulation**." Dkt. #1-8 at 6 (emphasis added). Monsanto does not and cannot contend that it actually manufactured Aroclor 1254 *because* it was bound by this specification—rather, the implication is that a different company had to meet this specification, and *chose* to incorporate Monsanto's PCBs to comply.  As the Ninth Circuit made clear in assessing this same evidence, it "shows only that the federal government purchased off-the-shelf PCB products from Monsanto and recommended the use of PCBs as a component in defense specifications.  It does not show that the federal government supervised Monsanto's manufacture of PCBs or directed Monsanto to produce PCBs in a particular manner, so as to come within the meaning of 'acted under.'" *Washington v. Monsanto Company*, 738 Fed. App'x at 555.

Monsanto's other evidence of government specifications consists only of inadmissible hearsay evidence that *other manufacturers* were purportedly subject to government specifications that referenced the use of Monsanto's PCBs[5] or a vague reference to a government report that did not address a specific federal requirement for use of PCBs.[6]  In any event, evidence that a product

---

[5] *See* Dkt. #1-10 (Raytheon April 1, 1973 agreement to accept Monsanto's terms for purchase of unspecified quantity of PCB product to meet government specification); Dkt. #1-20 (notes of Monsanto sales call to customer in Rhode Island that reported using Monsanto's PCBs to meet military specifications); Dkt. #1-21 (notes of Monsanto sales call to customer in New York who stated the "military had approved" the use of PCBs in their product).

[6] *See* Dkt. #1-31 (1996 United States Air Force Report addressing the risk assessment of PCB's onboard Navy vessels and merely noting that certain defense systems employed PCBs as a component and were used because of their fire retardant properties; the report does not cite or

could be used to meet a government specification is far from sufficient to show that the government *compelled* the use of the product for purposes of establishing federal officer jurisdiction.[7]

Indeed, Monsanto's attempt to meet its burden of proof using product specifications falls far short of the showing made by other product manufacturers that established a proper basis for federal officer removal. For example, the manufacturers of Agent Orange acted "under the direction" of the Federal Government because the government compelled them to produce Agent Orange under specifications that required a chemical formulation far more concentrated than they used for commercial herbicide production and even controlled its packaging and delivery--indeed, the government exercised "ongoing supervision over the formulation, packaging, and delivery of Agent Orange." *See Winters v. Diamond Shamrock Chem. Co.*, 149 F.3d 387, 399-400 (5th Cir. 1998).[8] Similarly, the manufacturer in *Ruppel* made the turbines at issue for the Navy, in a process "closely controlled" by the Navy, under detailed government specifications that required the use of asbestos, and controlled the content of any warnings. 701 F.3d at 1179. No similar "closely controlled" process or direction exists with regard to Monsanto's provision of PCBs that ultimately

---

establish a specific federal requirement for the use of PCBs in such systems). The Court in *Kelly* rejected the argument that this particular document, among others, established "direct specifications regarding the production and sale of PCBs" and concluded that it does "not show that the federal government compelled Old Monsanto to produce and sell PCBs." 2016 WL 3543050, at *10.

[7] *See Snowdon v. A. F. Chesterton, Co.*, 366 F. Supp. 2d 157, (D. Me. 2013) (remanding asbestos product liability case where manufacturer offered hearsay evidence that failed to demonstrate that Navy specifications relied upon by defendant were design or manufacturing specifications that called for the use of asbestos, as opposed to performance specifications that manufacturer met by choosing to incorporate asbestos).

[8] *Cf. e.g., In re "Agent Orange" Prod. Liab. Litig.*, 304 F. Supp. 2d 404, 430 (E.D.N.Y. 2004) (explaining that federal government "commandeered United States' industry's entire capacity to manufacture 2,4,5--T, . . . specified the contents, packaging, and method of delivery of the Agent Orange it compelled defendants to produce for the war effort . . . [and] required that there be no warnings on the Agent Orange containers delivered by defendants.").

found their way into the government's possession. *See Kelly*, 2016 WL 3543050, at *9 (rejecting similar evidence in support of federal officer jurisdiction and concluding that "the evidence does not show that the manufacturing process was supervised or controlled by the government").

