# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

_____

THE STATE OF NEW MEXICO, ex rel.
HECTOR BALDERAS, ATTORNEY
GENERAL,

   Plaintiff,         Case No.: 19-cv-01139 WJ-GBW

  v.

MONSANTO CO., SOLUTIA, INC.,
and PHARMACIA LLC,

   Defendants.

## MEMORANDUM OPINION AND ORDER
## GRANTING PLAINTIFF'S MOTION TO REMAND

THIS MATTER comes before the Court upon a Motion to Remand filed by Plaintiff on December 23, 2019 (**Doc. 8**). Having reviewed the parties' pleadings and the applicable law, the Court finds that Plaintiff State of New Mexico's Motion is well-taken and, therefore, is GRANTED.

## BACKGROUND

This lawsuit involves the transboundary transport of polychlorinated biphenyls ("PCBs") to and from areas outside of New Mexico. On May 29, 2019, Plaintiff, the State of New Mexico through its Attorney General (hereinafter "the State") filed a lawsuit against Defendants Monsanto Company ("Monsanto"), Solutia, Inc. ("Solutia"), and Pharmacia LLC ("Pharmacia") (collectively, "Defendants" or "Monsanto"), in the First Judicial District Court, County of Santa Fe to recover damages associated with Defendants' alleged contamination of New Mexico's natural resources with toxic PCBs manufactured, marketed, and sold by Monsanto. Doc. 1-1. Defendants removed the case to federal court on December 4, 2019, claiming that removal is

authorized under 28 U.S.C. §1441(a) (general removal statute); §1331 (federal question for "federal enclave" jurisdiction); and §1442(a)(1) (federal officer removal). In this motion, the State requests that the Court remand this matter back to state court because Defendants have failed to show any basis for federal officer, federal enclave, or federal question jurisdiction.

The complaint alleges that Monsanto knew for decades that PCBs were toxic and were widely contaminating natural resources and living organisms because of their foreseeable use and disposal, yet Monsanto concealed these facts and continued producing and promoting PCBs until Congress enacted the Toxic Substances Control Act ("TSCA") which banned the manufacture of PCBs as of January 1, 1978. 15 U.S.C. §2605(3). The State also alleges that Monsanto exacerbated the contamination from PCBs by instructing customers to dispose of PCBs in landfills, knowing that landfills were not suitable for PCB contaminated waste. The State asserts the following claims in the complaint and seeks compensatory and injunctive relief at law and in equity, as well as civil penalties under the relevant statutes:

First Cause of Action: Public Nuisance
Second Cause of Action: Design Defect
Third Cause of Action: Failure to Warn and Instruct
Fourth Cause of Action: Negligence
Fifth Cause of Action: Unjust Enrichment
Sixth Cause of Action: Violations of Unfair Practices Act (NMSA 1978, §§57-12-1, *et seq.*)

Monsanto claims that Plaintiff paints an "incomplete and misleading picture of PCBs and Old Monsanto's manufacturing practices." Doc. 22 at 2.[1] Monsanto describes commercial production of PCBs as a response to the electrical industry's need for materials that would provide increased fire resistance when used in transformers and capacitors, making PCBs "attractive for numerous industrial applications" because PCBs reduced the risk of costly and deadly fires.

---

[1] Defendant Pharmacia was formerly "Old Monsanto." *See Bailey v. Monsanto Co.*, 176 F. Supp. 3d 853, 855 (E.D. Mo. 2016).

Monsanto claims that it also produced PCBs for decades as a federal officer, charged with supplying to the United States Government ("Government") and its military contractors for national defense purposes including multiple wars, from World War II through the 1970's. Old Monsanto produced PCBs at facilities financed by the Government pursuant to "Certificates of Necessity" in order to fulfill national defense needs and to conform to federal specifications for military needs. Defendant further contends that in the 1970's, after Old Monsanto ceased selling PCBs to private industry due to environmental concerns, the Government "compelled" it to sell PCBs to military contractors pursuant to the Defense Production Act, deeming PCBs critical to the national defense.

Monsanto also contends that while it may be responsible for the majority of PCB manufacture, PCBs were produced globally by other manufacturers and that "byproduct PCBs" are introduced everyday into the environment by consumers including public entities such as the State. However, the merits of the State's claims and the extent of the damages allegedly caused by Monsanto are not before the Court in this motion. The only issue to be considered here is whether removal of this case was proper.

## DISCUSSION

Federal courts are courts of limited jurisdiction; there is a presumption against removal jurisdiction, which the defendant seeking removal must overcome. *Martin v. Franklin Capital Corp.,* 251 F.3d 1283, 1290 (10th Cir. 2001). Removal statutes are strictly construed, and ambiguities should be resolved in favor of remand. *See Laughlin v. Kmart Corp.,* 50 F.3d 871, 873 (10th Cir. 1995) (under 28 U.S.C. § 1441(a), there is a strong presumption against removal jurisdiction" and doubtful cases must be resolved in favor of remand). The defendant seeking removal must establish that federal court jurisdiction is proper "by a preponderance of the

evidence." *McPhail v. Deere & Co.*, 529 F.3d 947, 953 (10th Cir. 2008); *see also De La Rosa v. Reliable, Inc.*, 113 F. Supp. 3d 1135, 1151 (D.N.M. 2015).

The State contends that there is no legal basis for removal under either 28 U.S.C. §1331 or §1442(a)(1), offering several arguments in support of remand.

## I.      Monsanto is not a Federal Officer

Monsanto's removal notice claims "federal officer" jurisdiction under 28 U.S.C. §1442 based on assertions that it sold its PCBs to federal contractors and that it was ordered by the Government to provide PCBs that it did not want to provide.

Section 1442(a)(1) permits removal of a state court action against "any person acting under [an officer]. . . of the United States or of any agency thereof, in an official or individual capacity, for or relating to any act under color of such office." 28 U.S.C. § 1442.  For §1442(a)(1) to constitute a basis for removal, a private corporation must show:

(1)      that it acted under the direction of a federal officer;

(2)      that there is a causal nexus between the plaintiff's claims and the acts the private corporation performed under the federal officer's direction; and

(3)      that there is a colorable federal defense to the plaintiff's claims.

*Bd. of Cty. Commissioners of Boulder Cty. v. Suncor Energy (U.S.A.) Inc.*, 405 F. Supp. 3d 947, 975 (D. Colo. 2019) (citing *Greene v. Citigroup, Inc.*, No. 99-1030, 2000 WL 647190, at *6 (10th Cir. May 19, 2000).

While federal officer removal is read "expansively" in suits involving federal officials, it is read "narrowly where . . . only the liability of a private company purportedly acting at the direction of a federal officer is at issue." *Mobley v. Cerro Flow Prods., Inc.*, No. 09-697-GPM, 2010 WL 55906, at *3 & n.4 (S.D. Ill. Jan. 5, 2010); *see Watson v. Philip Morris Companies, Inc.*, 551 U.S. 142, 147 (2007) (liberal construction of §1442 "can find limits in a text's language,

context, history and purposes").  The State contends that this lawsuit does not implicate the purposes of §1442 because it does not seek to protect a federal officer from prosecution under state law in a state court. Rather this lawsuit seeks to hold Monsanto, a private company, accountable for contamination of a sovereign's natural resources. Moreover, the State contends that Monsanto is not a federal officer because (i) Monsanto was a mere vendor and not an arm of the Government, (ii) Monsanto did not act under the direction of a federal officer that is causally connected to the claims presented in this case, and (iii) Monsanto did not produce PCBs under any government contract or specifications.