Moreover, Monsanto cannot show that it was forced by the Federal Government to engage in the conduct described in the Complaint. With neither a federal contract nor detailed federal specifications to rely upon, Monsanto turns to the 1972 Interdepartmental Task Force Report, Dkt. #1-7, to show that the Federal Government deemed it necessary to continue producing PCBs for certain closed uses. The 1972 Report, however, **does not require Monsanto, or anyone else, to do or not do anything**--it notes that there are "many questions that remain unanswered" and simply provides a collection of "findings, conclusions, and recommendations." *Id*. at 12. As federal courts have already held in prior cases, the 1972 Report does not provide the type of "direction" that the federal officer removal statute contemplates: "The Monsanto Defendants were not banned by the federal government from continuing to produce PCBs; that is a far cry from being directed by the federal government to continue to produce PCBs." *Anderson,* 646 F. Supp. 2d at 1054; *see also Kelly*, 2016 WL 3543050 at *10 ("The exhibit does not show the federal government compelled Monsanto to manufacture and sell the PCBs.").[9]

---

[9] *Accord Mobley, supra*, 2010 WL 55906 at *7 n.4 ("The notice of removal in this case avers that PCBs were manufactured at this site in the 1970s consistent with a federal policy favoring use of PCBs in capacitors and transformers. However, even assuming this is true, this hardly amounts to proof that federal officers compelled the removing Defendants to take certain actions, much less that federal officers hindered the removing Defendants in safely disposing of chemical waste generated by production of PCBs."); *Brown*, 2010 WL 55905 at *7 n. 4 (same); *Custer*, 2009 WL 5033931 at *7 ("[Defendants] point to a joint report of five agencies finding that the continued production of PCBs was necessary for electrical services in the United States. However, none of the evidence submitted by Defendants shows the federal government ordered the Defendants to continue production of PCBs or that the government directed the Defendants in how to handle or dispose of the PCBs that they produced.").

Lastly, the evidence attached to Monsanto's Notice of Removal does not support the claim that the United States government "compelled" Monsanto to sell PCBs on various occasions during the 1970s. First, Monsanto cites an agreement by Bendix Corporation and the U.S. Atomic Energy Commission to indemnify Monsanto, on March 28, 1972, *if* Monsanto chose to sell 400 barrels of "Therminol FR-1" heat transfer fluids to Bendix Corp., "for use by [Bendix's] Kansas City Division." Dkt. #1-20 at 1. ***The agreement expressly provided that "[n]othing herein shall create or imply any duty or obligation of Monsanto to sell or deliver any Therminol FR-1 or other polychlorinated biphenyl products to Buyer."*** *Id*. at 2.

Monsanto also relies upon letters directing Monsanto to give priority to purchase orders from private companies pursuant to section 101 of the Defense Production Act of 1950. *See* Dkt. #1-22, 1-23, 1-25, 1-26. Section 101 of the DPA--now codified at 50 U.S.C. § 4511(a)--provides, in relevant part that the President may require that performance of certain contracts deemed necessary to the national defense "shall take priority over performance under any other contract or order." 50 U.S.C. § 4511(a). The provision "was enacted to reconcile conflicts between scheduled commercial production and sudden military needs in favor of war production." *See Washington*, 274 F. Supp. 3d at 1131 (citing *Eastern Air Lines, Inc. v. McDonnell Douglas Corp.*, 532 F.2d 957, 981-82 (5th Cir. 1976)). The letters do not demonstrate that Monsanto was forced to produce anything it was not already producing—only to prioritize certain orders over others. *See id.* (concluding that letters failed to show the government directed "Monsanto to produce PCBs that it had not already, or would not have otherwise, produced"). Moreover, evidence suggesting that Monsanto was required to comply with federal law "is not sufficient to establish that Monsanto 'acted under' federal authority." *Washington v. Monsanto Company*, 738 Fed. App'x at 556. In short, Monsanto fails to demonstrate federal officer status for purposes of removal.