A.     "Acting Under"

For purposes of section 1442, "acting under" a federal officer "must involve an effort to assist, or to help carry out, the federal superior's duties or tasks." *Watson v. Philip Morris Cos.*, 551 U.S. 142, 152 (2007). Cases in which the Supreme Court has approved removal involve defendants "working hand-in-hand with the federal government to achieve a task that furthers an end of the federal government." *Bailey v. Monsanto Co*., 176 F. Supp. 3d 853, 869-870 (E. D. Mo. 2016); *Ruppel v. CBS Corp.,* 701 F.3d 1176, 1181 (7th Cir. 2012).

The assistance that private contractors provide federal officers "goes beyond simple compliance" with the law and helps officers fulfill other basic governmental tasks." *Watson*, 551 U.S. at 153 ("Government contractors fall within the terms of the federal officer removal statute, at least when the relationship between the contractor and the Government is an unusually close one involving detailed regulation, monitoring, or 'supervision'").

In its Notice of Removal, Monsanto claims that between 1929 and 1977, it sold PCB products to the U.S. Army and Navy and to Government agencies such as the Tennessee Valley Authority, the U.S. Department of Agriculture and NASA. Doc. 1 at 18, ¶54.  The State argues

that Monsanto did not sell its PCB products under a direct contract with the Government but instead sold those products to government contractors rather than directly to the Government. The State's position appears to be supported by the evidence. The exhibits cited by Monsanto are letters from Government agencies such as the U.S. Atomic Energy Commission of the Department of Commerce "directing" Monsanto to ship PCB orders to "buyers" who were private companies such as Raytheon Corporation or Bendix Corporation. *See* Doc. 1, Exs. 17, 18, 20, 21, 22. Monsanto points to no evidence showing either that it produced PCBs under any direct Government contracts or that it sold directly to the Government. In fact, Monsanto offers an exhibit attached to its Notice of Removal which disavows any direct contract with the Government. *See* Doc. 1-13 at 2-3 (Request for Certification of Necessity dated 1941 stating that "Applicant [Monsanto] has no contract with the United States government or its agencies for the supply of [PCB].").[2]

Monsanto offers various invoices evidencing sales of products containing PCBs to federal sites in California, Georgia, Kentucky, Maine, and Pennsylvania. *See, e.g.,* Doc. 1-9; 1-11. 9, 1-11. The State claims that these sales account for an "infinitesimal fraction (8/10,000th of a percent)" of the total 1.4 billion pounds Monsanto produced in the United States and notes that there is no evidence that any of the products Monsanto directly supplied to the Government ever reached New Mexico.[3] The vast majority of Monsanto's PCB sales were to government contractors rather than to the Government itself. This is insufficient to confer "federal officer" jurisdiction. *See Bailey v. Monsanto Co*., 176 F. Supp. 3d 853, 870 (E. D. Mo. 2016) (rejecting federal officer

---

[2] Monsanto has attached over 500 pages of exhibits to its Notice of Removal. The Court assumes that Monsanto would have directed the Court's attention to those exhibits which contradict Plaintiff's arguments relating to whether Monsanto "acted under" a federal officer. Instead, Defendant refers to Exhibits 17, 18, 20, 21 and 22—none of which shows direct contracts with the government or direct sale *to* the government. The Court was not inclined to search through over 500+ pages of exhibits to find out otherwise and thus the Court assumes no such contracts exist.

[3] Monsanto does not refute these numbers.

basis for jurisdiction where Old Monsanto sold PCBs, by and large, to government contractors and not to the Government itself); *Kelly v. Monsanto Co.*, No. 4:15CV1825, 2016 WL 3543050, at *1 (E.D. Mo. June 19, 2016) (finding no federal jurisdiction where Monsanto sold, "by and large," to government contractors and not to the Government itself, contrasting case to Agent Orange case where federal officer removal was allowed because companies contracted with the Government for production of Agent Orange); *cmp. Durham v. Lockheed Martin Corp.*, 445 F.3d 1247, 1248 (9th Cir. 2006) (all products to which plaintiff claimed exposure were sold to the Air Force).

The State contends that Monsanto's relationship with the Government was not close enough to characterize Monsanto's role as "acting under" a government agency or officer. The Government did not supervise Monsanto's manufacture of PCBs or direct Monsanto to produce PCBs in a particular manner so as to come within the meaning of "acted under." *Washington v. Monsanto Co.*, 738 F. App'x 554, 555 (9th Cir. 2018)(evidence did not show that the Government supervised Monsanto's manufacture of PCBs or directed Monsanto to produce PCBs in a particular manner, so as to come within the meaning of "acted under" where the Government purchased off-the-shelf PCB products from Monsanto and recommended the use of PCBs as a component in defense specifications).

At most, Monsanto was a subcontractor for certain companies that incorporated PCBs into products that were then sold to the Government. *See, e.g.,* Doc. 1-18 at 2 (award documentation for Monsanto's Alabama plant noting that as of January 20, 1942 "company is a subcontractor"); *id.* at 5 (identifying Monsanto on July 7, 1944 as a "sub-contractor"). Also, evidence suggesting that Monsanto was required to comply with federal law "is not sufficient to establish that Monsanto 'acted under' federal authority." *Washington v. Monsanto Company*, 738 Fed. App'x at 556; *Faulk v. Owens-Corning Fiberglas Corp.*, 48 F. Supp. 2d 653, 663 n.14 (E.D. Tex. 1999) (rejecting

federal officer removal where defendants were "never under government control" regardless of whether they were required to comply with federal government regulations).

In its Notice of Removal, Monsanto claims that military specifications "continued to call expressly" for PCB products, referencing as an example a 1961 government specification for heat-resistant paint. Doc. 1 at 7-8. However, Monsanto's own exhibit refutes its argument that it was bound by government specifications. The exhibit identifies a formulation containing Aroclor 1254 (one of Monsanto's commercial PCB formulations) only as "an example of a formulation contemplated by this specification," and provides that *"in no way is the supplier restricted to this formulation."* Doc. 1-8 at 6. (emphasis added). Monsanto also points to other evidence of government "specifications," but none of this evidence shows that Monsanto was required to follow certain federal specifications for the production or use of PCBs. For example, Monsanto refers to a 1996 United States Air Force Report addressing the risk assessment of PCBs onboard Navy vessels. Doc. 1-31. This document notes PCBs fire retardant properties, explores the different use and location of PCBs on ships and submarines and considers possible scenarios for exposure and environmental contamination—but it does not cite or establish a specific federal requirement for use of PCBs in those systems.

There is evidence that *other manufacturers* may have been subject to government specifications referencing the use of Monsanto's PCBs. *See, e.g.,* Doc. 1-10 (Raytheon April 1, 1973 agreement to accept Monsanto's terms for purchase of unspecified quantity of PCB product so that Raytheon could meet government specification); Doc. 1-20 (notes of Monsanto sales call to customer in Rhode Island that reported using Monsanto's PCBs for "lacquer to meet Military Specs. . . . used in wire and cable applications"); Doc. 1-21 (notes of Monsanto sales call to epoxy-manufacturing customer in New York who stated the "military had approved" the use of PCBs in

their product). However, the fact that the PCBs produced by Monsanto *could* be used by other manufacturers to meet government specifications in their end-products does not establish that the Government compelled *Monsanto* to produce PCB according to government specifications for the purposes of federal officer jurisdiction.[4]  *See Kelly*, 2016 WL 3543050, at *10 (rejecting the argument that a particular document, among others, established "direct specifications regarding the production and sale of PCBs" and concluding that the document did "not show that the federal government compelled Old Monsanto to produce and sell PCBs").