15

       **2.**      **No Causal Nexus Exists Between Monsanto's Actions at Issue Here and the Directions of Any Federal Officer.**

Monsanto's removal attempt under the federal officer doctrine also fails because the State's claims have nothing do with anything Monsanto says it did at the behest of the Government. Monsanto must do more than show (which it has failed to do) that it made PCBs under the "general auspices" of the federal government.[10] Federal officer jurisdiction also requires a "causal nexus" between the acts defendant performed at the government's direction and the plaintiff's claims. *See Jefferson County*, 527 U.S. at 431; *Mesa*, 489 U.S. at 139; *Willingham*, 395 U.S. at 409. Monsanto has not demonstrated that the Federal Government had any role in directing the specific acts that led to the contamination of New Mexico's natural resources as alleged in the Complaint, namely, Monsanto's failure to warn and active concealment of the true properties of its PCBs, inadequate and misleading disposal instructions, false and misleading promotion of its PCBs, and creation of a public nuisance upon the State's natural resources.  *See Washington*, 274 F. Supp. 3d at 1131 ("even if the government contracted for Monsanto's PCBs, the Court cannot say that Monsanto was 'acting under' a federal agency where the government did not direct Monsanto to produce, [dispose of], and promote PCBs ***in a particular way***") (emphasis in original); *see also "Agent Orange" Prod. Liab. Litig.,* 304 F. Supp. 2d 442, 448 (E.D.N.Y. 2004) (citing *Arness v. Boeing N. Am.*, 997 F. Supp. 1268 (C.D. Cal. 1998)) (contrasting situations where federal officer jurisdiction existed when Federal Government had strict control over the development and production of toxic chemicals with situations where the government did not specify how to dispose of the chemical waste and disposal was the basis of plaintiff's claim); *Clayton, supra*, 2010 WL

---

[10] *See Mobley, supra*, 2010 WL 55906, at *7 & n.4; *Brown., supra*, 2010 WL 55905, at *7 & n.4; *Clayton*, 2010 WL 55675, at *7 & n.4; *Custer*, 2009 WL 5033931, at *8 (same); and *Anderson*, 646 F. Supp. 2d at 1055.

55675 at *7 (refusing to find federal officer jurisdiction where Monsanto could not demonstrate federal officer had directed the manner in which it should dispose of waste); *Anderson*, 646 F. Supp. 2d at 1054 ("the federal government did not direct the Monsanto Defendants to 'spill' or 'incompletely incinerate' or 'improperly burn' or 'discharge into surface or wastewater systems' or 'improperly landfill' Agent Orange or any other hazardous substance. Therefore, the fact that they produced Agent Orange to government specifications does not establish that the federal government directed them to perform the acts that form the basis for the liability claimed here").

Even the few instances Monsanto (wrongly) characterizes as government requirements that Monsanto sell it PCBs have no apparent causal connection to the contamination of New Mexico, which is at the heart of the State's case here.  They occurred in other states, after Monsanto had already been making, marketing, and distributing its products for widespread commercial and household use for approximately 40 years.  "There must be causal connection between what the officer has done under asserted official authority and the state prosecution." *Maryland v. Soper*, 270 U.S. 9, 33 (1926).[11] Without that causal connection, Monsanto's removal attempt fails.

---

[11] *See also, e.g., Faulk v. Owens-Corning Fiberglas Corp.*, 48 F. Supp. 2d 653, 663 n.14 (E.D. Tex. 1999) (rejecting federal officer removal and stating that "Defendants can bury this Court in federal government regulations controlling their actions. But if there is no causal nexus between Defendants' actions in response to this control and the Plaintiffs' claims, then the government did not "make them do it" since the "it" was never under government control."); *Meyers v. A. W. Chesterton*, No. 16-292, 2015 WL 2452346, at *6 (E.D. La. May 20, 2015) (rejecting federal officer removal because "nothing about the Navy's oversight prevented the Defendants from complying with any state law duty to warn."); *cf. Transwestern Pipeline Co. v. Monsanto Co.*, 46 Cal. App. 4th 502, 531 (Cal. App. 1996) (upholding jury verdict in indemnification claim for PCB remediation costs, on basis that "Government regulators did not manufacture [the PCB containing product at issue], Monsanto did. Government regulators did not fail to warn . . . of the environmental hazards of PCBs, Monsanto did.").