The Government's alleged control and direction over Monsanto's production of PCBs falls short of what is required as a proper basis for federal officer removal.  For example, the manufacturers of Agent Orange (an herbicide which was used during the Vietnam War to reduce foliage behind enemy lines) were found to have acted "under the direction" of the Government. In *Winters v. Diamond Shamrock Chem. Co.,* the Fifth Circuit found that the Government compelled the manufacturers to produce the chemical at issue under specifications that required a chemical formulation far more concentrated than they used for commercial herbicide production and even controlled its packaging and delivery, including "ongoing supervision over the formulation, packaging, and delivery of Agent Orange." 149 F.3d 387, 399-400 (5th Cir. 1998); *see In re "Agent Orange" Prod. Liab. Litig.*, 304 F. Supp. 2d 404, 430 (E.D.N.Y. 2004) (explaining that the Government "commandeered United State's industry's entire capacity to manufacture 2,4,5--T, . . . specified the contents, packaging, and method of delivery of the Agent Orange it compelled defendants to produce for the war effort . . . [and] required that there be no warnings on the Agent Orange containers delivered by defendants."); *Transwestern Pipeline Co. v. Monsanto Co.*, 46 Cal. App. 4th 502, 531 (Cal. App. 1996) (upholding jury verdict in indemnification claim

---

[4] The State characterizes these documents as hearsay. Monsanto does not respond to this argument, and the Court need not resolve the issue in order to continue with the analysis.

for PCB remediation costs, on basis that "Government regulators did not manufacture [the PCB containing product at issue], Monsanto did. Government regulators did not fail to warn . . . of the environmental hazards of PCBs, Monsanto did.").

In *Ruppel v. CBS Corp.,* the court held that a government contractor that included asbestos in the turbines it supplied to the United States Navy "acted under" a federal officer. 701 F.3d 1176, 1181 (7th Cir. 2012). The Seventh Circuit found that Westinghouse Corporation, CBS ' predecessor-in-interest, had worked hand-in-hand with the Government and had assisted the Government in building warships. *Id.* ("'Acting under 'covers situations, like this one, where the federal government uses a private corporation to achieve an end it would have otherwise used its own agents to complete."). The court also noted that the Navy knew of asbestos's health risks and controlled the content of any warnings. *Id.* at 1185. The case was reversed and remanded to state court for lack of federal officer jurisdiction.

In this case, Monsanto provides no evidence that it was working "hand-in-hand" with the Government and that it was compelled to produce and sell PCBs according to Government specifications. Thus, for purposes of federal officer removal under §1442, Monsanto has failed to show that it "acted under" the direction of a federal officer.

B.     Causal Nexus

Federal officer jurisdiction also requires, in conjunction with "acting under" a federal officer, a "causal nexus" between the acts defendant performed at the Government's direction and the plaintiff's claims. See *Jefferson Cty., Ala. v. Acker*, 527 U.S. 423, 431 (1999) (citing *Willingham v. Morgan,* 395 U.S. 402, 409 (1969); *Maryland v. Soper*, 270 U.S. 9, 33 (1926) ("There must be causal connection between what the officer has done under asserted official authority and the state prosecution.").

Relevant case law indicates that federal authorities must have required or compelled certain actions in order to establish a causal nexus for purposes of federal officer jurisdiction. In *Mobley v. Cerro Flow Prod., Inc.*, the court noted that the notice of removal in that case averred that plants where Monsanto made PCBs were operated under contracts with the Chemical Warfare Service, consistent with a federal policy favoring use of PCBs in capacitors and transformers. 2010 WL 55906, at *7 (S.D. Ill. Jan. 5, 2010). However, the court found that it was "hardly" proof that federal officers "compelled" the removing defendants to take certain actions:

> . . . even assuming this is true, this hardly amounts to proof that federal officers compelled the removing Defendants to take certain actions, much less that federal officers hindered the removing Defendants in safely disposing of chemical waste generated by production of PCBs.

*Id.* The Court concluded that while the acts complained of in the lawsuit "occurred under the general auspices of federal authorities," federal authorities did not specifically direct those acts—which was required to establish the necessary causal nexus for removal jurisdiction. *Id.*

The State contends that Monsanto has not demonstrated that the Government had any role in directing the specific acts that led to the contamination of New Mexico's natural resources as alleged in the complaint—for example, Monsanto's failure to warn and active concealment of the true properties of its PCBs, inadequate and misleading disposal instructions, false and misleading promotion of its PCBs, and creation of a public nuisance upon the State's natural resources. *See State of Washington v. Monsanto Co.,* 274 F. Supp. 3d 1125, 1131 (W.D.Wa. 2017), *aff'd* 738 F. App'x 554 (9th Cir. 2018) ("even if the government contracted for Monsanto's PCBs, the Court cannot say that Monsanto was 'acting under' a federal agency where the government did not direct Monsanto to produce, [dispose of], and promote PCBs in a particular way") (emphasis in original); *see also* "Agent Orange" Prod. Liab. Litig., 304 F. Supp. 2d 442, 448 (E.D.N.Y. 2004) (citing *Arness v. Boeing N. Am.*, 997 F. Supp. 1268 (C.D. Cal. 1998)) (contrasting situations where federal

officer jurisdiction existed when Federal Government had strict control over the development and production of toxic chemicals with situations where the government did not specify how to dispose of the chemical waste and disposal was the basis of plaintiff's claim); *Clayton v. Cerro Flow Prods., Inc.*, No. 09-550-GPM, 2010 WL 55675, at *7 & n.4 (S.D. Ill. Jan. 4, 2010) (refusing to find federal officer jurisdiction where Monsanto could not demonstrate federal officer had directed the manner in which it should dispose of waste).

As mentioned earlier, Monsanto has attached over 500 pages of exhibits to its Notice of Removal, *see n.2, supra*—and yet Monsanto does not offer any of those exhibits as hard evidence to refute the State's contentions. Monsanto responds only by claiming that the State's position is contradictory because it seeks to "hold Defendants liable for PCB contamination no matter where or how it arose, but, on the other hand, [argues] that evidence of PCB sales to the Federal Government is insufficient to establish the necessary causal nexus." Doc. 22 at 18. This statement conflates the causation question on the merits of the State's claims with the more limited and discrete issue of a causation nexus for purposes of federal officer removal. Also, in its "acting under" analysis, the Court has already found that Monsanto's PCB sales were generally made to government contractors rather than to the Government.

Monsanto cannot show a causal nexus without showing closely controlled process or direction by the Government, including control over the production of PCBs, warnings related to its use, alleged active concealment of health risks and instructions regarding its disposal, regardless of Monsanto's compliance with federal regulations.[5] In *Faulk v. Owens-Corning Fiberglas Corp.*, the Eastern District of Texas rejected federal officer removal, stating:

---

[5] Monsanto contends that it warned the Government regarding PCBs, referring to a letter it sent to the U.S. Department of Commerce in November 1972, noting "increasing environmental concerns" about PCB-containing products and questioning the directive that Monsanto sell this material ("Aroclar 1242") when "alternative

> Defendants can bury this Court in federal government regulations controlling their
> actions. But if there is no causal nexus between Defendants 'actions in response to
> this control and the Plaintiffs 'claims, then the government did not "make them do
> it" since the "it" was never under government control.