### 3.      Monsanto Has Not Shown It Has a Colorable Federal Defense.

Even if Monsanto could demonstrate that it acted as a federal officer (which it cannot), and that its conduct as a federal officer had the requisite causal nexus to the State's claims (which it did not), federal officer jurisdiction still does not exist because Monsanto cannot show that it has any colorable federal defenses.  Section 1442(a) requires the defendant to show it can assert a "colorable federal defense" as a separate and essential element of federal officer jurisdiction. *See Jefferson County*, 527 U.S. at 431; *Mesa*, 489 U.S. at 139; *Willingham*, 395 U.S. at 409. Monsanto invokes two defenses—the government contractor defense and the Defense Production Act—to support removal jurisdiction. Neither the record nor controlling law supports either defense.[12]

Well-established authority precludes Monsanto's "government contractor" defense, which is available only to those who contract with the government to design and manufacture military equipment. *See Cabalce v. Blanchard & Assoc.*, 797 F.3d 720, 731 (9th Cir. 2015). As discussed at length above, Monsanto has failed to prove it supplied PCBs in New Mexico under any contract with the Federal Government, and in fact has offered affirmative evidence that it did not have any such contracts. *See, infra*, at 9. Nor has Monsanto demonstrated that the Federal Government ever issued any "***reasonably specific***" specifications for PCBs as required for the government contractor defense. *See, infra*, at 11-14.  It is not sufficient for Monsanto to simply point to a government specification that mentioned PCBs as an option for the product's formulation. To support the government contractor defense, the specification must result from a "back and forth dialogue between the contractor and the government" showing that the government "engage[d] in a thorough review of the allegedly defective design and [took] an active role in testing and

---

[12] Indeed, the mere fact that Monsanto has litigated PCB-related cases for decades, but cannot cite even one single instance in which it ever has successfully employed either defense calls into doubt whether these defenses are in fact "colorable."

implementing that design"--or in other words, gave "more than a cursory rubber stamp approving the design." *Cabalce*, 797 F.3d at 731. Monsanto has not even attempted to make such a showing.

Similarly, Monsanto's Defense Production Act defense is not "colorable" because as described above, evidence submitted by Monsanto does not demonstrate that it was actually forced to produce anything it was not already producing—only to prioritize certain orders over others. *See, infra*, at 14. Moreover, even if Monsanto had been required to produce PCBs for the Federal Government (which it had not), that is insufficient to support federal jurisdiction here: "[F]or purposes of [plaintiff's] lawsuit, the letters do not direct Monsanto to conceal the toxicity of PCBs. Accordingly, Monsanto has failed to demonstrate a 'casual nexus' between Washington's claims and any actions that Monsanto took pursuant to a federal officer's direction." *Washington*, 274 F. Supp. 3d at 1131. As such, Monsanto's invocation of the Defense Production Act is not remotely a "colorable" defense.

**B.      Monsanto Has Not Established "Federal Enclave" Jurisdiction.**

**1.      Monsanto Failed to Meet its Burden of Proving that the State's Claims Arose on a Federal Enclave.**

No federal enclave jurisdiction exists in this case because Monsanto's unsupported and erroneous factual assertions do not establish that the State's claims in this case arose on any "federal enclave" to any meaningful extent. The State does not (and could not) seek relief for harm to federally owned resources; the State simply does not have standing to assert such a claim. That is enough to deny jurisdiction on federal enclave grounds. *See id.* at 1132 ("Washington asserts that it does not seek damages for contamination to waters and land within federal territory, as it would not have standing to do so. The Court is satisfied that, because Washington avowedly does not seek relief for contamination of federal territories, none of its claims arise on federal enclaves."); *Bd. of Cty. Commissioners of Boulder Cty. v. Suncor Energy (U.S.A.) Inc.*, No. 18-

19

CV-01672-WJM-SKC, 2019 WL 4200398, at *18 (D. Colo. Sept. 5, 2019) ("Federal enclave jurisdiction thus does not exist here because Plaintiffs' claims and injuries are alleged to have arisen exclusively on non-federal land. That the alleged climate alteration by Defendants may have caused similar injuries to federal property does not speak to the nature of Plaintiffs' alleged injuries for which they seek compensation, and does not provide a basis for removal.").[13]