48 F. Supp. 2d 653, 663 n.14 (E.D. Tex. 1999); *see also Bailey v. Monsanto Co*., 176 F. Supp. 3d

853, 870 (E. D. Mo. 2016) (rejecting federal officer basis for jurisdiction where Defendants have

not maintained that the manufacturing process itself was in any way supervised or controlled by

the government); *see Kelly*, 2016 WL 3543050, at *9 (rejecting evidence of regulation compliance

presented in  support of federal officer jurisdiction and concluding that "the evidence does not

show that the manufacturing process was supervised or controlled by the government").

Therefore, the Court finds that Monsanto has failed to show the causal nexus required for

federal officer removal under §1442.

C.      Colorable Federal Defenses

In order to satisfy its burden for federal officer removal under §1442, Monsanto must also

show that it has a colorable federal defense.  Monsanto raises two defenses: the Government

contractor defense  and the Defense Production Act defense.[6]

*1. Government Contractor Defense*

The government contract defense shields contractors from tort liability for products

manufactured for the Government in accordance with government specifications, if the contractor

warned the Government about any hazards known to the contractor but not to the Government.

---

acceptable materials are available. . . ."  Doc. 1-23 ( Ex. 18).  However, the letter also notes that its voluntary policy
of discontinuing sale of the material for the particular use requested "has had the approval of various branches of the
United States Government, including the U.S. Department of Commerce."  *Id.* While the letter acknowledges
"increasing concerns" about PCBs effect on the environment, it does not indicate that Monsanto was responsible for
warning the Government about the health and environmental risks related to PCBs.

[6]  Monsanto cannot meet the first two factors related to federal issues. Whether this case involves "federal issues"
will be discussed further in the opinion within the Court's analysis on whether federal common law applies in this
case. Monsanto also raises a preemption defense, which will also be discussed in that section.

*Hercules Inc. v. United States*, 516 U.S. 417, 422 (1996) (citing *Boyle v. United Technologies Corp.,* 487 U.S. 500, 512 (1988)). To establish the government contractor defense, a contractor must show: (1) the case involves "uniquely federal interests;" (2) a "significant conflict exists between an identifiable federal policy or interest and the operation of state law;" and (3) the contractor's actions fall within the "scope of displacement"—meaning that state law imposing design defects in military equipment is displaced by federal law." *Boyle,* 487 U.S. at 504 (1988).[7]

A contractor's actions fall within the "scope of displacement" if: : (1) "the United States approved reasonably precise specifications;" (2) the contractor "conformed to those specifications;" and (3) the contractor "warned the United States about the dangers" known to the contractor but not to the United States. *In re Gold King Mine Release in San Juan Cty., Colorado, on Aug. 5, 2015*, No. 1:18-MD-02824-WJ, 2019 WL 2330878, at *2 (D.N.M. May 31, 2019) (citing *Boyle v. United Technologies Corp.*, 487 U.S. at 512).

The government contractor defense is not available to Monsanto because, as the Court has already concluded, Monsanto did not contract directly with the Government and was at most a subcontractor. *See State of Ohio v. Sherwin-Williams Co*., No. 2:08-cv-00079, 2008 WL 4279579, * at 4 (S.D. Ohio Sept. 17, 2008) ("[T]here is no authority for the proposition that a subcontractor is entitled to the government contractor defense."). Monsanto claims that because there were no approved alternatives, use of PCBs was the "only way" to meet government specifications, but as

---

[7] The State claims that "well-established authority" holds that the government contractor defense is available "only to those who contract with the Government to design and manufacture military equipment." Doc. 8 at 25 (citing *Cabalce v. Blanchard & Assoc.,* 797 F.3d 720, 731 (9th Cir. 2015)). However, the question is not quite as settled as argued by the State. *Boyle* involved the crash of a military helicopter designed by a private contractor but did not address whether the defense was limited to military equipment. In *Andrew v. Unisys Corp.,* the U.S. District Court for the Western District of Oklahoma concluded that the defense was not strictly limited to contracts for military equipment and allowed the defense to be applied in that case, which involved stress injuries allegedly caused by a letter-sorting machine designed for and purchased by the United States Postal Service. 936 F.Supp. 821, 830 (W.D.Okla. 1996). Whether the government contractor defense should apply to PCB cases is a question that need not be resolved here, since the Court finds that Monsanto cannot meet this defense on other grounds.

discussed earlier, the Government's relationship with Monsanto did not involve detailed regulation, monitoring or supervision of the kind that characterizes the government contractor relationship. *See Watson*, 551 U.S. at 153.

### 2. Defense Production Act Defense

In relevant part, the Defense Production Act ("DPA," 50 U.S.C.App. §2061 *et seq.*, now codified at 50 U.S.C.A. § 4501) provides: "No person shall be held liable for damages or penalties for any act or failure to act resulting directly or indirectly from compliance with a rule, regulation, or order issued pursuant to this Act." 50 App. U.S.C. § 2157. Section 101 of the DPA provides in relevant part that the President may require that performance of certain contracts deemed necessary to the national defense "shall take priority over performance under any other contract or order." 50 U.S.C. § 4511(a). The provision "was enacted to reconcile conflicts between scheduled commercial production and sudden military needs in favor of war production." *See Washington*, 274 F. Supp. 3d at 1131 (citing *Eastern Air Lines, Inc. v. McDonnell Douglas Corp.*, 532 F.2d 957, 981-82 (5th Cir. 1976)).

Monsanto contends that it has "submitted evidence that PCBs were ordered by federal officers pursuant to the DPA." Doc. 22 at 20. *See, e.g.,* Doc. 1-22 (letter dated November 17, 1972 stating that Monsanto was "directed to accept" sale and ship 3,000 pounds of Aroclor #1242 to Emerson and Cuming); Doc. 1-23 (letter by Monsanto acknowledging acceptance of purchase order to Emerson and Cuming while advising that it no longer sold Aroclar for uses intended by Emerson and Cuming); Doc. 1-25 (letter from U.S. Department of Commerce to Monsanto dated June 24, 1974 directing shipment of Aroclor 1242 to Raytheon Co. Missile Systems Division). However, these letters do not indicate that Monsanto was being forced to produce anything it was not already producing, and at most was only directed to prioritize certain orders over others. *See*

*State v. Monsanto Co.*, 274 F. Supp. 3d at 1131(concluding that letters failed to show the Government directed "Monsanto to produce PCBs that it had not already, or would not have otherwise, produced"). Therefore, Monsanto cannot claim immunity from liability or damages under the DPA.

Moreover, Monsanto would not be able to invoke federal officer removal jurisdiction even if the DPA were to apply in this case because Monsanto has not satisfied the other two requirements under §1442, that is, a showing that it "acted under" a federal officer, and a causal nexus between the State's claims and Monsanto's acts.

## II.     "Federal Enclave" Jurisdiction

The State contends that Monsanto cannot assert jurisdiction under "federal enclave" jurisdiction because the State's claims did not arise on a federal enclave.

### A.     Claims Did Not Arise on a "Federal Enclave"

Courts presume that federal jurisdiction does not exit over a removed case unless the defendant can affirmatively show otherwise. As mentioned previously, federal courts are courts of limited jurisdiction and "possess only that power authorized by the Constitution and statute . . . which is not to be expanded by judicial decree." *Kokkonen v. Guardian Life Ins. Co.,* 511 U.S. 375, 377 (1994) (cit. omitted).