Even if Plaintiff's disclaimer of claims arising on federal enclaves were not enough— which it is—the fact that some, but not all, of the relevant toxic exposure occurred on a federal enclave would nevertheless not be sufficient to invoke federal jurisdiction. *Olig v. Xanterra Parks & Resorts, Inc.*, No. CV 13-15, 2013 WL 3936904, at *3 (D. Mont. July 30, 2013) (determining federal enclave jurisdiction based on "the locus in which the claim arose," i.e., "where the substance and consummation of the claim occurred, and where all pertinent events occurred"). Indeed, federal courts in toxic tort cases have refused to impose federal enclave jurisdiction merely because a relatively minor proportion of the exposure occurred in a federal enclave.[14] Monsanto identifies only 19 waterways (of the 57 total) that pass "within federal Los Alamos National

---

[13] Monsanto makes much of the State's so-called "brazen attempt to avoid federal jurisdiction" by carving out any claim with respect to federal enclaves. *See* Dkt 1 at 23, n.8 (citing Compl. ¶ 148). What Monsanto fails to acknowledge however, is that New Mexico, not Monsanto, is the master of its Complaint and it is not for Monsanto to define the scope of Plaintiff's claim. Moreover, there is nothing "brazen" about asserting only claims for which a plaintiff has standing.

[14] *See Ballard v. Ameron Int'l Corp.*, No. 16-cv-06074-JSC, 2016 WL 6216194 at *3 (N. D. Cal. Oct. 25, 2016) (holding that no federal enclave jurisdiction existed over personal injury claim when plaintiff alleged exposure at a federal enclave where he worked for six months but also at 16 other jobsites over a period of many years); *Anderson v. Crown, Cork & Seal*, 93 F. Supp. 2d 697, 702 (E.D. Va. 2000) (holding no federal enclave jurisdiction existed over naval worker's asbestos personal injury claim, where plaintiff spent "majority" of time at sea and not in shipyard that was alleged to be a federal enclave); *see also Akin v. Big Three Indus.*, 851 F. Supp. 819, 825 & n.4 (E.D. Tex. 1994) ("When exposures allegedly occur partially inside and partially outside the boundaries of an enclave an argument would surface that the state's interest increases proportionally, while the federal interest decreases.").

Laboratories enclave" as being impaired with PCBs.  Dkt. #1 at 23.  However, Monsanto has not demonstrated—via reference to maps, land grants, or other supporting facts or evidence—the extent that the identified waterways are located in the alleged federal enclave or even what the geographic definition of the enclave is.  Mere conclusory allegations of jurisdiction are not enough; the party pleading jurisdiction "must allege in his pleading the facts essential to show jurisdiction." *Penteco Corp. Ltd. Partnership–1985A v. Union Gas Sys., Inc.*, 929 F.2d 1519, 1521 (10th Cir. 1991). In any event, the identified waterways, insofar as they course through the LANL enclave, make up only a small fraction of the hundreds of river miles and 20,000-plus lake acres of PCB-contaminated waterbodies at issue in this case.  Indeed, Monsanto concedes that *no* federal enclave encompasses the numerous other lakes, rivers, reservoirs and canyons named in paragraph 147 of the Complaint. The State's interest arising from the contamination of these areas far outweighs any potential federal interest that might give rise to federal enclave jurisdiction if the contamination at issue had occurred on federal lands. *Cf. Akin, supra*, 851 F. Supp. at 825 & n.4.

Monsanto's references to other waters "near" or "adjacent to" federal enclaves do not improve its position. Water is not part of a federal enclave merely because it is located adjacent to or near the enclave or flows into or out of it. *See, e.g., People of the State of California v. U.S.*, 235 F.2d 647, 656 (9th Cir. 1956) ("The [Federal] government, as regards all claimants to water outside the enclave, is not in the position of sovereign."). Federal enclave jurisdiction exists where the claim arises *on* the federal enclave--not nearby or adjacent to it.[15] Indeed, the cases Monsanto

---

[15] *See Willis*, 555 F.2d at 726 (holding enclave jurisdiction proper only if accident giving rise to claim occurred on property that qualified as federal enclave, as opposed to other property).

cites in which a court found federal enclave jurisdiction or applied the federal enclave doctrine

arose solely from events that occurred on the federal enclave—not near it or beside it.[16]

### 2.    In the Clean Water Act, the Federal Government Expressly Authorized States to Control Water Pollution on Federal Lands.