The complaint in this case alleges that the only natural resources "that are the subject of this suit *all rest within the State of New Mexico*." Compl., ¶22 (emphasis added). Despite this clear disclaimer, Monsanto claims there are 19 waterways of the 57 total—without any supporting facts or evidence—that the State's suit is subject to federal enclave jurisdiction because certain bodies of water described in the Complaint are allegedly on, adjacent to, or near certain federal enclaves. This argument falls short of what is necessary to invoke federal jurisdiction: these identified

waterways make up only a small fraction of the hundreds of river miles and 20,000-plus lake acres of PCB-contaminated waterbodies at issue in this case, and even partial occurrence on a federal enclave is insufficient to invoke federal jurisdiction. *See Akin v. Big Three Indus.*, 851 F. Supp. 819, 825 & n.4 (E.D. Tex. 1994) ("When exposures allegedly occur partially inside and partially outside the boundaries of an enclave an argument would surface that the state's interest increases proportionally, while the federal interest decreases.").[8]

Monsanto's reference to federal land "near" federal enclave fares no better as a basis for federal enclave jurisdiction. *See* Doc. 22 at 23 (referring to "the many thousands of acres of federal enclave in or near New Mexico") and at 22, n.11 (noting that "[v]ast areas of land in and near New Mexico are federal enclaves," citing to Ex. 2, a White Sands Missile Range Environmental Impact Statement which includes discussion on storage and disposal of PCBs). As Plaintiff notes, water is not part of a federal enclave merely because it is located adjacent to or near the enclave or flows into or out of it. *See, e.g., People of the State of California v. U.S.*, 235 F.2d 647, 656 (9th Cir. 1956) (the federal government, "as regards all claimants to water outside the enclave, is not in the position of sovereign."). Federal enclave jurisdiction exists only where the claim arises on the federal enclave–not nearby or adjacent to it. *See State v. Monsanto Co.*, 274 F. Supp. 3d 1125, 1132 (W.D. Wash. 2017), *aff'd*, 738 F. App'x 554 (9th Cir. 2018) (where plaintiff did not seek relief for contamination of federal territories and would have no standing to do so, court was "satisfied" that none of plaintiff's claims arose on federal enclaves); *see also, Willis v. Craig,* 555 F.2d 724, 725 (9th Cir. 1977) (district court did not have jurisdiction where accident did not occur

<hr>

[8] *See Ballard v. Ameron Int'l Corp*., No. 16-cv-06074-JSC, 2016 WL 6216194, at *3 (N. D. Cal. Oct. 25, 2016) (holding that no federal enclave jurisdiction existed over personal injury claim when plaintiff's alleged exposure at a federal enclave where he worked for six months but also at 16 other jobsites over a period of many years); *Anderson v. Crown, Cork & Seal*, 93 F. Supp. 2d 697, 702 (E.D. Va. 2000) (holding no federal enclave jurisdiction existed over naval worker's asbestos personal injury claim, where plaintiff spent "majority" of time at sea and not in shipyard that was alleged to be a federal enclave.

on federal enclave). Therefore, the Court finds that Monsanto has not satisfied its burden to establish federal enclave jurisdiction under 28 U.S.C. §1331.

B.     Federal Common Law

Monsanto contends that federal jurisdiction exists under 28 U.S.C. §1331 because it turns on federal common law and that federal common law must govern interstate pollution cases. In its Removal Notice (Doc. 1-12), Monsanto cites *Illinois v. City of Milwaukee, Wis*., 406 U.S. 91 (1972) ("*Milwaukee I*") for the proposition that "pollution of interstate or navigable waters creates actions arising under the 'laws'of the United States within the meaning of Section 1331(a)." In *Milwaukee I,* the state of Illinois sued the city of Milwaukee in federal district court over the discharge of sewage into Lake Michigan. The court applied federal common law to the state's nuisance claims, finding that (1) federal common law applies to air and water in their ambient or interstate aspects and (2) pollution of interstate or navigable waters created actions under the "laws" of the United States, pursuant to 28 U.S.C. §1331.

Following the 1972 amendments to the Clean Water Act ("CWA"), the Supreme Court reversed part of the holding in *Milwaukee I* which applied federal common law to plaintiff's claims, holding that the 1972 amendment displaced federal common law (at least with respect to the claims brought by the state in that case) and as a result, no federal common law remedy was available to the respondents in that case. *City of Milwaukee v. Illinois & Michigan*, 451 U.S. 304, 319 (1981) ("*Milwaukee II*") ("The establishment of such a self-consciously comprehensive program by Congress, which certainly did not exist when [*Milwaukee I*] [was decided, strongly suggests that there is no room for courts to attempt to improve on that program with federal common law."); *see also Am. Elec. Power Co. v. Connecticut*, 564 U.S. 410, 423-25 (2011) (recognizing that "amendments to the Clean Water Act displaced the [federal common law]

nuisance claim recognized in *Milwaukee I*" and holding that "the Clean Air Act and the EPA actions it authorizes displace any federal common-law right to seek abatement of carbon-dioxide emissions from fossil-fuel fired powerplants").

Monsanto relies on other cases to support its position that federal common law governs all claims for transboundary pollution, but none of these cases advance Monsanto's position because they predate either the Supreme Court's decision in *Milwaukee II* or the relevant federal environmental laws for the claims presented in those cases. Thus, Monsanto cannot rely on any of these cases to argue that the instant case must turn on federal common law simply because it concerns environmental pollution.

A.      "Well-Pleaded Complaint" Rule

Monsanto also contends that if federal common law *could* be applied to Plaintiff's claims, that alone confers jurisdiction sufficient to support removal to federal court—but this argument is incorrect. The Court begins the analysis with the "well-pleaded complaint" rule. *Devon Energy Prod. Co., L.P. v. Mosaic Potash Carlsbad, Inc.*, 693 F.3d 1195, 1202 (10th Cir. 2012) ("To determine whether a claim arises under federal law, courts examine the "well-pleaded allegations of the complaint and ignore potential defenses.") (citing *Beneficial Nat'l Bank v. Anderson,* 539 U.S. at 6)). Under the rule, a suit arises under federal law "only when the plaintiff's statement of his own cause of action shows that it is based on federal law." *Id.* (quoting *Louisville & Nashville R.R. v. Mottley,* 211 U.S. 149, 152 (1908) (internal quotes omitted); *see also Caterpillar v. Williams*, 482 U.S. 386, 392 (1987) ("The presence or absence of federal question jurisdiction is governed by the 'well pleaded complaint rule,' which provides that federal jurisdiction exists only when a federal question is presented on the face of the plaintiff's properly pleaded complaint.").

The well-pleaded complaint rule "makes the plaintiff the master of the claim" so that "he or she may avoid federal jurisdiction by exclusive reliance on state law." *Caterpillar Inc. v. Williams*, 482 U.S. 386, 392 (1987). Thus, even if both federal and state law provide a remedy to the plaintiff, the plaintiff can avoid federal jurisdiction by pleading state law—at the price, of course, of foregoing the federal remedies. *Felix v. Lucent Techs., Inc.*, 387 F.3d 1146, 1154 (10th Cir. 2004) (as master of the claim, plaintiff "may avoid federal jurisdiction by exclusive reliance on state law") (citing *Beneficial Nat'l Bank v. Anderson,* 539 U.S. 1, 6 (2003); *see Fajen v. Found. Reserve Ins. Co.*, 683 F.2d 331, 333 (10th Cir. 1982) (to support removal jurisdiction, "the required federal right or immunity must be an essential element of the plaintiff's cause of action, and that the federal controversy must be 'disclosed upon the face of the complaint, unaided by the answer or by the petition for removal'")).