Monsanto's bid for federal enclave jurisdiction also fails because the Federal Government

has ceded back to the State the authority to regulate water pollution and abatement on federal

property. States may regulate activities within a federal enclave with the express permission of

Congress:

> Each department, agency, or instrumentality of the executive, legislative, and judicial branches of the Federal Government (1) having jurisdiction over any property or facility . . . shall be subject to, and comply with, all Federal, State, interstate, and local requirements, administrative authority, and process and sanctions respecting the control and abatement of water pollution in the same manner, and to the same extent as any nongovernmental entity including the payment of reasonable service charges. The preceding sentence shall apply (A) to any requirement whether substantive or procedural (including any recordkeeping or reporting requirement, any requirement respecting permits and any other requirement, whatsoever), (B) to the exercise of any Federal, State, or local administrative authority, and (C) to any process and sanction, whether enforced in Federal, State, or local courts or in any other manner.

33 U.S.C. § 1323 (a). Thus, the State's claims under State law are not "assimilated" into federal

law, creating federal question jurisdiction as Monsanto contends, but rather, proceed under the

Federal Government's express grant of authority to the State to regulate water pollution and

---

[16] *See Allison v. Boeing Laser Tech Servs.*, 689 F.3d 1234, 1235 (10th Cir. 2012) (employment-related claims by employee who worked on a federal enclave); *Akin v. Ashland Chem. Co.*, 156 F.3d 1030, 1034 (10th Cir. 1998) (personal injury case arising from exposure to chemicals while working at an Air Force Base); *see also Cooper v. S. California Edison Co.*, 170 F. App'x. 496, 497 (9th Cir. 2006) (retaliation claims by employee who worked on a federal enclave); *Mater v. Holley*, 200 F.2d 123, 124 (5th Cir. 1952) (personal injury claims arising from defendants' negligent acts which occurred "within the boundaries of [a federal facility,] Fort McPherson, Georgia").

abatement on federal lands. Accordingly, even if Monsanto's federal-enclave arguments were correct—and they are not—federal jurisdiction would still be lacking in this case.

### 3.      No "Federal Common Law" Jurisdiction Exists.

Monsanto's argument that New Mexico's state-law claims actually arise under federal law flouts the long-standing and firmly entrenched "well-pleaded complaint" rule. Further, Monsanto's argument for applying "federal common law" misrepresents clear and unambiguous holdings by the United States Supreme Court. Monsanto's "federal common law" argument should be rejected.

Under Title 28, Section 1331 of the U.S. Code, federal district courts have "original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." In determining whether a claim arises under federal law, courts examine the "well[-]pleaded' allegations of the complaint and ignore potential defenses . . . ." *Devon Energy Prod. Co., L.P. v. Mosaic Potash Carlsbad, Inc.*, 693 F.3d 1195, 1202 (10th Cir. 2012), citing *Beneficial Nat'l Bank v. Anderson*, 539 U.S. 1, 6 (2003). The well-pleaded complaint rule is a "powerful doctrine" that "severely limits the number of cases in which state law 'creates the cause of action' that may be initiated in or removed to federal district court*." Franchise Tax Bd. of Cal. v. Construction Laborers Vacation Tr. for S. Cal.*, 463 U.S. 1, 9-10 (1983).

A suit arises under federal law "only when the plaintiff's statement of his own cause of action shows that it is based on federal law." *Schmeling v. NORDAM*, 97 F.3d 1336, 1339 (10th Cir. 1996), citing *Louisville & Nashville R.R. v. Mottley*, 211 U.S. 149, 152 (1908); *see also* Erwin Chemerinsky, Federal Jurisdiction § 5.2.3, at 295 (6th ed. 2012) ("[I]t must be clear from the face of the plaintiff's complaint that there is a federal question."). This rule "makes the plaintiff the master of the claim" so that "he or she may avoid federal jurisdiction by exclusive reliance on state law." *Caterpillar Inc. v. Williams*, 482 U.S. 386, 392 (1987); *see, e.g., Felix v. Lucent Techs., Inc.*,

387 F.3d 1146, 1154 (10th Cir. 2004). "By omitting federal claims from a complaint, a plaintiff can [generally] guarantee an action will be heard in state court." *Qwest Corp. v. City of Santa Fe*, 380 F.3d 1258, 1264 n.1 (10th Cir. 2004).  Among the many oft-repeated reasons for maintaining strict adherence to the well-pleaded complaint rule is the bedrock principle of federalism; it is especially important to avoid exercising federal jurisdiction when it would "herald a potentially enormous shift of traditionally state cases into federal courts." *Gilmore v. Weatherford*, 694 F.3d 1160, 1176 (10th Cir. 2012) (quoting *Grable & Sons Metal Prod., Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308, 319 (2005)). Such is the case here, where New Mexico's Complaint fully and exclusively relies on state-law causes of action sounding in business regulation and tort.