The State's complaint in this case alleges that Monsanto's acts violated New Mexico state laws related to public nuisance, defective design, failure to warn, and unjust enrichment, as well as New Mexico's Unfair Practices Act. It was carefully crafted to explicitly plead only state law claims concerning only State-owned, State-controlled, or State-managed natural resources, for example:

- The natural resources that are the subject of this suit all rest within the State of New Mexico. No federal subject-matter jurisdiction exists or invoked herein. Compl., ¶22.

- [Monsanto] marketed, sold, and distributed commercial PCB formulations and/or products and materials containing PCBs to customers within New Mexico. ¶ 25.

- [Monsanto] knowingly caused the pollution and impairment of New Mexico's waters, soils and other natural resources, which posed an increasingly hazardous threat to the environment of New Mexico and New Mexico residents' health, and deployed unfair and deceptive trade practices to continue promoting and selling its poisonous products in New Mexico. ¶¶ 14-21.

Because the State is the master of its complaint, removal is precluded unless Monsanto can show that an exception applies to the well-pleaded complaint rule—specifically, that the state law claims asserted in the complaint are completely preempted. *Devon Energy*, 693 F.3d at 1203–04 (requiring defendant to prove one of the two exceptions to the well-pleaded complaint rule in order to invoke federal jurisdiction);[9] *see Miller v. United States*, 710 F.2d 656, 662 (10th Cir. 1983) (party invoking federal jurisdiction bears burden of establishing its existence).

B.      Preemption

Ordinary preemption "regulates the interplay between federal and state laws when they conflict or appear to conflict." Thus, preemption is only a defense to the complaint and does not render a state-law claim removable to federal court. *Felix*, 387 F.3d at 1154 ("federal pre-emption is ordinarily a federal defense to the plaintiff's suit," and thus is insufficient grounds for removal) (citing *Metro. Life Ins. Co. v. Taylor*, 481 U.S. 58, 63 (2004); *Bd. of Cty. Commissioners of Boulder Cty. v. Suncor Energy (U.S.A.) Inc.*, 405 F. Supp. 3d 947, 964 (D. Colo. 2019) (ordinary preemption—in contrast to complete preemption—"would not provide a basis for federal jurisdiction").

"Complete preemption" describes "the specific situation in which a federal law not only preempts a state law to some degree but also substitutes a federal cause of action for the state cause of action, thereby manifesting Congress's intent to permit removal." *Devon Energy*, 693 F.3d at 1205; *Metro. Life Ins. Co. v. Taylor*, 481 U.S. 58, 66 (1987) ("even an "obvious" pre-emption defense does not, in most cases, create removal jurisdiction" without clear congressional intent).

---

[9] The other exception to the well-pleaded complaint rule requires a defendant to show there is a "substantial, disputed federal-law issue" necessarily embedded in a plaintiff's claims, sometimes referred to as the "*Grable* doctrine." *See Grable & Sons Metal Prod. Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308, 312 (2005), cited in *Devon Energy*, 693 F.3d at 1208. Monsanto takes no position as to whether removal may have been justified under the *Grable* doctrine, so the Court need not consider this second exception and will focus solely on the preemption issue, which underlies Monsanto's federal common law argument.

Unlike ordinary preemption, complete preemption "is so 'extraordinary 'that it 'converts an ordinary state law common-law complaint into one stating a federal claim for purposes of the well-pleaded complaint rule." *Caterpillar,* 482 U.S. at 393.

Complete preemption occurs only when Congress intended for federal law to provide the "exclusive cause of action" for the claim asserted. *See Beneficial Nat. Bank v. Anderson*, 539 U.S. 1, 9 (2003) ("complete preemption doctrine" did not apply because no "clear congressional intent" was found to permit removal); *Felix*, 387 F.3d at 1154 (noting that the Supreme Court has recognized an exception or "independent corollary" to the well-pleaded complaint rule known as the "complete pre-emption" doctrine) (citing *Caterpillar Inc. v. Williams*, 482 U.S. 386, 393 (1987)).

### 1. Federal Common Law and Removal

The complaint asserts purely state law claims, yet Monsanto still insists that the case raises federal interests sufficient to allow removal because the State's allegations involve "global circulation" of PCBs and transboundary pollution. Monsanto urges the Court to go beyond the face of the well-pleaded complaint and recast the state law claims as "arising under" federal common law.

In the discussion above on the "well-pleaded complaint" doctrine, the Court concluded that the State's complaint asserts only state law claims and that none of those claims are displaced by federal common law. However, even if the Court were to ignore the well-pleaded complaint doctrine and find that Plaintiff's state law claims implicated federal common law, removal still would not be appropriate without a showing of *complete* preemption of the issues raised. Federal common law cannot support complete preemption without a "demonstration of Congressional intent to make the action removable." *Metro. Life Ins. Co. v. Taylor*, 481 U.S. 58, 63 (1987); *Felix*,

387 F.3d at 1156 ("federal pre-emption is ordinarily a federal defense to the plaintiff's suit," and thus is insufficient grounds for removal) (quoting *Metro. Life Ins. Co. v. Taylor*, 481 U.S. at 63); *see also Marcus v. AT & T Corp.*, 138 F.3d 46, 53-54 (2d Cir. 1998) (rejecting argument that unpled federal common law provided the basis for removal of state law claims where federal common law did not completely preempt plaintiff's claim).

Monsanto provides no legal authority to show that Congress has manifested an intent for federal common law to *completely* preempt the area of environmental pollution or public nuisance. Defendant relies heavily on *Milwaukee I,* in which the Supreme Court stated, "When we deal with air and water in their ambient or interstate aspects, there is a federal common law." 696 F.3d at 855. That case also held that pollution of interstate or navigable waters "create[d] actions arising under the 'laws of the United States within the meaning of § 1331(a)." However, because the plaintiffs in both *Milwaukee I* and *II* filed suit in federal court, the Supreme Court did not address preemption issues—either ordinary or complete—because the cases were not removed. *See Bd. of Cty. Commissioners of Boulder Cty. v. Suncor Energy (U.S.A.) Inc.*, 405 F. Supp. 3d at 962 (rejecting defendants 'argument that removal may be based on existence of an "unplead federal common law claim. . . ." and noting that defendants' argument could not find support in cases where plaintiff filed the lawsuit in federal court and thereby invoked federal jurisdiction, including *Milwaukee I*).

Monsanto therefore cannot rely on cases that were filed in federal court to support its argument that removal is proper here because removal jurisdiction is "a somewhat different animal than original federal question jurisdiction—i.e., where the plaintiff files originally in federal court." The distinction between the two is succinctly described in a case from the Southern District of New York:

> When a plaintiff files in federal court, there is no clash between the principle that the plaintiff can control the complaint—and therefore, the choice between state and federal forums . . . On the other hand, when plaintiff files in state court and purports to only raise state law claims, for the federal court to assert jurisdiction it has to look beyond the complaint and partially recharacterize the plaintiffs [sic] claims—which places the assertion of jurisdiction directly at odds with the principle of plaintiff as master of the complaint. It is for this reason that removal jurisdiction must be viewed with a somewhat more skeptical eye; . . .