To invoke federal-question jurisdiction, Monsanto must prove "either (1) that [New Mexico]'s state-law claims are completely preempted, or (2) there is a substantial, disputed federal-law issue necessarily embedded in [New Mexico]'s state-law claims." *Devon Energy*, 693 F.3d at 1203-04. Notably, preemption is normally a defense to be raised in, and adjudicated by, state court—not a basis for removal to federal court.  *Felix*, 387 F.3d at 1166-1167.  Monsanto has not made any preemption arguments here and rests on an argument that the State's claims invoke substantial, disputed issues of federal law.

The seminal case defining substantial issues of federal law is *Grable*, which embraces "the commonsense notion that a federal court ought to be able to hear claims recognized under state law that nonetheless turn on substantial questions of federal law, and thus justify resort to the experience, solicitude, and hope of uniformity that a federal forum offers on federal issues." 545 U.S. at 314. Monsanto names no federal law on which this case turns. Instead, Monsanto falsely characterizes this case as an interstate matter and then dredges up an obsolete theory, that "federal common law must govern interstate pollution cases."

24

Monsanto includes a single paragraph in its Removal Notice purporting to contain case law supporting its argument that this case turns on federal common law. Dkt. #1 at 12.  But all of the authority cited by Monsanto has been overturned, rejected, or both. Monsanto first cites *Illinois v. City of Milwaukee, Wis.*, 406 U.S. 91 (1972) ("*Milwaukee I*") for the proposition that "pollution of interstate or navigable waters creates actions arising under the 'laws' of the United States within the meaning of Section 1331(a)." But the Supreme Court abrogated that holding in light of the 1972 amendments to the Clean Water Act. *City of Milwaukee v. Illinois & Michigan*, 451 U.S. 304, 319 (1981) ("*Milwaukee II*") ("The establishment of such a self-consciously comprehensive program by Congress, which certainly did not exist when *Illinois v. Milwaukee* was decided, strongly suggests that there is no room for courts to attempt to improve on that program with federal common law."); *see also Am. Elec. Power Co. v. Connecticut*, 564 U.S. 410, 423-25 (2011) (recognizing that "amendments to the Clean Water Act displaced the nuisance claim recognized in Milwaukee I" and holding that "the Clean Air Act and the EPA actions it authorizes displace any federal common-law right to seek abatement of carbon-dioxide emissions from fossil-fuel fired powerplants.").  Monsanto also cites *People of State of Illinois v. Outboard Marine Corp.*, 619 F.2d 623 (7th Cir. 1980), for the existence of federal common law, but the Supreme Court vacated the judgment in that case because *Milwaukee I* required reconsideration. *Outboard Marine Corp. v. Illinois*, 453 U.S. 917 (1981) (granting certiorari and vacating judgment). Monsanto's reliance on *United States v. Solvents Recovery Services of New England*, 496 F. Supp. 1127, 1134 (D. Conn. 1980), is similarly misplaced because it relied on the defunct holding in *Milwaukee I*. Finally, Monsanto cites a 1901 dispute over "undefecated filth and sewage and poisonous and unhealthful and noxious matters" visited upon the state of Missouri by the state of Illinois, in which the U.S. Supreme Court applied a federal common law of nuisance predating all of the above cases.

25

*State of Missouri v. State of Illinois*, 180 U.S. 208, 213, 215 (1901).  Plainly, that decision, like *Milwaukee I*, predates the federal environmental laws, including the Clean Water Act, and is no longer valid to support a concept of federal environmental common law.