*E. States Health & Welfare Fund v. Philip Morris, Inc.*, 11 F. Supp. 2d 384, 389–90 (S.D.N.Y. 1998) (concluding that "complete preemption" is the "very limited exception" to the well-pleaded complaint rule).

Monsanto's argument that the State's state law claims "arise under" federal common law is—as the State has observed—essentially "nothing more than an ordinary preemption defense" which is inadequate for federal removal.  Doc. 23 at 13.  When ordinary preemption applies, the federal court "lacks the power to do anything other than remand to the state court where the preemption issue can be addressed and resolved." *Felix v. Lucent Techs., Inc.*, 387 F.3d at 1158 (citation omitted).  The Tenth Circuit has held that anything short of congressional intent to completely preempt a certain field is insufficient for federal removal:

> The Supreme Court, however, has recognized an exception (or "independent corollary") to the well-pleaded complaint rule for a narrow category of state-law claims that can independently support federal jurisdiction and removal.  *Felix,* 387 F.3d at 1154. These claims are "completely preempted" because they fall within the scope of federal statutes intended by Congress completely to displace all state law on the given issue and comprehensively to regulate the area. *Id.* at 1154–55. Unlike ordinary preemption, which is a federal defense to a state-law claim under the Supremacy Clause of the Constitution that does not render a state-law claim removable to federal court, complete preemption makes a state-law claim "purely a creature of federal law," and thus removable from state to federal court from the outset.

*Hansen v. Harper Excavating, Inc.*, 641 F.3d 1216, 1220–21 (10th Cir. 2011) (quoting *Franchise Tax Bd. v. Constr. Laborers Vacation Trust,* 463 U.S. 1, 23–24 (1983); *see also Caterpillar*, 482

U.S. at 392–93 (under the well-pleaded complaint rule, courts must ignore potential defenses such as preemption).

Monsanto does not offer any legal authority for the proposition that federal common law confers federal removal jurisdiction, and case law is to the contrary. For example, in *United States v. City of Las Cruces*, the Tenth Circuit remanded an action brought by the United States to quiet title to water rights in a portion of a river that was part of a reclamation project undertaken pursuant to the federal Reclamation Act. 289 F.3d 1170, 1185 (10th Cir. 2002). The court acknowledged that there might be federal common law in disputes over air and water "in their ambient or interstate aspects. *Id.* (citing *Illinois v. City of Milwaukee,* 406 U.S. 91, 103 (1972) ("When we deal with air and water in their ambient or interstate aspects, there is federal common law. . . ." (footnote and citation omitted)). Yet the court found that federal common law did not arise where there was "no legal vacuum to fill" because in that situation there was "no uncertainty over which state's laws applies to determine the United States' rights." *Id.* at 1186.

In *Rhode Island v. Chevron Corp.*, the state of Rhode Island brought an action in state court against certain energy companies, alleging various state-law tort claims including public nuisance, arising from the damage those companies allegedly inflicted and would inflict upon non-federal property and natural resources in the state. 393 F. Supp. 3d 142 (D.R.I. 2019). The case was removed, and the plaintiff moved to remand. The district court acknowledged that federal common law has survived in limited areas such as in transborder air and water disputes and noted that some of it "has been displaced" by the Clean Air Act ("CAA"). However, the district court granted plaintiff's motion to remand because complete preemption was lacking with respect to both common law and the CAA:

> . . . whether displaced or not, environmental federal common law does not—absent congressional say-so—completely preempt the State's public nuisance claim, and

therefore provides no basis for removal. . . . With respect to the CAA, [a]s far as the Court can tell, the CAA authorizes nothing like the State's claims, much less the exclusion of those sounding in state law. In fact, the CAA itself says that controlling air pollution "is the primary responsibility of States and local governments." 42 U.S.C. § 7401(a)(3); *Am. Elec. Power Co. v. Connecticut*, 564 U.S. 410, 428 (2011) (the CAA "envisions extensive cooperation between federal and state authorities . . . .").

393 F.Supp.3d at 149-150.

In contrast, the court in *United States v. Outboard Marine Corp.* concluded that the Government's claim against a supplier of PCB for causing the discharge of PCB into navigable waters around Waukegan, Illinois could not be resolved on a state law claim of products liability. 549 F. Supp. 1032, 1034 (N.D. Ill. 1982). The court found that the issue required a "federal rule of decision" because the case was marked by "substantial federal interests which may not be protected adequately by a state law rule of decision. *Id.* ("In such cases the need for a federal rule of decision and the absence of any governing federal statute require the court to fashion federal common law.").

While the holding in *Outboard Marine Corp.* might appear to be contrary to the general deference given to the "well-pleaded complaint," upon closer look, the case is quite distinguishable from the instant case. First, *Outboard Marine Corp.* was decided after *Milwaukee I* but before the Supreme Court decided *Milwaukee II,* which rejected the application of federal common law in favor of federal environmental statutes. Second, the plaintiff in *Outboard Marine Corp.* was the United States Government rather than the state, which is a reasonable basis for the court's finding that a federal interest was at stake:

While this holding may not require a federal rule of decision for every case which in some way involves water pollution, the court considers *Milwaukee I* to govern the present case, in which the federal interest is at its strongest—the United States is suing to protect its sovereign interest in the nation's waterways

549 F. Supp. at 1034.

Third and probably most important, *Outboard Marine Corp.* was filed in federal court and was not a removed case. The United States sued Monsanto under the federal common law of nuisance, under a federal statute (the Refuse Act, 33 U.S.C. §407) and a state law claim of products liability—which the court concluded could not be resolved under a state law theory. As discussed above, federal common law—even if it did apply to this case—cannot support removal to federal court without complete preemption.

Additionally, there is a Tenth Circuit case which the Court came upon in its own research and which at first blush seems to support Monsanto's position. In *Madsen v. Prudential Fed. Sav. & Loan Ass'n*, the Tenth Circuit stated that "the application of federal common law to a plaintiff's cause of action is sufficient to invoke federal jurisdiction and thus support removal." 635 F.2d 797, 802 (10th Cir. 1980). At the same time, the *Madsen* court cautioned that federal common law "is not automatically applied to resolve all disputes in a field subject to pervasive federal regulation" and that "a question of federal law . . . lurking in the background" is not sufficient to confer federal jurisdiction. *Madsen,* 635 F.2d at 804 (citing *Gully v. First Nat. Bank*, 299 U.S. 109, 117 (1936)). In *Madsen,* borrowers from a savings and loan institution sought to recover interest realized from the bank's use of escrowed funds. The bank removed to federal court, claiming that removal jurisdiction existed because the contract at issue must be interpreted based on federal common law rather than state law. The Tenth Circuit held that removal was improper:

> In deciding whether rules of federal common law should be fashioned, normally the guiding principle is that a significant conflict between some federal policy or interest and the use of state law in the premises must first be specifically shown.

635 F.2d at 802 (citing *Wallis v. Pan American Petroleum Corp.*, 384 U.S. 63, 68 (1966)). The court concluded that there was "no significant conflict between the federal policy regarding handling of escrow accounts and state law in the area of federal savings and loan regulations." *Id.*

This Court finds that the statement in *Madsen*—that the application of federal law to a plaintiff's claims supports removal—does not govern here for several reasons:

First, the statement that the application of federal common law supports removal was made with no discussion at all and relied solely on *Milwaukee I* for support. *Milwaukee I* cannot support any statement regarding federal removal law because *Milwaukee I* was initially filed in federal court and was not a removed case. Also, the findings in *Milwaukee I* related to federal common law and were later reversed by the Supreme Court in *Milwaukee II*.