Failing to identify any decisions establishing the existence of relevant federal common law, Monsanto pivots to New Mexico's correct characterization of PCBs as "a global contaminant" – based on ***Monsanto's own internal documents*** – and to Monsanto's own profligate use of PCBs that has created a pervasive national emergency. *See generally* Dkt. #1 at 12-14.[17] Monsanto's acknowledgement of its role in global PCB contamination is of no moment here. New Mexico's claims arise solely and entirely from state laws designed to protect New Mexico residents from injuries resulting from Monsanto's conduct. As the Complaint makes plain, "[Monsanto] marketed, sold, and distributed commercial PCB formulations and/or products and materials containing PCBs to customers within New Mexico." *Id.* ¶ 25. The Complaint further alleges that Monsanto knowingly caused the pollution and impairment of New Mexico's waters, soils and other natural resources, which posed an increasingly hazardous threat to the environment of New Mexico and New Mexico residents' health, and deployed unfair and deceptive trade practices to continue promoting and selling its poisonous products in New Mexico. *See generally id.* ¶¶ 14-21. These acts violated New Mexico state laws concerning public nuisance, defective design, failure to warn, and unjust enrichment, as well as New Mexico's Unfair Practices Act. New Mexico's Complaint relies entirely and exclusively on these state-law causes of action and therefore precludes removal based on 28 U.S.C. § 1331.

---

[17] It is beyond ironic that Monsanto attempts to evade responsibility for the damage it wrought in New Mexico by pointing out that its tortious behavior has been global, systemic and widespread.

## IV.    CONCLUSION

Federal officer jurisdiction does not exist in this case because Monsanto was not a federal officer, did not otherwise act "under the direction" of a federal officer in any way that is causally connected to the State's claims, and lacks any colorable federal defenses. Federal enclave jurisdiction does not exist because the State asserts only claims arising out of injuries to non-federal natural resources, and these arise outside of the federal enclaves Monsanto identifies, and because the Federal Government expressly authorized the State to regulate water pollution on federal lands in the Clean Water Act. Finally, federal common law jurisdiction does not exist because there is no federal environmental common law and in any event, New Mexico alleges solely state law claims for injury solely within the State.  For these and all the reasons discussed in its motion and supporting brief, New Mexico respectfully asks that this Court find that it lacks subject matter jurisdiction and remand this action to state court.

Dated:  December 23, 2019                    HECTOR H. BALDERAS
                                             ATTORNEY GENERAL OF NEW MEXICO

                                             /s/ *P. Cholla Khoury*
                                             P. Cholla Khoury
                                             Assistant Attorney General
                                             Anne E. Minard
                                             Special Assistant Attorney General
                                             P.O. Drawer 1508
                                             Santa Fe, New Mexico 87504-1508
                                             ckhoury@nmag.gov
                                             Tel: 505-490-4052
                                             aminard@nmag.gov
                                             Tel: 505-490-4045
                                             Fax: 505-318-1050

                                             Marcus Rael
                                             ROBLES, RAEL & ANAYA
                                             500 Marquette Ave. NW
                                             Suite 700
                                             Albuquerque, New Mexico 87102

27

Tel: (505) 242-2228
Fax: (505) 242-1106
marcus@roblesrael.com

Kyle J. McGee
(Admitted *Pro Hac Vice*)
Viola Vetter
(Admitted *Pro Hac Vice*)
GRANT & EISENHOFER P.A.
123 Justison St
Wilmington, DE 19801
Tel: (302) 622-7000
Fax: (302) 622-7100
kmcgee@gelaw.com
vvetter@gelaw.com

Scott Summy (Motion for *Pro Hac Vice* Admission
to be Filed)
Carla Burke Pickrel (Motion for *Pro Hac Vice*
Admission to be Filed)
Brett Land (Motion for *Pro Hac Vice* Admission to
be Filed)
BARON & BUDD, P.C.
3102 Oak Lawn Avenue, #1100
Dallas, TX 75219
Tel: (214) 521-3605

*Special Counsel for Plaintiff the State of New
Mexico*

28

## <u>CERTIFICATE OF SERVICE</u>

I, hereby certify that on the 23rd day of December 2019, the foregoing document was filed

and served electronically through the CM/ECF on the following counsel of record.

Timothy C. Holm
Alex C. Walker
MODRALL, SPERLING, ROEHL, HARRIS & SISK, P.A.
P.O. Box 2168
Albuquerque, NM 87103-2168
tholm@modrall.com
awalker@modrall.com


HECTOR H. BALDERAS
ATTORNEY GENERAL OF NEW MEXICO

/s/ *P. Cholla Khoury*
P. Cholla Khoury