Second, *Madsen* has not been cited for its statement that the application of federal common law supports removal and no Tenth Circuit case has reiterated that statement. Instead, *Madsen* is cited in these other cases solely to support the "well-pleaded complaint" doctrine. *See, e.g., Fajen v. Found. Reserve Ins. Co.*, 683 F.2d 331, 333 (10th Cir. 1982) (noting that the Tenth Circuit has held that "the required federal controversy . . . must be disclosed upon the face of the complaint, unaided by the answer or by the petition for removal") (citing *Madsen,* 635 F.2d at 800)).

Third, *Madsen* held that removal was inappropriate because there was no "significant conflict" between federal policy and state law regarding the law at issue. There is no such conflict in this case, nor any conflict between two areas of state law.[10]

And finally, *Madsen* cannot be considered circuit precedent in light of the more recent Tenth Circuit cases mentioned above, *Felix v. Lucent Techs., Inc.*, and *Hansen v. Harper Excavating, Inc.,* both of which make clear that state law claims can be displaced as an exception to the "well-pleaded complaint" rule only where there is clear congressional intent to completely preempt a particular field. Generally, "earlier, settled precedent" should be followed over "a

---

[10] Monsanto argues that a "conflict" exists between federal and state law within the context of preemption which the Court will discuss in the next section.

subsequent deviation therefrom," *see Webb v. ABF Freight System, Inc.*, 155 F.3d 1230, 1242 (10th Cir. 1998), and *Madsen* cannot be viewed as "settled precedent" for the above-stated reasons.

### 2.     *Complete Preemption Required for Federal Removal*

Monsanto argues that some or all of the State's state law claims are preempted (without claiming *complete* preemption, however) by the federal Comprehensive Environmental Response, Compensation and Liability Act of 1980 ("CERCLA"), citing *New Mexico v. Gen. Elec. Co.*, which held that CERCLA's comprehensive scheme for natural resource damages preempts any state remedy. 467 F.3d 1223, 1247–48 (10th Cir. 2006). In that case, the state sought a remedy of an unrestricted award of money damages for groundwater contamination. The Tenth Circuit held that the state could not obtain that remedy through its public nuisance and negligence causes of action because the remedy conflicted with and was preempted by CERCLA and other federal environmental statutes. Preemption of a remedy, however, is not equivalent to complete preemption. While Monsanto refers to this case in its response brief, *see* Doc. 22 at 20, it omits the portion of the decision in which the Tenth Circuit makes it very clear that CERCLA does not supplant state law claims:

> This is not to say the State's public nuisance and negligence theories of recovery are completely preempted in view of the ongoing remediation in the South Valley. *We need not go that far.* Rather, the *remedy* the State seeks to obtain through such causes of action—an unrestricted award of money damages—cannot withstand CERCLA's comprehensive NRD scheme.

*New Mexico v. Gen. Elec. Co.*, 467 F.3d 1223, 1247–48 (10th Cir. 2006) (emphasis added).

Because CERCLA does not completely preempt the availability of the State's state law claims, there is no basis for removal. The Court need not address the viability of the State's claim for

remedial damages, since the only issue before the Court is whether this case should manded to state court.[11]

The Clean Water Act ["CWA"] is another example of a federal environmental statute which allows states to regulate activities with the express permission of Congress without turning the issue into a federal question. *See New Mexico on behalf of New Mexico Env't Dep't v. United States Envtl. Prot. Agency*, 310 F. Supp. 3d 1230, 1266 (D.N.M. 2018) ("[W]hen a court considers a state-law claim concerning interstate water pollution that is subject to the [CWA], the court must apply the law of the State in which the point source is located.") (citing *International Paper Co. v. Ouellette*, 479 U.S. 481, 487, 107 S.Ct. 805, 93 L.Ed.2d 883 (1987)). While the Supreme Court held in *Milwaukee II* that the 1972 amendments to the Clean Water Act displaced federal common law, it did not hold that the Clean Water Act completely preempted related state law claims. 451 U.S. at 319 (holding that "the Clean Air Act and the EPA actions it authorizes displace *any federal common-law right* to seek abatement of carbon-dioxide emissions from fossil-fuel fired powerplants") (emphasis added).

Thus, Monsanto fails to offer any authority that either federal common law or a federal environmental statute displaces the State's state law claims. There is no basis for federal removal without "complete preemption" manifested by congressional intent, regardless of the "global" nature of the alleged environmental pollution. In *Bd. of Cty. Commissioners of Boulder Cty. v. Suncor Energy (U.S.A.) Inc.*, the District of Colorado rejected defendant's federal common law argument for removal jurisdiction in the global warming context. 405 F. Supp. 3d 947, 964 (D. Colo. 2019). The court found that "an ordinary preemption defense" did not support removal and

---

[11] In *N.M. v. G.E.,* the Tenth Circuit noted that "only a few federal statutes . . . so pervasively regulate their respective areas that they have complete preemptive force," giving as one example in this rarefied category, the Employee Retirement Income Security Act ("ERISA").

that complete preemption was required. *Caterpillar*, 482 U.S. at 393 ("Unlike ordinary preemption, complete preemption "is so 'extraordinary' that it 'converts an ordinary state law common-law complaint into one stating a federal claim for purposes of the well-pleaded complaint rule.'"); *Geddes v. Am. Airlines, Inc.*, 321 F.3d 1349, 1352-53 (11th Cir. 2003) ("[A] case may not be removed to federal court on the basis of a federal defense, including that of federal preemption").

Thus, without evidence of congressional intent to completely preempt the areas of law related to the fields of environmental public nuisance and negligence, this case lacks the requisite federal question for federal removal, regardless of whether federal common law exists.

## CONCLUSION

In sum, the Court finds and concludes:

(1) Monsanto has failed to satisfy any of the three requirements for federal officer removal under §1442;

(2) Monsanto has not satisfied its burden of showing a basis for federal enclave jurisdiction under §1331 because the State's claims did not arise on a federal enclave;

(3) The environmental interests at issue as alleged in the complaint can be adequately protected by a state law rule of decision; there is no conflict between state laws in this case which would call for the application of federal common law and that any federal common law which may exist does not displace or preempt the claims asserted in the complaint.

One last item is worth mentioning again: this is not the first of Monsanto's unsuccessful efforts to remove similar environmental pollution cases to federal court. In its brief, the State included a list of nine cases where Monsanto's attempts at federal removal were rejected by other federal courts, *see* Doc. 8 at 5, some of which the Court has incorporated into its analysis. In all

of these cases, the courts considered the same arguments for federal officer removal which are presented by Monsanto in this case—and all of those courts rejected those arguments. Yet Monsanto does not mention these cases at all. The Court agrees with the State that Monsanto's silence on these opinions "only confirms its attempted removal under the federal officer doctrine is meritless."[12]

Therefore, the State's Motion to Remand (**Doc. 8**) is hereby **GRANTED** for the reasons stated in this Memorandum Opinion and Order, and the Clerk of the Court is hereby directed to take the necessary action to remand the above captioned case to the First Judicial District Court, County of Santa Fe, State of New Mexico.

**IT IS SO ORDERED.**

_____
CHIEF UNITED STATES DISTRICT JUDGE

---

[12] Monsanto has filed a Motion to Dismiss (Doc. 10) which is pending before the Court but will not be heard in this Court given that the case will be remanded to state court.